# EXHIBIT N

**IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FOR
VINDICTIVE PROSECUTION**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division,

FILED
MAILROOM

AUG - 7 2020

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA ) Criminal No. 1:16-CR-42
      Plaintiff.              )
                              )
                              )
      V.                      )
                              )
                              )
   ARDIT FERIZI               )
      Defendant.              )
                              )

EMERGENCY MOTION FOR SENTENCE REDUCTION
PURSUANT TO 18 U.S.C § 3582(c)(1)(A)

COMES NOW Petitioner, Ardit Ferizi, pro se, respectfully
moves this Honorable Court pursuant to amendments made in
Compassionate Release due to "First Step Act",
"extraordinary and compelling reasons" provision under
18 U.S.C § 3582(c)(1)(A), to grant Petitioner
Compassionate Release and be re-sentenced due to
Covid-19 pandemic, the risk of death he faces if infected
with Covid-19 virus due to his underlying Medical and
Mental health Issues, and other reasons stated in this
Motion. In support of this Motion, Petitioner states as follows:

Page 1 OF 21

# Background

Petitioner was born in December 1, 1995, in Republic of Kosovo. Petitioner is not a U.S. citizen and prior to his current incarceration has never been to the United States before.

Petitioner, 19 years old at the time of arrest, On September 15, 2015 was arrested in Kuala Lumpur, Malaysia by Malaysian Authorities in cooperation with U.S. Government at Kuala Lumpur International Airport and has been detained since, Petitioner was planing to visit his family in the Republic of Kosovo.
Petitioner was a College student in Malaysia, studying Computer Science at that time.

On September 15, 2015, Petitioner was detained by Malaysian Authorities at a secret detention center, there he was subject to inhumane treatment and cruel and unusual punishment, including daily electroshockings, beatings, food and water deprivation, sleep deprivation, threats and daily interrogations by Malaysian Officials.

During Petitioners detainment at Secret Detention Center, the U.S. Government agents, traveled to Malaysia and examined the items seized by Malaysian officials and their interrogatory notes, and as a result of that, the U.S. Government officials brought a Criminal Complaint against Petitioner on October 6, 2015.

Page 2 OF 21

On October 12, 2015, the U.S. Government through Interpol initiated extradition proceedings for Petitioner.

Petitioner was transfered from "secret detention Center" to notorious high Security and death row prison "Sungai Buloh" pending the outcome of the extradition proceedings in Malaysias justice System.

After spending nearly 4 months detained in Malaysia, Petitioner was extradited to the United States and was held at Alexandria Detention Center during court proceedings.

On September 23, 2016 this Court sentenced Petitioner to 180 Months incarceration for Conspiracy Providing Material Support to Designated Foreign Terrorist Organisation and 60 months to be served Consecutively for Obtaining Information from a Protected Computer", and 10 years of Supervised release.

Page    3 of 21

## Petitioners Medical and Mental health issues

Petitioner is a Chronic Care inmate, suffering from Chronic Asthma (see, Bureau of Prisons, Health Problems Summary at "Exhibit A"), Chronic Abdominal Pain (see, Bureau of Prisons, Chronic Pain Management Summary at "Exhibit B"), and Obesity (currently 240 lbs, 5'11" HT), and is being treated with a variety of Medications (see "Exhibit C").

Petitioner is diagnosed and suffers from a variety of Mental health disorders including but not limited to, Schizophrenia, ADHD, Post-Traumatic-Stress Disorder (PTSD), Anxiety Disorders, Mood Dysfunction and other (see Forensic Psychological Evaluation by Clinical & Forensic Psychologist Jeffrey Aaron, Ph.D at "Exhibit E" Dated August 23, 2016.

Petitioner is currently encountering problematic circumstances with the Bureau of Prisons in that he has attempted on numerous occasions to visit Medical and Psychology staff of his suffering from constant abdominal pain which his institution is unable to diagnose and treat, including not providing treatment for his ADHD, PTSD, Anxiety Disorders and other issues — another grave concern about the safety and welfare of Petitioner in the Custody of the Bureau of Prisons during this incarceration. Moreover the Correctional Facility where Petitioner is housed exposes him to grave humidity, allergies, and extreme heat, with no air conditioning which is affecting Petitioner in having Asthma Attacks.

Page 4 OF 21

# Reasons for Granting the Motion

Petitioner is currently incarcerated as a Medium Custody inmate at U.S.P Lewisburg General Population.

Here at U.S.P Lewisburg, staff is not following the guidelines of checking temperature of inmates, social distancing and also many staff members don't follow the guidelines of wearing masks or gloves when dealing with inmates which put the inmates at risk of contracting Covid-19 virus by an outside source.

Petitioner is a so-called "Two-hour-watch" inmate, there are only 2 (two) inmates on "Two-hour-watch" program at U.S.P Lewisburg, (see "Exhibit D", U.S. Department of justice, Federal Bureau of Prisons, Memorandum for Two-hour watch inmate, From J. Konkle / C. Sizemore, Captain).

As part of "two-hour-watch" program, Petitioner is issued a "yellow card" and is required to report to a staff member at least 15 times a day just to comply with "Two-hour-watch" program procedures, and the "yellow card" get touched by staff members at least 7 times everyday, including at Dining facility and Recreational activity, putting me in high risk of contracting the virus.

Page 5 of 21

Petitioner send an "Inmate Request to Staff" to Warden and Captain at U.S.P Lewisburg expressing his concerns in writting (see Exhibit F), Petitioner's request was returned back with no response.

Petitioner send an "Inmate Request to Staff" to Medical Department on july 21, 2020 asking about Covid-19, testing procedures, and that petitioner is not feeling well and would like to be tested, (see Exhibit G, U.S. Department of justice, Inmate Request to Staff dated july 21, 2020), Petitioner never received a response back nor Medical Department following up regarding my complains.

There is concern that the Covid-19 disease could quickly spread among Federal Prisoners and Prison staff because of the nature of the prison environment. Prisons are places where hundreds of prisoners are living and working in close proximity to each other and where they are forced to have regular contact, as in this case Petitioner forced to have contact and must report to Staff every two-hours between 6:00 am and 10:00 PM, not including when moving from one location to another with the "yellow card".

Page 6 of 21

Prisons are generally not conducive to Social distancing. Also, prison infirmaries typically do not have the resources available to most hospitals, such as isolation Beds, that would help prevent the spread of the disease.

There are also concerns that if prison staff were hard hit by Covid-19, a significant number of staff would require quarantine, they would be unavailable to perform their duties, including providing care to sick prisoners; and the disease could spread.

On March 13, 2020, the Bureau of Prisons (BOP) released a "Covid-19 Action Plan."
The "Action Plan" largely focused on restricting access to Federal prisons and limiting the movement of prisoners between prisons.
The so-called "Action Plan" said very little about protecting Federal Prisoners who suffer from Asthma and Obesity or other Chronic ailments. As such, a week later, On March 18, 2020, the American Civil liberties Union (ACLU), sent a letter to the Department of Justice (DOJ) and its BOP seeking the Release of prisoners in the custody of BOP who might be at risk for serious illness or death because of Covid-19.

In addition, Multiple Members of Congress have also urged DOJ and BOP to take steps "to reduce the incarcerated population and guard against potential exposure to Covid-19, and legislations has been introduced that would require the release of some Federal prisoners during National Emergency relating to a Communiable disease.

BOP updated its so-called "Action Plan" on March 19, 2020, to clarify that while prisoner movement is limited under the plan, BOP would still move prisoners as needed to properly manage the prison population, and to outline new conditions that must be met if a prisoner is transferred.

On March 31, 2020, BOP announced that effective April 1, 2020, all prisoners will be placed on a 14 day lockdown in their assigned cells as a measure to prevent the spread of Covid-19. Prisoners were allowed to leave their cells during this period for certain reasons, such as attending programming or to shower and use the phone.

Page 8 of 21

On April 14, 2020 BOP announced that it's "Action Plan" which was initially set to expire on April 12, 2020, would be extended until May 18, 2020.

No further information has been provided by the BOP with respect to any continuing action plan beyond May 18, 2020, and since then inmates have been freely moving in the housing units, participate in recreational activities, attend Chapel and Dining Facility with others, inmates are out of cells daily for almost 14 hours everyday.

While the previously-implemented "Action Plan" could be applauded, the so-called "Action Plan" does very little to vulnerable Federal Inmates with pre-existing health conditions that make the w0refully, susceptible to contracting the Virus. More particularly, being as a "Two-hour-watch" inmate and also the housing units of all BOP facilities share ventilation with "rows" of cells within the housing units, calling into question whether an effective quarantine could be accomplished in the housing units. Therefore an inmate with Covid-19 in cell 101, hypothetically, could pass Covid-19 virus to an inmate in cell 102-132, and 201-232, if not 301-332.

Page 9 OF 21

Additionally, sanitation protocol practiced by the BOP with respect to housing Unit, dining Rooms, Chapel area, Prison corridors and other shared areas further places inmates with pre-existing health conditions at greater risk of contracting the virus.

BOP data indicate that Covid-19 has become widespread in the Federal Prison System.
As of July 26, 2020, BOP reported that thousands of inmates and BOP staff members in 98 prisons had tested positive for Covid-19 and over 100 prisoners have died from the Disease. See U.S. Department of Justice, Bureau of Prisons, Covid-19 Resources, https://www.BOP.GOV/CoronaVirus.

It is speculated that the prisoners who have died from the virus while in BOP custody were vulnerable inmates like petitioner who suffered from Health conditions which minimized their immune system and/or made them more susceptible to fatality from the Virus, including but not limited to Asthma, Anxiety Disorders, Obesity and other.

According to "Vera Institute of Justice", "it is not a matter of if, but when, Covid-19 shows up in Courts, jails, Detention Centers, prisons, and other places where the work of the Criminal System occur.

While prisons may appear to be closed environments, because prisoners cannot leave and return to the facility on their own volition, there are opportunities for the disease to be introduced into any Prison."

Covid-19 Could be introduced by the Prison's staff who could be exposed when they are not at the prison, and subsequently introduce it to the facility when they come to work. Covid-19 could also be transmitted to a prisoner through face-to-face visits with family, friends, or attorneys. Also, while prisoners cannot freely leave the facility, they do travel outside it for things such as court appearances or Medical appointments. The introduction of Covid-19 into a prison raises the concern that the nature of the prison environment can facilitate its spread. Prisons typically hold hundreds of prisoners who live in close proximity to one another.

There are also concerns about hygiene, Prisoners don't have access to Anti-Bacterial soap to wash their hands, and hand sanitizer can be considered "Contraband" because it Contains alcohol. These Concerns are especially acute for Prison Systems that are operating over capacity.

Page 11 of 21

There are also concerns about whether Prisoners will have access to adequate Medical Care if a prison staff is hit hard by the disease. If Covid-19 were to spread among prison staff resulting in widespread quarantines, there could be fewer Medical Staff to deliver care or fewer correctional staff available to transport critically ill prisoners to outside Medical Facilities. Also, prison infirmaries tend to have fewer Medical Resources, such as isolation beds, compared to hospitals.

On June 25, 2020, Petitioner send a Request for Compassionate Release to Federal Bureau of Prisons Director, Michael Carvajal (see, Exhibit H "Copy of letter send via U.S. Mail to FBOP Director Michael Carvajal), and a copy of it to Prison authorities. A receipt of my Reduction-In-Sentence Request was issued on July 6, 2020 (see, "Exhibit I", Receipt of my Request for Reduction-In-Sentence to FBOP Director and Prison Authorities), the request was later denied.

Under 18 U.S.C § 3582(c)(1)(A), as modified by the "First Step Act" (December 21, 2018), a court may reduce a Defendants sentence upon Motion of the Director of Bureau of Prisons ("BOP") or upon Motion of the Defendant. The Court in determining the circumstances must also consider the factors in 18 U.S.C § 3553(a).

## Petitioner's Criminal History

Petitioner is a Medium custody inmate incarcerated at Federal Bureau of Prisons.

Petitioner has no pending detainers and prior to this incarceration has never been incarcerated in any jail, prison, "holding facility", or any type of Detention Center whatsoever in his whole life.

On September 23, 2016, At Sentencing Hearing, U.S. Attorney Brandon Lang Van Grack incorrectly overstated Petitioner's Criminal History, when submitted to the Court ("Government Exhibit 1"), (see, Sentencing Transcripts, Case 1:16-CR-0042-LMB, Page 15 of 34), the "Government Exhibit 1" was very decieving and was done and presented at heist, half of the document was translated in English language and the other half was left in the original Albanian language.

"Document" was filed under seal, and is currently under seal, it's a Document from Kosovo Police and lists different incidents that Kosovo Police thought i am suspected of and not been convicted of.

Page 13 OF 21

As Court is aware from my prior letters to Court, only once, Kosovo Police they proceeded to court for 1 count charge, it was equivalent to Misdemeanor and Petitioner plead guilty and was given alternative sentencing rather Detention since it was petty offense.

The status of the "incidents" was not translated in English but was left in Albanian language "i dyshuar" which if translated to English by any Certified translator, simply means "Suspected".

At Sentencing Hearing, U.S. Attorney Brandon Long Van Grack, incorrectly and misleadingly stated after presenting "Government Exhibit 1" that "this is not someone who just In a single instance hacked a Government database and was in trouble. This is someone who, over multiple years, was engaged in Multiple actions, including criminal activity more than just hacking into a Government Database", and that Petitioner allegedly has already "re-offended over and over and over again" (see, Sentencing Transcripts, 09:30:57 — 09:33:00).

Page 14 OF 21

The Court in determining appropriate sentence and the 3553(a) factors, was being based on the "Government Exhibit 1" and stated "The point is he would have been 15 years old at the time" refering to incidents listed in "Government Exhibit 1" (see Sentencing Transcripts, 09:32:53), and also stated to Petitioner "You've been able to hack into Government databases at least since the age of 15" (see, Sentencing Transcripts, 09:45:30-38") and also Court stated "And you had the opportunity when you had those first rounds of issues with the COURTS in Kosovo to have this issue addressed" (see, Sentencing Transcripts, 09:45:52-58).


And finally, when imposing sentence, Court stated "Because of the need, among other things, for general deterrence, the need to make sure this Defendant is deterred from such future conduct, given his track record going back five or six years with hacking" and imposed a 240 months sentence (see, Sentencing Transcript, 09:48:27 — 09:48:40). This was all being based on the "Government Exhibit 1" which was partly translated, very deceiving and presented at heist, at Sentencing.


Page 15 OF 21

Those "incidents" Petitioner was suspected of never proceeded to Court, since they were baseless, and is not uncommon for people to be suspected of incidents, and as Courts know, in every investigation there may be many suspects and the person is not guilty until get found guilty by judicial System.

Petitioners "hacker identity" led to Government of Kosovo making him and others suspects of "incidents" when they were no able to find the real actors who committed the crimes.

Petitioner traveled internationally and was student in Malaysia, travelling with Republic of Kosovo issued passport and publicly in Social Media explaining his student life in Malaysia, the Kosovo Police never initiated "extradition proceedings" or request for "Deportation" of their own citizen back to Republic of Kosovo nor did they ever issue "Red or Blue Notice" through Interpol or block me from travelling from Kosovo's Main International Airport to Kuala Lumpur, Malaysia with Republic of Kosovo issued passports.

Page 16 of 21

Petitioner has no Criminal History whatsoever, even the equivalent Misdemeanor conviction was expunged since it was a petty offense, (see, Certified Translation from the Albanian language of Republic of Kosovo, Basic Court Gjakove, Criminal History of Petitioners, Ardit Ferizi, Certified by Kosovo Judicial Council and Ministry of Foreign Affairs of Republic of Kosovo in Prishtina - Kosovo, at Exhibit j" attached with this Motion) which this official Document, fully translated, clearly shows that Petitioner has no criminal history nor any criminal proceeding are being initiated against him.

The original document in Albanian language is also attached to this Motion and is marked as Exhibit K".

Page 17 OF 21

## Petitioner's likelyhood of Re-offending

Petitioner now has been incarcerated for almost 5 years, starting in Malaysia, on September 15, 2015, and until now.

During Petitioners incarceration, Petitioner spend almost 3 years on "high-Max" at the "Communication Mangement Unit" (CMU), a unit separate from General Prison Population at FCC Terre Haute, Indiana, that houses inmates convicted of Terrorism, National Security cases or otherwise the inmate requires a higher monitoring.

The CMU also serves as a "Step-Down" for some Inmates released from "ADX-MAX" located in Florence, Colorado, who require higher monitoring of their communications and behavior. CMU is controlled and managed by CTU (Counter-Terrorism Unit).

Petitioner got cleared by Counter-Terrorism Unit at CMU and deemed not to be a threat to safety of Americans nor Government Employees at the General Prison population, nor require higher monitoring, and is categorised as having "low risk of recidivism" if released from prison in his BOP, CTU, "PATTERN SCORE" (see Exhibit "O", U.S. Department of justice, Inmate-Staff Communications, PATTERN SCORE, Signed by R. Smith, Case Manager at Federal Bureau of Prisons) and transfered to FCI Cstll, S.C.

During Petitioners incarceration, Petitioner enrolled and
completed numerous Educational Courses and other Programming
(see "Exhibit L" Department of Justice,
Federal Bureau of Prison, Re-Entry Plan for Ardit Ferizi),
and also pursued in Cooperation with Psychology Department
numerous Psychology Programming Services and sucessfully
completed much of it (see, "Exhibit N", Department of justice,
Psychology Services, General Administrative note issued by
Psychologist Jennifer Enigk to support this Motion).

On April 15, 2020 a powerful tornado damaged
FCI Estill prison in South Carolina, and all inmates, including me
were transfered on an Emergency transfer to U.S. Penitentiary
Lewisburg since there was no other empty prison available to
house almost 1000 inmates at one time.

Petitioner has a projected release date in 2032,
and pursuant to "First Step Act" of 2018, is also eligible
to apply for "Two-Thirds" release on February 9, 2029,
(see, Exhibit M", U.S. Department of Justice,
Federal Bureau of Prisons, Sentence Monitoring,
Computation Data for inmate Ardit Ferizi).

Page 19 of 21

# Petitioners Release Plan

Petitioner has substantial Family support readily available in the event he is released.

Names, Addresses and Contact Information for Petitioner support team are available upon request.

Petitioner has a wonderful option for residency,
Petitioner has been invited to reside with his family at Mihail Gramero, Gjakove, Kosovo, 50000,
At the same house he grew up at and before leaving for his student life in Malaysia.

Petitioner Family does not have a Criminal Record and are legitimately employed.

Pursuant to Judicial Removal order issued by this Court on june, 15, 2016, Petitioner will be expeditely removed from the United States and be Deported back to Republic of Kosovo, and no Immigration Delays/ hearings are required, (see, "Exhibit L", 1 OF 3, U.S. Department of justice, Bureau of Prisons, Re-Entry Plan Ardit Ferizi')
IHP-NO HEARING REQUIRED.

Date 7-28-2020

Respectfully Submitted,
Ardit Ferizi #89453-083
USP Lewisburg
Po Box 1000
Lewisburg, PA, 17837

# CERTIFICATE OF SERVICE

I hereby certify that on july 28, 2020, i will
put this Mail in Prison MailBox to be send via
U.S. Mail to Clerk of Court, which will then send
a notification of such filing (NEF) to the
U.S. Attorney office.

Ardit Ferizi #89453-083
USP Lewisburg
Po Box 1000
Lewisburg, PA, 17837

Page 21 OF 21