# EXHIBIT Q

**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE PROSECUTION**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | 1:16-CR-42 (LMB) |
| ARDIT FERIZI, ) | |
| ) | |
| Defendant. ) | |

## United States' Response in Opposition to
## Defendant's Renewed Motion for Compassionate Release

The United States, by and through its undersigned counsel, respectfully requests that the defendant's renewed motion for compassionate release be denied. As the government acknowledged in its prior filings, Ferizi is at elevated risk of contracting COVID-19, and as such has established "extraordinary and compelling circumstances" to justify release for purposes of 18 U.S.C. § 3582. He has exhausted his administrative remedies and this motion is now properly before the Court. However, though his renewed motion addresses several procedural concerns raised by the Court in the most recent telephonic hearing, his new request fails to address the § 3553(a) factors that provide the most critical reasons why his motion should fail. Ferizi is a convicted terrorist hacker who seeks to be released to a foreign country, outside the reach of the United States. Despite the updates provided in his new motion, the seriousness of his offense and the danger he poses to the community make him an inappropriate candidate for compassionate release.

The defendant's renewed motion describes four key updates since his last filing. First, it describes the ongoing COVID-19 outbreak at FCI Gilmer, where Ferizi is currently located. Second, it states that there is no bar to the defendant's repatriation in Kosovo, should he be released and deported. Third, it provides a somewhat speculative update regarding the COVID

status of ICE detention facilities and the amount of time the defendant would be likely to spend there. Fourth, it confirms that, were the defendant to appear on the no-fly list, it would not prevent ICE from deporting him to Kosovo via air travel.

The government agrees with the factual background of three of these four points, if not, perhaps, the conclusions the defendant draws from them. There is an ongoing COVID outbreak at FCI Gilmer—though the safety procedures, described in the government's original response, used by BOP to control such outbreaks are still in place and have continued to be successful at controlling transmission at many other facilities across the country. It likewise does appear to be the case that Ferizi would be able to return to Kosovo if and when he is deported from the United States. And finally, the United States has confirmed with FBI and ICE that, regardless of the defendant's no-fly status, he would be able to board a deportation flight.[1]

The final factual assertion in the defendant's renewed motion—the defendant's contention regarding the relative safety of ICE detention—merits more discussion. As he concedes in his motion, all discussion of the relative safety of ICE detention in comparison to BOP custody must necessarily be speculative to some extent because it involves predictions about the future. At the time of this motion, the COVID-19 rates at FCI Gilmer are indeed higher than the rates at the two ICE detention centers at which the defendant would most likely be held. But, given the nature of the spread of COVID-19, this could change at any time. Both BOP and ICE facilities are taking very similar hygiene and social-distancing precautions to prevent the spread of COVID-19. An outbreak at FCI Gilmer could be brought under control,

---

[1] The defendant mistakenly states in his pleading that he would be able to fly internationally because deportation flights are not commercial flights. In fact, many deportations do take place on commercial flights. A deportee's no-fly status, however, can be temporarily waived for a deportation flight, whether commercial or chartered.

2

and a new outbreak occur at the ICE detention center. Likewise, the defendant's contention that most ICE detainees usually spend two months or less in administrative custody is based on 2019 data that may (or may not) have changed in light of procedures ICE has put in place to respond to the COVID-19 pandemic.

In the aggregate, the defendant's new arguments change very little about the framework for evaluating his compassionate release motion. Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). In addition, 18 U.S.C. § 3582(c)(1)(A) directs the Court to consider the statutory sentencing factors when adjudicating a compassionate release motion. Both of these directives counsel against compassionate release in the defendant's case.

Without belaboring the points already made in the government's initial response, the defendant's crime was extremely serious, and caused real harm to innocent victims who lived in fear of an ISIL or ISIL-inspired attack striking them in their own homes. The defendant's dismissive attitude towards the seriousness of his offense, which runs throughout his filings, is deeply concerning. The defendant's most recent motion, for example, minimizes the defendant's crime of terrorism—for which this Court sentenced him to 20 years' incarceration—as "sharing information he obtained from hacking into a retail database with someone who then posted the information in a threatening message." Dkt. 101. Of course, Ferizi did not simply pass on some incidentally-hacked personal information to a stranger. Rather, he took the information he stole and filtered it to identify United States government and military personnel precisely so that ISIL could specifically target them for attacks. True, Ferizi did not personally post the call to murder U.S. government personal. But he sent the information to ISIL with the explicit knowledge and

3

intent that that was what ISIL intended to do with it—that ISIL wanted the filtered information in order to post a "hitlist" of U.S. government personnel to target for terrorist murders.

If the defendant were to be released to a foreign jurisdiction, there would be no way for this Court to monitor his behavior, or to ensure the safety of the community should he reoffend. Deportation would prevent the Court from, for example, modifying the terms of the defendant's supervised release to include a period of home confinement, supervised by the U.S Probation office, with technological monitoring of the defendant's online activities. As the government acknowledged in its previous filing, while the offer of the defendant's mother to provide a home, work, and educational opportunities for the defendant should he be returned to Kosovo ought to factor into the Court's analysis, the defendant is an adult fully capable of leaving his parents' home at any time. What the defendant is proposing is not a release to home confinement, with Mrs. Ferizi acting as a third-party custodian to ensure that the defendant adheres to his conditions of release. Rather, the defendant is requesting an early release with no conditions whatsoever.

One additional point merits further discussion. Both at oral argument and at several points in his filings, the defendant appears to be under the misapprehension that, as he claimed in his Reply (Dkt. 95), "the United States government can request that Kosovo's authorities supervise Mr. Ferizi when he is returned to Kosovo." Unfortunately, this is incorrect. There is no treaty basis, or, to the knowledge of the DOJ Office of International Affairs officials who liaise directly with the Kosovo judicial authorities, any precedent for such a request. The United States has no Mutual Legal Assistance Treaty with Kosovo, which means that even simple requests to share evidence (such as the request to interview the defendant made by Kosovo early in this case) are entirely at the discretion of the respective governments. Accordingly, the undersigned is not aware of any method by which this Court could order or require a foreign

4

sovereign to superintend what would be, in effect, long-distance supervised release.

Furthermore, though the defendant contends that, were he to violate his conditions of release, he could be extradited back to the United States pursuant to this country's extradition treaty with Kosovo, this, too, is incorrect. While the United States does have an extradition treaty with Kosovo, that treaty, by its terms, limits extradition to a defendant facing new charges, or a defendant being brought to serve a sentence based on a conviction.[2] According to the Office of International Affairs, there is no treaty basis to request extradition for a supervised release violation or similar infraction. If the defendant were to commit a new crime (as opposed to violating release terms), and if the United States were able to ascertain that he had done so, the government would still need to collect sufficient evidence to charge him from half a world away, and then go through the demanding process of litigating the extradition in Kosovo courts. This Court is well aware of the difficulty of obtaining evidence from overseas, and of the tremendous hurdles the government must often surmount, even with an extradition treaty in place, in order to bring a defendant from overseas to face justice in an American court. Extradition is neither a straightforward nor a simple process.

All of these developments, then, leave the Court in largely the same position as after the prior hearing. While there is now confirmation that certain procedural hurdles to deportation can be surmounted, the § 3553(a) factors—including the seriousness of the defendant's offense, the relatively small percentage of his sentence the defendant has so far served, and the inability of the Court to ensure the safety of the community were he to reoffend—all counsel against compassionate release. The Court should therefore deny the defendant's renewed motion.

---

[2] Extradition Treaty with the Republic of Kosovo, U.S.-Kosovo, art. 2. March 29, 2016. A copy of the treaty is available at https://www.state.gov/wp-content/uploads/2019/06/19-613-Kosovo-Extradition.pdf.

5

Finally, if this Court were to disagree with the government's position above, any order that this Court issues that grants a defendant compassionate release should require the defendant to undergo a 14-day quarantine that BOP controls before any release into the custody of any other government agency, including ICE.

**Conclusion**

For the foregoing reasons, as well as those articulated in the government's response in opposition to the defendant's first motion for compassionate relief, the Court should deny the defendant's renewed motion.

                                  Respectfully submitted,

                                  G. Zachary Terwilliger
                                  United States Attorney

                                  /s/

                                  Danya E. Atiyeh
                                  Assistant United States Attorney
                                  United States Attorney's Office
                                  2100 Jamieson Avenue
                                  Alexandria, VA 22314
                                  Office:  (703) 299-3700
                                  Fax:     (703) 299-3980
                                  Email:  danya.atiyeh@usdoj.gov

Case 1:21-cr-00402-MBH ... Document 103 Filed 11/24/20 Page 7 of 7 PageID# 926

**Certificate of Service**

I certify that on November 24, 2020, I filed electronically the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record.

By:       /s/
Danya E. Atiyeh
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office: (703) 299-3700
Fax: (703) 299-3980
Email: danya.atiyeh@usdoj.gov