# EXHIBIT U

**IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS FOR
VINDICTIVE PROSECUTION**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
| ) | |
| Appellant,     ) | |
| ) | |
| v.     ) | No. 20-7830 |
| ) | |
| ARDIT FERIZI,     ) | |
| ) | |
| Defendant-Appellee.     ) | |

**United States' Motion to Stay Release**

Ardit Ferizi, a Kosovo citizen, computer hacker, and sympathizer of the Islamic State of Iraq and al-Sham (ISIS), was convicted in 2016 of providing material support to ISIS and unauthorized computer access. Ferizi breached the servers of a U.S. company, stole personal identifying information of over 100,000 of its customers, and used that information to locate U.S. military and government personnel. He identified approximately 1,300 such individuals and sent the information to a high-profile ISIS member in Syria, intending for ISIS to "hit them hard." The ISIS member published a "kill list" with these names and added the following message: "the soldiers of the khilafah, who soon with the permission of Allah will strike at your necks in your own lands!"

In sentencing Ferizi to 240 months' imprisonment in 2016, the district court highlighted how the victims were affected by having their names appear on a terrorist

1

kill list posted on the internet. But on December 3, 2020, five years into a 20-year sentence, the district court granted Ferizi compassionate release and ordered that he be released in 14 days and promptly deported to Kosovo. In granting such relief, the district court abused its discretion. BOP intends to release Ferizi on December 21. The government now moves to stay his release.

**Procedural History**

### A.      Ferizi's offense conduct.

ISIS is a designated Foreign Terrorist Organization. On September 21, 2014, ISIS' spokesperson, Abu Muhammad al-Adnani, openly called for attacks against citizens and military employees of countries participating in the U.S.-led coalition against ISIS. (PSR¶9; Ex.D at 2) On March 20, 2015, ISIS member Junaid Hussain, acting under the banner of "the Islamic State Hacking Division," posted online a "kill list" that included 100 names and addresses of U.S. military personnel. (PSR¶9) Hussain was a Syria-based ISIS member actively engaged in supporting the group's efforts to conduct terrorist attacks against U.S. military members and government personnel. (Ex.D at 4)

About one month later, Ferizi, then-residing in Malaysia and using the Twitter moniker "@Th3Dir3ctorY," began communicating with an ISIS member known as Tariq Hamayun. (PSR¶1; Ex.D at 3) Hamayun used the Twitter moniker "@Muslim_Sniper_D." (PSR¶11) On April 26-27, 2015, Ferizi and Hamayun communicated through Twitter. (Ex.A at 10; Ex.D at 3; PSR¶11). At one point,

2

Ferizi told Hamayun that he had "4 million data of kuffar[1] countrys which attacking islamic state."[2] (Ex.F at 7) Ultimately, Ferizi provided Hamayun with screenshots of credit card information belonging to 68 individuals. (PSR¶11; Ex.D at 3) Later, Hamayun commented on this information, "MashAllah [what God has willed] brother I check some of this info its really good[,]" and added, "Can do some damage inshallah[.]" (Ex.F at 7) Ferizi asked Hamayun to confirm his identity as "Abu Al-Britani," whom he knew to be an ISIS member. (Ex.A at 10; PSR¶11) Hamayun confirmed his identity and association with Junaid Hussain, claiming that Hussain "told me a lot about u." (Ex.A at 10-11; PSR¶11). Hamayun also implored Ferizi to "come and join us in the Islamic state." "InshAllah," or God-willing, Ferizi responded.  (Ex.F at 7)

Beginning in June 2015, Ferizi unlawfully accessed a U.S. company's server. (PSR¶12; Ex.D at 3) Ferizi obtained administrator-level access and spent the next two months extracting the personal identifying information (PII) of over 100,000 customers. (PSR¶13; Ex.D at 3). Ferizi specifically searched for email addresses ending in ".gov" or ".mil." and culled the PII of approximately 1,300 U.S military and government personnel. (PSR¶13; Ex.D at 3)

Ferizi provided the information to ISIS "with the understanding that ISI[S] would use the PII to hit them hard." (Ex.D at 4) Ferizi did this by contacting Junaid

---

[1] *Kuffar* is a derogatory name for non-Muslims.
[2] All errors are in the original quotations.

Hussain, whom he knew was a member of ISIS actively engaged in supporting the group. (Ex.D at 3-4) At one point, Hussain told Ferizi: "we will make like a message inshAllah […] like u know the hit list I made […] we will make message to kuffar and release the .mil and .gov[.]" (Ex.F at 10-11) Soon after, Hussain stated "Allahu Akbar [...] Akhi this will hit them hard[.]" (*Id.* at 11) Ferizi immediately responded "yes brother inshalllah[.]" *Id.*

On August 11, 2015, Hussain, acting in the name of "the Islamic State Hacking Division," issued a public message over Twitter with the heading: "NEW: U.S. Military AND government HACKED by the Islamic State Hacking Division!" (PSR¶17) The message contained a link to a 30-page document containing the names, e-mail addresses, passwords, locations, and telephone numbers of the 1,300 U.S. military members and government personnel Ferizi had unlawfully obtained. (Ex.A at 12; Ex.D at 4; PSR¶17) The document, addressed to the "Crusaders" conducting "bombing campaign[s] against the muslims," stated as follows:

> we are in your emails and computer systems, watching and recording your every move, we have your names and addresses, we are in your emails and social media accounts, we are extracting confidential data and passing on your personal information to the soldiers of the khilafah, who soon with the permission of Allah will strike at your necks in your own lands!

(Ex.D at 4-5) About two weeks later, Hussain was killed in an airstrike in Syria. (Ex.A at 8)

4

On October 6, 2015, Ferizi was charged by criminal complaint in the Eastern District of Virginia. Malaysian authorities arrested him on October 12, 2015, and extradited him to the U.S. on January 22, 2016.

**B.    Ferizi's prosecution.**

On February 16, 2016, Ferizi was charged in a four-count indictment with: conspiring to provide and providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Counts One and Two); unauthorized computer access, in violation of 18 U.S.C. § 1030(a)(2)(c) (Count Three); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(2).

On June 15, 2016, Ferizi pled guilty to Counts Two and Three. At sentencing on September 23, 2016, after Ferizi's brief, four-line allocution, the district court asked him if he had "any true understanding of what [he] actually did[.]" (Ex.G at 25) Ferizi claimed he did, and the court responded "I'm still not sure. Why did you do it?" *Id*. Ferizi responded, "it was something -- happened very fast." *Id*. The district court disagreed: "It didn't happen that fast. You're communicating back and forth over a period of time, aren't you?" *Id*. The court added, "this was a case where it wasn't a one time incident. You had plenty of time to think about what was going on." *Id*. In rendering its sentence, the court explained that youthfulness "can't excuse this kind of conduct." (*Id*. at 26) The court then stressed the effect of Ferizi's crimes on his victims:

5

> I think the Government's representations about the impact that this kind of conduct had on 1300, absolutely innocent, victims cannot be ignored by the Court. It's also extremely important to send messages to other young people like yourself who has skills with computers that playing around with computers is not a game. […] And so what you did was extremely serious. And the Court feels that the sentence has to reflect that.

*Id.*

The district court also rejected Ferizi's attempt to minimize the harm that his 1,300 victims suffered: "just having your name on a list knowing that you've been identified to a terrorist group, in my view, is sufficiently terrorizing for those people on the list. And their letters certainly attest to that fact." (*Id.* at 27) Continuing, the court added that one victim "who has a very unique name, in particular, mentions that maybe the only name in that particular area would make it very easy to find that person. And the fact that they are basically on a hit list making them basically targets is very, very serious." (Ex.G at 27)

The district court imposed a 240-month sentence, comprised of 180 months for the material support conviction and 60 months for the hacking conviction, and in doing so, noted Ferizi's years-long involvement in hacking:

> Because of the need, among other things, for general deterrence, the need to make sure this defendant is deterred from such future conduct, given his track record going back five or six years with hacking, the Court is satisfied that a total sentence of 240 months is sufficient but not greater than necessary to achieve the purposes of Section 3553(a).

(*Id.* at 27-28) The court also imposed a 10-year term of supervised release.

### C.    Ferizi moves to amend his sentence.

At sentencing, the government mentioned that a certain Haris Qamar was arrested in Virginia after driving by the home of two individuals whose names and addresses were on the kill list Junaid Hussain posted in March of 2015. (*Id.* at 12) Three days after sentencing, Ferizi moved to amend his sentence, arguing that the government's representation improperly suggested that he was the source of the information in Junaid Hussain's March of 2015 "kill list." (*See* Ex.H) The government rejected Ferizi's characterization of its sentencing statement and stressed that it referenced Qamar "to show that persons in the United States actually read and follow ISI[S] kill lists; that these lists are more than just bits and bytes posted on the internet." (Ex.I at 7)

At the hearing on the motion, the court re-explained its sentencing decision by summarizing several letters it had reviewed describing the harm suffered by Ferizi's victims, and cited again a letter from a victim with a unique name:

> I think we had talked about the fact that people with unique names, not like Smith or Brown, where there are just, you know, millions in society, but with a unique name that would make them almost the only person in society, that they are very vulnerable to being easily identified when they're on such a list, and this individual, … said, among other things, "I am the only one" -- and this is a quote: "I am the only one with my last name in the country I live in, and it is not difficult at all to find me. There is nothing anyone can do to prevent something happening to me, or worse, to my family, since I would never be able to see or identify anyone. Already, I have had a suspicious visit to my house that I had to report to the [redacted] security, who in turn informed the [redacted] police. These people came to my house and knew my name."

(*Id*. at 2-4) Rejecting Ferizi's motion, the court explained that this sort of harm drove its original sentencing decision:

> Now, that is an example … that underscores my conclusion that this kind of conduct is extraordinarily serious and that it does expose innocent people, especially innocent people who are working for the U.S. government or serving in the military, to even if not threats, the fear of threats. It puts people in a, in a position where they are worried, and therefore, it's a very serious crime, and that was the basis upon which this Court felt that a 20-year sentence was appropriate[.]

*Id*. at 4.

### D.    Ferizi moves for compassionate release.

On August 7, 2020, while at USP Lewisburg, Ferizi filed a *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The district court appointed counsel who argued that Ferizi's asthma and obesity were factors placing him at a higher risk of suffering complications from COVID-19 and justifying his release to Kosovo. (*See* Ex.K at 1). The government opposed the motion due to the seriousness of Ferizi's offense; the government's (and the court's) inability to supervise Ferizi in a foreign country; the risk of Ferizi recidivating; and the danger Ferizi's release posed to the community. (*See* Ex.L).

At a hearing on October 6, 2020, the court denied Ferizi's motion because of logistical obstacles to Ferizi traveling to Kosovo and the government's inability to ensure the safety of the community once Ferizi left the U.S. (Ex.O at 3; Ex.M)

On November 11, 2020, Ferizi, now residing at FCI Gilmer, filed a second motion for compassionate release, arguing that FCI Gilmer was experiencing an outbreak of COVID-19. (Ex.N at 1-3) Ferizi also represented that he had resolved the practical obstacles to returning to Kosovo. (*Id*. at 5) The government stressed that the changed circumstances did not alter the seriousness of Ferizi's offense or the government's inability to supervise a computer hacker in Kosovo. (*See* Ex.P)

On December 3, 2020, the district court granted Ferizi's motion and reduced his sentence to time served, concluding that Ferizi was particularly susceptible to COVID-19 and had shown a likelihood of contracting the disease in prison. (Ex.O at 3-5)

The court recognized that Ferizi committed a "serious offense" and that "his actions were harmful to the individuals whose names appeared on the list posted by ISI[S]." (*Id*. at 6-7) "Nevertheless," the court concluded, "even defendants who have committed very serious offenses can be appropriately released from custody or supervision where there is no indication that defendant poses a risk to the public, and reducing defendant's sentence to time served will not diminish the seriousness of his offense or respect for the law." (*Id*. at 7) (cleaned up) As the court stated, Ferizi's "offense did not involve violence, and none of the individuals whose information he gave to ISI[S] suffered physical harm." *Id*. The court announced that Ferizi had reformed:

> Defendant has explained that he "totally and completely oppose[s] ISI[S] and all that it stands for," and that immaturity rather than ideology was the primary motivator of his conduct: "When I gave the information, I was mostly focused on trying to show off my hacking skills to people I had met online. I deeply regret my actions and I accept the consequences of what I have done."

*Id*. The court rejected the government's concerns about recidivism and its inability to supervise Ferizi in a foreign country. Calling the government's position "somewhat alarmist," the court stated that the government had expeditiously identified and apprehended Ferizi in 2015, and Kosovo had cooperated throughout the investigation. (*Id*. at 8)

The court then reduced Ferizi's sentence to time served and ordered him placed in a 14-day quarantine, followed by his release to Immigration and Customs Enforcement (ICE) for deportation to Kosovo. (*Id*. at 8-9)

The government sought a stay on December 14. (ECF No. 107) The court has yet to rule though.

## Argument

The four factors for assessing a stay include: (1) whether the stay applicant has made a strong showing of likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). These factors weigh in favor of a stay.

## A.    Likelihood of Success on the Merits

*Hilton* explained that a stay is appropriate if the government "has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits," provided that "the second and fourth factors in the traditional stay analysis militate against release." 481 U.S. at 778. The government has demonstrated a likelihood of success on appeal, or at the very least, a substantial case on the merits.

Under § 3582(c)(1)(A), a court may reduce a defendant's sentence only after considering the factors in 18 U.S.C. § 3553(a). In releasing Ferizi, the district court abused its discretion by improperly downplaying the seriousness of his offense and the public safety concerns.

As to the seriousness of the offense, the court's conclusions in releasing Ferizi conflict with both the record and the court's prior findings. Although the district court paid lip service to the serious nature of the defendant's offenses, (Ex.O at 6-7), it failed to adequately consider this factor in releasing Ferizi. The court contended that (1) Ferizi's offense of providing information used to generate a kill list for ISIS did not involve violence and did not result in the victims suffering physical harm; and (2) Ferizi rightly claims that he is completely opposed to ISIS and was "mostly" focused on showing off his hacking skills when he committed the offense. (Ex.O at 7) Neither of these justifications withstand scrutiny.

### i.    Ferizi supported ISIS and was not just "showing off."

Ferizi's statement on which the district court relied ("I was mostly focused on trying to show off my hacking skills") was made in 2016, prior to sentencing. If the court considered his claim trustworthy, it would have credited it at sentencing. Clearly, it did not, as its sentence amply confirms: 15 years on the material support conviction (five years shy of the statutory maximum), and 5 years on the hacking conviction (the statutory maximum). Moreover, the court rejected Ferizi's attempted minimization at the original sentencing. For example, when Ferizi suggested his involvement in the crime began when he met a girl online who supported ISIS, the court responded with "Well, this was a case where it wasn't a one-time incident. You had plenty of time to think about what was going on." (Ex.G at 25-26) Yet four years later, Ferizi's excuse has taken on a new life, with the court crediting what it previously rejected.

Ferizi's statement is also at odds with the record. To begin, Ferizi agreed that his actions "were done willfully and knowingly and with the specific intent to violate the law, and were not committed by mistake, accident, or *other innocent reason*." (Ex.D at 5) (emphasis added). Ferizi's post hoc excuse is therefore flatly contradicted by his own guilty plea and the court was not permitted to give it *any* weight. *United States v. Curry*, 461 F.3d 452, 460–61 (4th Cir. 2006) (district court erred in basing sentence on conclusion that conflicted with weight of evidence and

verdict); *see also United States v. Mumuni Saleh*, 946 F.3d 97, 108–11 (2d Cir. 2019).

The record also demonstrates that Ferizi embraced ISIS and did not act from "immaturity rather than ideology." (Ex.O at 7) *First*, Ferizi agreed that "[d]uring this entire period of the [charged conduct], [he] knew ISIS had engaged in and was engaging in terrorist activity and terrorism." (Ex.D at 3) *Second*, Ferizi administered a website that hosted ISIS videos. (Ex.F at 2) *Third*, Ferizi referred to the countries involved in the coalition against ISIS as "kuffar countries." (*Id*. at 7) *Fourth*, Ferizi sent Hamayun an initial batch of 68 persons' credit card information roughly one week after Hamayun posted on Twitter comments concerning ISIS and improvised explosive devices. *E.g.*, Ex.A at 10 ("IEDs is my favorite weapon after Sniping, u hit the enemy &amp; disappear in thin air like a Ghost. Its a Must."). *Fifth*, Ferizi specifically asked Hamayun to confirm his identity as "Abu Al-Britani," whom he knew to be a member of ISIS. (*Id*. at 10; PSR¶11) *Sixth*, Ferizi provided Junaid Hussain with the PII of 1,300 U.S. citizens "with the understanding that ISI[S] would use the PII to hit them hard." Ex.D at 4. *Seventh*, Ferizi knew Hussain intended to create a "kill list" with the PII. (Ex.F at 10-11) And finally, in internet chats with other individuals, Ferizi defended ISIS' release of hit lists containing U.S. service members' information ("cos they was the people who killed people in iraq and syria [...] if someone kill your family and run would u not find him and kill him?"), and

the group's publicized beheadings of civilians ("ill tell u they never kill someone without reasons believe me i guarantee u[.]" (*Id*. at 7)

Ferizi was committed to ISIS' cause, and cannot show he did not truly mean the consequences of his actions or was just "showing off." Ferizi's excuse rang hollow in 2016, and the district court erred in crediting it in 2020. *United States v. Smith*, 451 F.3d 209, 222 (4th Cir. 2006) (court abuses its discretion if it bases its decision on "a clearly erroneous assessment of the evidence").

At bottom, the district court erred in whitewashing Ferizi's offense conduct. Its conclusions as to the seriousness of the offense are at odds with Ferizi's guilty plea, the facts in the record, and the court's own prior findings and conclusions. The court's "sanitized accounts are impossible to square with the undisputed offense conduct and the objective seriousness and violent nature of the crimes to which [the defendant] pled guilty." *United States v. Daoud,* 980 F.3d 581, 592 (7th Cir. 2020); *see also id*. ("These are not the actions of an immature and impressionable youth trying to impress his friends.").

### ii.    As the court previously found, Ferizi seriously harmed his victims.

The district court's conclusion that Ferizi's offense did not involve violence, and that none of the individuals whose information he gave to ISIS suffered physical harm, (Ex.O at 7), improperly minimized the seriousness of his offense and conflicts with the court's prior findings.

14

At sentencing, the court accepted the PSR's recommendation of a two-level increase under U.S.S.G. § 2M5.3(b)(1)(E) for the provision of material support with the intent, knowledge, or reason to believe it would be used to commit or assist in the commission of a violent act. (PSR¶30; PSR p.18-19 (Addendum); Ex.G at 26) To merit this enhancement, the court must have concluded that Ferizi knew "or had reason to believe that [his] support would be used to assist in acts of violence by [ISIS]." *United States v. Dhirane*, 896 F.3d 295, 304 (4th Cir. 2018). That required finding conflicts with the district court's more recent, sanitized conclusion that Ferizi's offense did not "involve" violence.

To be sure, although Ferizi did not literally commit an act of violence, that is a distinction without a difference in this case. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 35 (2010) (§ 2339B "criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur."); *United States v. Abu Ali*, 528 F.3d 210, 265 (4th Cir. 2008) ("[W]hile Abu Ali may not have planted any bombs, shot any weapons, … the steps he did take were significant. Indeed, he joined the al-Faq'asi terrorist cell in Saudi Arabia with the hopes of facilitating terrorist attacks in the United States."); *United States v. Farhane*, 634 F.3d 127, 148 (2d Cir. 2011). As Ferizi himself admitted, he provided the PII to ISIS "with the understanding that ISI[S] would use the PII to hit them hard." (Ex.D at 4)

The district court also abused its discretion in minimizing the harm suffered by Ferizi's victims. At sentencing, the court was unequivocal on the issue of harm:

"just having your name on a list knowing that you've been identified to a terrorist group, . . . is sufficiently terrorizing for those people on the list."  (Ex.G at 27; *see also id.* at 26 ("the impact that this kind of conduct had on 1300, absolutely innocent, victims cannot be ignored by the Court.")).  The court also referenced the victim impact letters attesting to this fact. *Id*. The court made reference to one victim with a unique name, commenting that "the fact that they are basically on a hit list making them basically targets is very, very serious." *Id*. Another victim summed up his fears as follows: "I have to live constantly under the threat that someone might actually arrive at my residence and harm me or my family members.") (Ex.E at 14) And, as the example of Haris Qamar shows, the notion that individuals inclined to the jihadist ideology would be moved by ISIS' kill lists was hardly speculative. Indeed, the court recognized as much at the post-sentencing hearing, stating that Ferizi's "conduct is extraordinarily serious" and that it "expose[s] innocent people, especially innocent people who are working for the U.S. government or serving in the military, to even if not threats, the fear of threats." (Ex.J at 4; *see also id*. ("having your name on a kill list "puts people in a, in a position where they are worried, and therefore, it's a very serious crime[.]")).

Yet in granting Ferizi compassionate release, the district court treated physical harm as the only truly serious form of harm. Such a conclusion conflicts with the district court's prior treatment of the issue and unduly minimizes the seriousness of the offense and the harm caused to Ferizi's many victims. *See United States v.*

*Jackson*, 862 F.3d 365, 397 (3d Cir. 2017) ("District Court committed reversible error by downplaying the severity of Defendants' criminal misconduct.").

### iii. The district court erred in downplaying the risk of recidivism and not adequately considering the public safety concerns posed by Ferizi's release.

Finally, the district court erred in ignoring Ferizi's risk of reoffending and by downplaying the public safety threat posed by the inability to supervise Ferizi in Kosovo.

The district court denied Ferizi's first motion for compassionate release, in part, because of "the government's argument that there was no way to secure the safety of the community once defendant had left the jurisdiction of the United States[.]" (Ex.O at 3) At the hearing in October 2020, the court deemed Ferizi a risk to the public and treated the inability to supervise him in Kosovo as critical to its decision to deny relief:

> I read over the mental health evaluation that was done back in 2016, which was part of, I guess, the sentencing proceeding, and it was interesting that he did voice issues with the United States, and he is, obviously, a fairly skillful hacker. I don't know what kinds of guarantees there could be placed on him that he would not reengage in hacking activities aimed at the United States. If he were being released domestically, I would have ways of controlling him. I could put him on computer monitoring surveillance by the probation office, I could have him on GPS monitoring, I could do all sorts of things, but I can't do that when he's over in Kosovo. And so, the danger that he poses is out there. I'm not saying it's a high risk, but it's certainly not the least risk, and he is mentally unstable based upon the mental health history here. So I have to look at that in terms of the 3553(a) balancing factor because the safety of the community is definitely a factor that goes into any of these types of decisions.

17

(Ex.M at 9-10)

Less than two months later, however, the court changed its tune. The government's concerns about supervision and public safety were now "somewhat alarmist" because in 2015, the government was able to quickly arrest Ferizi (never mind that he was arrested in Malaysia, not Kosovo), and because Kosovo cooperated in the investigation. (Ex.O at 8) Therefore, the court postulated, the government will have equal success in detecting, investigating, charging, and extraditing Ferizi from Kosovo should he reoffend.

This conclusion was based on pure speculation. The government's success in securing Ferizi's arrest and extradition from Malaysia five years ago in no way guarantees similar success in the future in Kosovo. Moreover, the government's public safety concerns include *supervising* Ferizi's activity. Only a few years ago, the district court agreed, imposing ten years of supervised release and barring Ferizi from having "any contact or communications whatsoever with any known terrorist, terrorist organizations, or any known hackers." (Ex.G at 28-29; *see also id*. at 27-28 (240-month sentence required "to make sure this defendant is deterred from such future conduct, given his track record going back five or six years with hacking")). Indeed, only two months ago the district court viewed Ferizi as a "skillful hacker" who harbored animosity toward the U.S. and who could not be released without the court's supervision. (Ex.M at 9-10) Nothing has changed.

In dismissing the government's public safety concerns, the district court also failed to adequately consider Ferizi's risk of recidivating. Ferizi has "been able to hack into Government databases at least since the age of 15." (Ex.G at 25) He is the self-proclaimed leader of a Kosovo hacking group which claims to have conducted over 20,000 hacks worldwide. (PSR¶10-11; Ex.A at 6-7, 15) Ferizi has served five years of a 20-year sentence and is currently 25-years-old. Given his history, and the fact that "the risk of recidivism is inversely related to an inmate's age at release[,]" *United States v. Fowler*, 948 F.3d 663, 670 (4th Cir. 2020) (internal quotation marks and citation omitted), there is every reason to believe Ferizi will continue to ply his trade upon returning to Kosovo.

Even putting aside the public safety concerns posed by someone with Ferizi's history and skillset, the district court failed to account for the unique recidivism challenges posed by a defendant with a demonstrated interest in jihadism. *See Hassoun v. Searls*, 968 F.3d 190, 204 (2d Cir. 2020) (staying defendant's release and underscoring that "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation"). Courts have recognized that "terrorism is different from other crimes," *Mumuni Saleh*, 946 F.3d at 112, and that it "represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); *see also United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015);

*United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011); *accord United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir. 2008) (U.S.S.G. § 3A1.4 enhancement intended to "Punish[] more harshly than other criminals those whose wrongs served an end more terrible than other crimes."). The district court gave short shrift to the government's legitimate recidivism and public safety concerns and thereby abused its discretion.

The government has a strong likelihood of success on appeal, or, at the very least, a "substantial case on the merits." *Hilton*, 481 U.S. at 778.

### B.    Harm to the Government and Public Interest

The second and fourth *Hilton* factors ask "whether the applicant will be irreparably injured absent a stay" and "where the public interest lies." 481 U.S. at 776. Both factors favor a stay. Ferizi's premature release raises obvious public safety concerns. Five years into a 20-year sentence, a defendant convicted of hacking on behalf of ISIS has been ordered released to a foreign country where he will be free to resume his exploits with impunity.

The government will also be irreparably injured absent a stay. The district court ordered BOP to transfer Ferizi to ICE custody for "prompt" deportation to Kosovo. (Ex.O at 7-8) Absent a stay, the government will likely lose its ability to secure Ferizi's incarceration should it prevail on appeal.

### C.    Harm to Other Parties

The third *Hilton* factor asks whether issuance of the stay will substantially

injure the other parties in the proceeding. The government recognizes that given Ferizi's health conditions, this factor weighs in his favor. But for the reasons already explained, this factor does not outweigh the others. The public deserves protection from Ferizi's crimes. *See United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020) (affirming denial of compassionate release due to serious nature of offense, despite defendant's terminal illness).

## Conclusion

The *Hilton* factors weigh in favor of staying Ferizi's release pending the resolution of this appeal.

Date: December 16, 2020                    Respectfully submitted,

                                           G. Zachary Terwilliger
                                           United States Attorney

                              By:    _____/s/_____
                                           Joseph Attias
                                           Assistant United States Attorney
                                           919 East Main Street, Suite 1900
                                           Richmond, Virginia 23219
                                           (804) 819-5400

## Certificate of Service and Compliance

I certify that this motion does not exceed 5,200 words (and is in fact 5,200 words) and complies with the requirements of Fed. R. App. P. 27. I also certify that on December 16, 2020, I filed electronically the foregoing with the Clerk of the Court using the CM/ECF system and will serve the defendant's counsel in the district court via email.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____
/s/

Joseph Attias
Assistant United States Attorney