# EXHIBIT B

**IN SUPPORT OF DEFENDANT'S
MOTION TO SUPPRESS AND REQUEST
FOR FRANKS HEARING**

PAGES 1 - 121

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JEFFREY S. WHITE, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          PLAINTIFF,           )
                               )
  VS.                          )          NO. CR 11-0009 JSW
                               )
JASPER KNABB,                  )
                               )
          DEFENDANT,           )
_____)

                               SAN FRANCISCO, CALIFORNIA
                               THURSDAY, JUNE 7, 2012

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

FOR PLAINTIFF:          UNITED STATES ATTORNEY
                        450 GOLDEN GATE AVENUE
                        SAN FRANCISCO, CALIFORNIA  94102
                    BY: **JONATHAN D. SCHMIDT**
                        ASSISTANT UNITED STATES ATTORNEY

FOR DEFENDANT:          MARK STUART GOLDROSEN
                        ATTORNEY AT LAW
                        255 KANSAS STREET
                        SUITE 340
                        SAN FRANCISCO, CA  94103


REPORTED BY:            JAMES YEOMANS, CSR 4039, RPR
                        OFFICIAL REPORTER

                COMPUTERIZED TRANSCRIPTION BY ECLIPSE

| 1  | THURSDAY, JUNE 7, 2012                                  9:30 A.M. |

2       **THE COURT:**  GOOD MORNING, EVERYBODY.

3       **THE CLERK:**  CALLING CASE NUMBER CR-11-009, UNITED

4  STATES VERSUS JASPER KNABB.

5       COUNSEL, PLEASE STEP FORWARD TO THE PODIUM AND STATE

6  YOUR APPEARANCES.

7       **MR. SCHMIDT:**  GOOD MORNING, YOUR HONOR.

8       JONATHAN SCHMIDT FOR THE UNITED STATES.

9       **MR. GOLDROSEN:**  GOOD MORNING, YOUR HONOR.

10      MARK GOLDROSEN I'M ONE OF TWO ATTORNEYS REPRESENTING

11  MR. JASON KNABB WHO'S PRESENT IN COURT.

12      **MR. ELLIOTT:**  GOOD MORNING, YOUR HONOR.

13      KIRK ELLIOTT APPEARING ON BEHALF OF MR. KNABB.

14      **THE COURT:**  WE'RE HERE FOR IMPOSITION OF JUDGMENT AND

15  SENTENCING.  I THINK, THE FIRST ORDER OF BUSINESS SHOULD BE --

16  I UNDERSTAND THAT -- ADDRESS THIS TO THE GOVERNMENT, UNDER THE

17  VICTIM'S RIGHT STATUTE THERE'S MAYBE ONE OR MORE ALLEGED

18  VICTIMS WHO WISH TO ADDRESS THE COURT DIRECTLY, WHICH IS THEIR

19  RIGHT UNDER UNITED STATES VERSUS KENNA, K-E-N-N-A; IS THAT

20  CORRECT?

21      **MR. SCHMIDT:**  THAT'S CORRECT, THERE'S TWO, YOUR HONOR.

22      **THE COURT:**  ALL RIGHT.  LET'S BRING THEM FORWARD ONE

23  AT A TIME.

24      WOULD YOU STEP TO THE MICROPHONE, SIR, PLEASE.

25      **THE CLERK:**  COULD YOU PLEASE STATE YOUR NAME FOR THE

```
1    RECORD.

2              THE WITNESS:  FRANK SISCA.

3              THE CLERK:  SPELL YOUR LAST NAME?

4              THE WITNESS:  S-I-S-C-A.

5              THE CLERK:  THANK YOU VERY MUCH.

6              THE COURT:  ALL RIGHT.  LET ME JUST ASK A LITTLE BIT

7    OF BACKGROUND.  WHAT CITY DO YOU RESIDE, SIR?

8              THE WITNESS:  I LIVE IN SAN CARLOS, CALIFORNIA.

9              THE COURT:  YOU WISH TO ADDRESS THE COURT AS A

10   POTENTIAL VICTIM OF THE ALLEGED CRIMES OF THE DEFENDANT?

11             THE WITNESS:  YES, YOUR HONOR.

12             THE COURT:  GO AHEAD.

13             MR. GOLDROSEN:  WOULD YOU PREFER WE SIT?

14             THE COURT:  NO, PLEASE SIT DOWN.  ABSOLUTELY.  NO

15   REASON FOR TO YOU STAND THERE.  YOU WANT TO ADDRESS COUNSEL AND

16   THE DEFENDANT YOU CAN STEP UP.  THANK YOU FOR REMINDING ME OF

17   THAT.

18             ALL RIGHT.  YOU MAY PROCEED, SIR.

19             THE WITNESS:  AGAIN, JUDGE, I WOULD LIKE TO THANK YOU

20   FOR BEING SO ASTUTE IN THIS CASE THAT IS A MESS THUS FAR AND I

21   AM VERY HAPPY YOU'RE THE JUDGE FOR THIS CASE.

22             KNABB AGREED THE ELEMENTS OF HIS OFFENSE --

23             THE COURT:  LET ME INTERRUPT YOU FOR ONE SECOND.  PULL

24   THE MICROPHONE, YES, BECAUSE THE ACOUSTICS ARE NOT VERY GOOD IN

25   THIS COURT, THAT'S WHY I HAVE BEEN ONE HERE.  KEEP GOING.
```

1    THANK YOU.

2          **THE WITNESS:**  KNABB AGREED THAT THE ELEMENTS OF HIS

3    OFFENSE ARE HE KNOWINGLY EXECUTED A SCHEME TO DEFRAUD

4    INVESTORS.

5          HE AGREED TO COMMIT AND BECOME A LEAD MEMBER OF THE

6    CONSPIRACY WITH THE INTENT TO ACCOMPLISH THIS SCHEME.  AND HE

7    KNOWINGLY AND WILLFULLY FALSIFIED BOOKS, RECORDS AND ACCOUNTS.

8          KNABB AGREED THAT HE'S GUILTY OF THESE OFFENSES TO

9    WHICH HE PLEADED GUILTY AND HE AGREED THAT THE FOLLOWING FACTS

10   ARE TRUE.

11         BEGINNING MAY 2005 AND CONTINUING THROUGH FEBRUARY

12   2008 KNABB AND DURLAND CONSPIRED AND DID KNOWINGLY EXECUTE A

13   SCHEME TO DEFRAUD INVESTORS AND TO OBTAIN MONEY AND PROPERTY BY

14   MEANS OF FALSE AND FRAUDULENT PRETENSES, REPRESENTATIONS AND

15   PROMISES.

16         KNABB AND DURLAND HAD UNRESTRICTED PEGASUS STOCK

17   ISSUED UNDER FALSE PRETENSES TO THEIR FAMILY, FRIENDS,

18   ASSOCIATES AND COMPANIES TO CONCEAL THEIR CONTROL OF THE STOCK.

19         KNABB AND DURLAND SOLD THE STOCK TO THE INVESTING

20   PUBLIC OR HAD THE RECIPIENTS OF THIS STOCK SELL THE STOCK ON

21   THEIR BEHALF AND FUNNEL THE PROCEEDS BACK TO THEM.

22         AND KNABB AND DURLAND FILED DOCUMENTS WITH THE SEC

23   THAT CONTAINED FALSE STATEMENTS AND OMISSIONS REGARDING THE

24   AMOUNT OF STOCK ISSUED AND THE TRUE REASON FOR ITS ISSUANCE.

25         KNABB AND DURLAND ALSO FAILED TO FILE REPORTS WITH THE

1    SEC DISCLOSING THE ACQUISITION AND SALE OF PEGASUS STOCK THEY

2    SECRETLY CONTROLLED THROUGH THEIR FAMILY, FRIENDS, ASSOCIATES

3    AND COMPANIES.

4            IN REFERENCE TO VICTIMS VERSUS INVESTORS.  THESE

5    DEBATES ABOUT THERE ARE NO VICTIMS BECAUSE THE ATTORNEYS CANNOT

6    QUANTIFY ANY LOSSES AND THAT WE ARE JUST INVESTORS IS ABSURD.

7            I BOUGHT STOCK IN PEGASUS WHILE THE ROBBERY SCHEME TO

8    DEFRAUD WITH FALSE AND MISLEADING INFORMATION WAS GOING ON AND

9    AS RESULT THEY STOLE MY RETIREMENT INVESTMENT.

10           I AM A VICTIM OF THIS FRAUDULENT SCHEME.  I NEVER

11   WOULD HAVE BOUGHT PEGASUS STOCK IF I HAD KNOWN THE TRUTH ABOUT

12   KNABB AND DURLAND'S IMPLEMENTING A SCHEME TO DEFRAUD INVESTORS.

13           IT IS CLEAR FROM THE SEC'S COMPLAINT THAT PEGASUS

14   STOCK HAD NO REAL UNDERLYING VALUE BECAUSE THE COMPANY WAS A

15   SHAM.

16           KNABB AND DURLAND'S ILL-GOTTEN GAIN COULD NOT HAVE

17   OCCURRED WITHOUT A LOSS.  THIS WAS NOT A VICTIMLESS CRIME.

18           KNABB AND DURLAND COMMITTED THE ROBBERY BY ADMITTING

19   TO SECURITIES FRAUD, CONSPIRACIES TO COMMIT SECURITIES FRAUD,

20   AND KEEPING FALSE BOOKS AND RECORDS WHILE KNOWINGLY EXECUTING A

21   SCHEME TO DEFRAUD INVESTORS.

22           THEY ENGAGED IN TRANSACTIONS, PRACTICES OF COURSES OF

23   BUSINESS WHICH OPERATED AS A FRAUD OR DECEIT UPON PURCHASES OF

24   SECURITIES.

25           BEGINNING MAY 2005 AND CONTINUING THROUGH FEBRUARY

2008 DURLAND AND KNABB CONSPIRED AND DID KNOWINGLY EXECUTE A
SCHEME TO DEFRAUD INVESTORS AND TO OBTAIN MONEY AND PROPERTY BY
MEANS OF FALSE AND FRAUDULENT PRETENSES, REPRESENTATIONS AND
PROMISES UNBEKNOWN TO ME.

THE FALSE SEC FILLINGS CONCEALED THE FACT THAT KNABB
AND DURLAND WERE BASICALLY PRINTING PEGASUS SHARES TO ENRICH
THEMSELVES BY TAKING MONEY FROM THE INVESTORS WRONGFULLY,
ILLEGALLY, SECRETLY AND UNEXPECTED FOR THEIR OWN ILL-GOTTEN
GAIN.

I RELIED ON PUBLICLY AVAILABLE INFORMATION INCLUDING
SEC FILINGS MADE BY PEGASUS WHEN MAKING MY INVESTMENT DECISIONS
RELATING TO PEGASUS.

BY FEBRUARY 2008 PEGASUS HAD ISSUED OVER 479 MILLION
SHARES, WHICH WAS MORE THAN 75 PERCENT OF ITS TOTAL OUTSTANDING
SHARES IN THIS FRAUDULENT MANNER TO FAMILY, FRIENDS AND
ASSOCIATES AND COMPANIES.

DO YOU THINK FOR ONE MINUTE I WOULD HAVE WALKED INTO A
BANK IF I KNEW A ROBBERY WAS GOING ON?

DO YOU THINK FOR ONE MINUTE I WOULD HAVE BOUGHT STOCK
IN PEGASUS IF I KNEW A SCHEME TO DEFRAUD INVESTORS WAS GOING
ON?

THE NUMBER OF VICTIMS.  THE FBI IDENTIFIED OVER 650
VICTIMS AND GAVE THOSE NAMES TO THE VICTIM NOTIFICATION
DEPARTMENT, OF WHICH I AM IDENTIFIED AS A VICTIM.

THE NUMBER OF VICTIMS SHOULD NOT BE CONFUSED WITH THE

```
1   IDEA THAT THERE ARE NO VICTIMS BECAUSE ATTORNEYS CANNOT FIGURE

2   OUT A LOSS TO INVESTORS.  PLEASE ADJUST THE GUIDELINES

3   CALCULATION ACCORDINGLY.

4        VICTIM'S LOSS COULD NOT BE DETERMINED.  IN

5   MR. SCHMIDT'S U.S. SUPPLEMENTAL SENTENCING MEMORANDUM HE

6   MENTIONS THE STOCK PRICE ROSE FROM 6.50 TO $18 A SHARE.

7   HOWEVER, THE REAL STOCK PRICE IS WHAT CANNOT BE QUANTIFIED HERE

8   BECAUSE OF ALL THE FALSE SEC FILINGS.

9        BY ADMISSION THE SEC FILINGS WERE BOGUS, THE REALITY

10  WAS STOCK WAS WORTHLESS BECAUSE OF ALL THE FRAUD AND FALSE

11  REPORTING.  FOR ME THIS IS A SIMPLE TO DETERMINE MY LOSS.  THEY

12  ROBBED ME OF MY TOTAL INVESTMENT WHICH THEY PLEADED GUILTY TO

13  BY DEFRAUDING INVESTORS WITH THEIR SCHEME.

14       I DID NOT BUY THIS STOCK TO TAKE ON THE RISK OF

15  PARTICIPATING IN A SCHEME TO DEFRAUD MYSELF.  I HAVE COMPLETED

16  AND FILED A VICTIM IMPACT STATEMENT OF FINANCIAL LOSS IN EXCESS

17  OF $77,000 AND HAVE PROVIDED DOCUMENTED PROOF OF MY LOSS WHICH

18  IS ON FILE WITH THE DEPARTMENT OF JUSTICE VICTIM NOTIFICATION

19  SYSTEM OFFICE.

20       AS TO BEING AN ORGANIZATION LEADER.  IN THE SEC

21  COMPLAINT KNABB INCLUDED NAMES OF PARTICIPANTS IN THE SCHEME:

22  HIS THEN MISTRESS, HIS PILOT, CHARLES ADAMS HIS PERSONAL

23  ASSISTANT, GLOBAL EVENT MAKERS AND TAMMY KNABB HIS THEN WIFE.

24       ADDITIONALLY, IN KNABB'S PLEA AGREEMENT HE ADMITTED TO

25  CAUSING OLDE MONMOUTH TO ISSUE SHARES TO FAMILY, FRIENDS,
```

ASSOCIATES, AUTO VENTURES CONNECTED TO THEIR MOTHER-IN-LAW

NANCY SPEAR, SISTER-IN-LAW SHERRY WILSON AND FRIEND HERMAN

JONES, ARROW MARINE MAVIN CONNECTED TO KNABB AND EQUITY

INVESTMENT CORPORATION CONNECTED TO DURLAND, WHILE DIRECTING

THESE AGENTS TO TRANSFER PORTIONS, BUT NOT ALL OF THE PROCEEDS

BACK TO THEMSELVES ALLOWING THE AGENTS TO KEEP A PORTION OF THE

PROCEEDS.

         IN MR. SCHMIDT'S U.S. SUPPLEMENTAL SENTENCING

MEMORANDUM HE STATED THE SCHEME INVOLVED THE PARTICIPATION OF

APPROXIMATELY EIGHT PEOPLE AND I COUNT MORE.

         CAN ANYONE ARGUE THAT KNABB AND DURLAND WERE NOT THE

RINGLEADERS WITH EIGHT OR MORE PARTICIPATING AGENTS THEY WERE

DIRECTING?

         PLEASE ADJUST THE GUIDELINE CALCULATION ACCORDINGLY.

         BEING AN OFFICER OR DIRECTOR.  IN THE SEC COMPLAINT,

IN RESPECTIVE PLEA AGREEMENTS KNABB AND DURLAND ADMITTED TO IN

NOVEMBER OF 2004 KNABB BECAME THE PRESIDENT AND A DIRECTOR OF

PEGASUS.

         IN JUNE 2006 HE BECAME THE CHIEF EXECUTIVE OFFICER AND

REMAINED IN THAT POSITION UNTIL AT LEAST JANUARY 29, 2008.

         IN NOVEMBER OF 20004 STEVEN DURLAND BECAME THE CHIEF

FINANCIAL OFFICER AND A DIRECTOR OF PEGASUS.  HE REMAINED IN

THAT POSITION UNTIL, AT LEAST, JANUARY 29, 2008.

         TO ME THIS IS ALSO VERY STRAIGHTFORWARD THEY WERE

OFFICERS AND DIRECTORS OF THE COMPANY.  PLEASE MAKE AN

ADJUSTMENT TO THE GUIDELINE CALCULATIONS ACCORDINGLY.

ACCEPTANCE OF RESPONSIBILITY.  IN MR. SCHMIDT'S U.S.
REPLY TO JASPER KNABB SUPPLEMENTAL SENTENCING MEMORANDUM HE
STATES:

BECAUSE MR. KNABB WAS NOT FULLY COOPERATIVE WITH THE
PROBATION OFFICE THE GOVERNMENT DOES NOT RECOMMEND AN
ADDITIONAL DECREASE OF LEVEL.

IN PARTICULAR MR. KNABB HAS BEEN EVASIVE ABOUT THE
FLUIDITY BETWEEN HIS AND HIS CURRENT WIFE LAURA VALAAS
FINANCES.

IN MR. SCHMIDT'S UNITED STATES MEMORANDUM REGARDS TO
SECOND AMENDED PRESENTATION INVESTIGATION REPORT, HE STATES THE
UNITED STATES AGREES THAT A FAILURE TO PROVIDE ACCURATE
FINANCIAL DISCLOSURES IS OBSTRUCTION OF JUSTICE.  PLEASE MAKE
ANY ADJUSTMENT TO THE GUIDELINE CALCULATION.

THE GUIDELINE CALCULATIONS.  IN THE DEFENDANT
INFORMATION RELEVANT TO THE CRIMINAL ACTION IN U.S. DISTRICT
COURT BROUGHT BY THE FBI STATES:

COUNT 1 MAXIMUM PRISON SENTENCE IS 25 YEARS, COUNT 2
MAXIMUM PRISON SENTENCE IS 25 YEARS, COUNT 3 THE MAXIMUM PRISON
SENTENCE IS 20 YEARS.

IN HIS PLEA AGREEMENT KNABB AGREED THE COURT IS NOT
BOUND BY THE SENTENCING GUIDELINES AND THAT THE COURT MAY
CONCLUDE THAT A HIGHER GUIDELINE RANGE APPLIES TO HIM.  AND IF
IT DOES, HE WILL NOT BE ENTITLED NOR WILL WE ASK TO WITHDRAW

1   HIS GUILTY PLEA.  PLEASE ADJUST THESE GUIDELINE CALCULATIONS TO

2   GIVE HIM THE MAXIMUM SENTENCE POSSIBLE.

3           AS A SIDE NOTE BECAUSE I NEVER SAW THE PLEA AGREEMENT

4   OF DURLAND PRIOR TO HIS SENTENCING HEARING ON OCTOBER 13TH 2011

5   AND RECEIVING HIS PLEA AGREEMENT ON FEBRUARY 29TH 2012, AFTER

6   THE SENTENCING HEARING I WOULD HAVE MADE STRONG OBJECTIONS TO

7   HIS GUIDELINE CALCULATION AS WELL.  HE'S JUST AS GUILTY AS

8   KNABB.

9           AS A VICTIM I WOULD MAKE ANY MOTION I COULD TO REVISIT

10  HIS SENTENCE AND ADJUST HIS GUIDELINE CALCULATIONS AND HIS

11  SENTENCE ACCORDINGLY, ALONG WITH THE ORDER OF RESTITUTION FOR

12  HIS CRIMES HE COMMITTED.

13          RESTITUTION.  IN KNABB'S PLEA AGREEMENT HE AGGRIEVED

14  TO GIVE UP HIS RIGHT TO APPEAL HIS CONVICTIONS, THE JUDGMENT

15  AND ORDERS OF THE COURT.  HE ALSO AGREED TO WAIVE ANY RIGHT HE

16  MAY HAVE TO APPEAL ANY ASPECT OF HIS SENTENCE, INCLUDING ANY

17  ORDERS RELATED TO FORFEITURE AND OR RESTITUTION.

18          HE AGREED THAT THE COURT IS NOT BOUND BY THE PARTYS'

19  UNDERSTANDING OF RESTITUTION AND THE COURT MAY ORDER

20  RESTITUTION.

21          HE AGREED THAT HE WILL MAKE A GOOD FAITH EFFORT TO PAY

22  ANY FINE, FORFEITURE OR RESTITUTION HE IS ORDERED TO PAY.

23          BEFORE OR AFTER SENTENCING HE WILL UPON REQUEST OF THE

24  COURT, THE GOVERNMENT OR THE U.S. PROBATION OFFICE PROVIDE

25  ACCURATE AND COMPLETE FINANCIAL INFORMATION, SUBMIT SWORN

1  STATEMENTS AND GIVE DEPOSITIONS UNDER OATH CONCERNING HIS

2  ASSETS AND HIS ABILITY TO PAY.

3         SURRENDER ASSETS HE'S OBTAINED AS WELL OF HIS CRIMES.

4  AND RELEASE FUNDS AND PROPERTY UNDER HIS CONTROL IN ORDER TO

5  PAY ANY FINE, FORFEITURE OR RESTITUTION.  HE WILL AGREE TO PAY

6  THE SPECIAL ASSESSMENT AT THE TIME OF SENTENCING.

7         IN MR. SMITH'S U.S. REPLY TO JASPER KNABB'S

8  SUPPLEMENTAL SENTENCING MEMORANDUM HE DISCUSSES RESTITUTION AS

9  FOLLOWS:

10        IF APPROPRIATE, THE SEC MAY DISTRIBUTE SOME OF THESE

11 FUNDS TO THE VICTIM INVESTORS.

12        IN MR. SCHMIDT'S UNITED STATES MEMORANDUM REGARDS TO

13 THE SECOND AMENDED PRESENTENCE INVESTIGATION REPORT HE FURTHER

14 DISCUSSES RESTITUTION AS FOLLOWS:

15        IT IS SIGNIFICANT TO DETERMINING AMONG OTHER THINGS

16 THE APPROPRIATENESS OF A FINE AND RESTITUTION.

17        HERE, THOUGH, THE PARTIES AGREE THAT RESTITUTION WOULD

18 NOT BE HANDLED IN THE PARALLEL CASE -- I'M SORRY, WOULD BE

19 HANDLED IN THE PARALLEL CASE UNDER THE PLEA AGREEMENT.

20        THE COURT IS NOT BOUND BY THE PARTYS' UNDERSTANDING OF

21 RESTITUTION AND THE COURT MAY ORDER RESTITUTION.  HENCE,

22 ACCURATE FINANCIAL DISCLOSURES ARE MATERIAL TO SENTENCING.

23        YOUR HONOR, I HAVE LEARNED YOU CONCLUDED THE SEC CASE

24 WITH DIS-ENGORGEMENT OF EACH DEFENDANT WITHOUT DIRECTION OF HOW

25 THE MONEY WILL BE DISTRIBUTED.

1          I HAVE CALCULATED AND SUPPLIED THE PROOF MY LOSS IN A

2    BINDER TO THE COURTS THROUGH THE VICTIM NOTIFICATION SYSTEM'S

3    OFFICE, WHICH I WAS TOLD THE BINDER WITH MY PROOF OF LOSS WAS

4    DISTRIBUTED TO THE COURT.

5          I AM STILL PRAYING FOR AN ORDER OF RESTITUTION,

6    SPECIAL ASSESSMENT OR FINE FROM YOU IN MY FAVOR FRANK SISCA

7    AGAINST KNABB, DURLAND AND ALL THE PARTIES AS NAMED ON

8    ATTACHMENT C WHICH WAS ATTACHED TO MY RECENT LETTER TO YOU AS

9    PART OF YOUR JUDGMENT OF SENTENCE TODAY.

10         THIS HOPEFULLY WOULD INCLUDE THE PRINCIPLE AMOUNT OF

11   $77,000, INTEREST ALLOWED, ANY COMPENSATION AND ANY OTHER

12   FURTHER RELIEF THE COURT MAY DETERMINE, PLUS THE FEES OF ANY

13   COLLECTION COST.

14         THANK YOU, YOUR HONOR, FOR YOUR TIME AND CONSIDERATION

15   TO MY LETTER.

16         **THE COURT:**  THANK YOU, SIR.

17         MR. SCHMIDT, ANY OTHER PEOPLE WHO WISH TO ADDRESS THE

18   COURT?

19         **MR. SCHMIDT:**  YES, YOUR HONOR, THERE'S ONE MORE.

20         **THE COURT:**  ALL RIGHT.

21         **THE CLERK:**  WOULD UP PLEASE STATE YOUR NAME FOR THE

22   RECORD.

23         **THE WITNESS:**  GLENN REED, G-L-E-N-N, R-E-E-D.

24         **THE COURT:**  SIR, WHAT CITY DO YOU RESIDE?

25         **THE WITNESS:**  I LIVE IN COVEY, SOUTH CAROLINA, SUBURB

| | |
|---|---|
| 1 | OF MYRTLE BEACH, SOUTH CAROLINA. |
| 2 | **THE COURT:**  DO YOU WISH TO MAKE A STATEMENT TO THE |
| 3 | COURT? |
| 4 | **THE WITNESS:**  ABSOLUTELY. |
| 5 | **THE COURT:**  GO AHEAD. |
| 6 | **THE WITNESS:**  I WANT TO THANK THE COURT FOR ALLOWING |
| 7 | ME THE TIME AS A VICTIM OF THIS SCAM TO PRESENT MY STORY.  AS |
| 8 | SO MANY OF THE VICTIMS IN THIS THEY WILL NOT STEP FORWARD AND |
| 9 | THIS IS ONE OF THE PROBLEMS WITH SCAMS OF THIS NATURE. |
| 10 | PEOPLE'S HONOR ARE PUT ON THE LINE AND CONSEQUENTLY THEY WILL |
| 11 | NOT COME FORWARD. |
| 12 | SO IN THE MYRTLE BREACH AREA THERE ARE A HUNDRED PLUS |
| 13 | OF US THAT HAVE BEEN SCAMMED BY MR. KNABB AND I AM THE ONLY ONE |
| 14 | THAT'S COME FORWARD. |
| 15 | IT'S MY HOPE AS WELL AS THE HOPE OF HUNDREDS OF OTHER |
| 16 | INVESTORS THAT WERE CHEATED IN THIS CASE THAT THE COURT WILL |
| 17 | TAKE A VERY DEEP LOOK INTO CASE. |
| 18 | **THE COURT:**  BECAUSE THIS IS BEING TAKEN DOWN BY A |
| 19 | COURT REPORTER, HE'S PRETTY GOOD BUT HE'S NOT THAT GOOD. |
| 20 | **THE WITNESS:**  I SAW HIM MOVING PRETTY FAST THERE. |
| 21 | **THE COURT:**  NOT FAST ENOUGH.  HE WON'T BE ACCURATE, |
| 22 | MAKE BELIEVE YOU'RE DICTATING TO HIM.  THAT'S EXACTLY WHAT |
| 23 | YOU'RE DOING. |
| 24 | **THE WITNESS:**  SURE. |
| 25 | **THE COURT:**  THANK YOU, SIR. |

1          **THE WITNESS:**  ALL RIGHT.  WE REALIZE THAT THIS CASE

2    MERITS THE FULLEST MEASUREMENT OF PUNISHMENT THAT THE LAW

3    ALLOWS FOR CRIMES OF THIS MAGNITUDE.

4          WE ARE ASKING FOR THE FULL 30 YEAR SENTENCE TO BE

5    GRANTED, WHICH EXCEEDS THE 17 AND A HALF YEARS THAT I

6    UNDERSTAND THE FEDERAL PROBATION OFFICE RECOMMENDED AND

7    DEFINITELY MORE SO THAN THE SEVEN AND A HALF YEARS THE

8    PROSECUTOR'S OFFICE HAS SUGGESTED.

9          YET MORE IMPORTANTLY WE AS A GROUP ARE FLABBERGASTED

10   BY JAY KNABB'S ARROGANT ATTITUDE OF I DID NO REAL HARM HERE.

11   AND HIS REQUEST OF SOME 40 MONTHS FOR THIS CRIME BASED ON HIS

12   STATEMENT THAT BECAUSE HE WAS MISLED BY OTHERS WHOM HE TRUSTED

13   HE THEN DID THE SAME TO HIS INVESTORS.  WHAT A LUDICROUS

14   STATEMENT FOR ANYONE TO MAKE.

15         FROM THE MAGNITUDE OF THIS SCAM, IT HAS WIDELY BEEN

16   RUMORED AND DOCUMENT TO A DEGREE JAY HAS HIDDEN SOME THREE TO

17   400 MILLION DOLLARS FROM THE INVESTORS AND THIS COURT.  THAT

18   BEING SAID, THIS IS THE SIMPLE -- IF THIS IS A SIMPLE SENTENCE

19   OF 40 MONTHS, THAT MEANS MR. KNABB IS GOING TO BE PAID $10

20   MILLION A MONTH TO GO TO JAIL FOR 40 MONTHS.

21         I WANT TO KNOW WHAT LINE DO I GET IN THAT I CAN GET

22   THAT SAME TREATMENT AND MAKE A FEW BUCKS ON THIS.  BUT BEFORE I

23   GO INTO MY STATEMENT I'D LIKE TO READ ARTICLE WHICH WAS

24   PUBLISHED IN SUNDAY'S PAPER IN THE SOUTH CAROLINA NEWS.

25         FEDERAL PROSECUTORS IN CHICAGO HAVE ANNOUNCED ONE OF

THE LARGEST EVER FINANCIAL FRAUD CASES TO COME ACROSS THEIR

DESK.  U.S. ATTORNEY GENERAL'S OFFICE SAID FRIDAY THAT BOTH THE

CEO AND HEAD TRADER OF SUTTON MANAGEMENT GROUP ARE ACCUSED OF

DEFRAUDING MORE THAN 70 CUSTOMERS OUT OF SOME 500 MILLION

BEFORE THE FIRM COLLAPSED.  500 MILLION.

JAY KNABB BILKED 650 OF US AND WHAT DO WE KNOW IS AN

ACCURATE FIGURE?  I DOUBT SERIOUSLY THREE TO 500 MILLION IS

ANYWHERE NEAR IT.

THEN ON THE PLANE LAST NIGHT AS HE CAME I FOUND THIS

MOST INTERESTING.  THIS GOES RIGHT ALONG WITH THE CHARACTER OF

WHAT WE'RE TALKING ABOUT TODAY.

LUXURY FELON GETS MAXIMUM SENTENCE.  THAT'S WHAT WE'RE

ASKING HERE FOR TODAY.  WE DON'T WANT LENIENCY SERVED HERE.  A

POINT COMES IN THE JUDICIAL SYSTEM WHEN WE HAVE TO GO BACK TO

THE OLD SCHOOL OF GIVING A PERSON HIS JUST DUE, AN EYE FOR AN

EYE, SO TO SPEAK.

DON'T SIT OUT HERE WITH THE FEDERAL GUIDELINE THAT

SAYS, WAIT A MINUTE, I CAN PICK AND CHOSE WHAT I WANT TO DO, SO

I WANT TO BE A BANK ROBBER, I ONLY ROB ONE BANK I'LL GET THIS,

IF I ROB 10 BANKS I'LL GET A LITTLE BIT MORE, IF I ROB A

HUNDRED BANKS I'M NOT GOING TO GET ANYMORE.  THAT'S WHERE WE'RE

AT TODAY.

THIS DEFENDANT IN U.S. DISTRICT COURT JUDGE JOE

ANDERSON HE WAS WILLING TO GIVE THE CRIMINAL AT LEAST A TINY

BREAK AT SENTENCING, IF THEY HAD SHOWN ANY REMORSE.  WE'VE SEEN

1    AND HEARD NO REMORSE ON MR. KNABB'S PART.

2            BUT TUESDAY WHEN HOPKINS A TAX CHEAT BEGAN TO LECTURE

3    THE LAW AND SAID SHE DIDN'T CONSIDER HERSELF A CROOK, EVEN

4    THOUGH THE JURY HAD ANNOUNCED HER GUILTY, ANDERSON GAVE HER THE

5    MAXIMUM PRISON SENTENCE ALLOWED BY LAW 75 MONTHS.

6            THE PROSECUTOR SAID I'M A CONVICTED FELON AND I

7    DISAGREE WITH THIS DOROTHY SAID.  SHE WINED TO THE JUDGE.  THE

8    JUDGE REPLIED WITH ALL DUE RESPECT, MA'AM, THE JURY HAS SAID

9    YOU'RE A CONVICTED FELON.

10           JAY KNABB HAS ADMITTED HE'S A LIAR, A THIEF, A CHEAT,

11   ANY ADJECTIVE YOU WANT TO PUT ON HIS CRIMINAL ACTIVITY HE'S

12   ADMITTED TO, HE REPRESENTS.

13           SO LAST FEBRUARY AFTER THE SENTENCING OF 18 COUNTS OF

14   TAX FRAUD, ONE COUNT OF THEFT OF GOVERNMENT PROPERTY, THEFT

15   WITH ID THEFT, SHE DECLINED TO TESTIFY IN HER OWN TRIAL.

16           NOW, NOT UNDER OATH SHE'S APPEARING BEFORE THE JUDGE

17   AS A VICTIM.  SHE COULDN'T STOP TELLING THE JUDGE HOW THE

18   PROSECUTOR HAD RAILROADED HER.  THURSDAY HEARING THE JUDGE WAS

19   TO SENTENCE HER AND TELL HER WHEN TO REPORT TO PRISON.

20           HE'S GOING TO ALLOW HER AS MOST JUDGES DO TO, HERE'S

21   YOUR SENTENCE, 30, 40 DAYS, SIX MONTHS, WE'VE SEEN IT IN THE

22   PAPER, TAKE YOUR TIME GET YOUR AFFAIRS IN ORDER AND THEN REPORT

23   FOR COURT.

24           THE JUDGE WAS FLABBERGASTED BY HER OUTBURST.  HE

25   ORDERED THE U.S. MARSHALS TO IMMEDIATELY TAKE HER FROM THE

1   COURTROOM AT THE END OF THE SENTENCING.

2          SHE DIDN'T NEED ANYMORE TIME.  SHE DONE ALL THE DAMAGE

3   SHE COULD AND POTENTIAL.  THAT'S ANOTHER CONSIDERATION THAT WE

4   WOULD LIKE TO ASK TODAY.

5          IF MR. KNABB IS INDEED SENTENCED TODAY WE ASK HE BE

6   PUT IN HANDCUFFS AND ESCORTED OUT OF THE COURT TO START SERVING

7   HIS TIME TODAY BECAUSE WE INVESTORS FEEL THIS MAN IS A FLIGHT

8   RISK.

9          WE KNOW HE HAS MILLIONS AND MILLIONS OF DOLLARS

10  STASHED AWAY.  WE ALSO KNOW THAT HE'S HOODWINKED HIS CURRENT

11  WIFE INTO STEALING ASSETS OF HIS ON E-BAY, SO WE KNOW HE HAS

12  FUNDS.

13         WE'RE JUST ASKING FOR A DECORUM OF JUSTICE HERE.  SO

14  THESE TWO SCAM ARTISTS THAT JUST SCAMMED 70 PEOPLE, THEY'RE

15  SMALL IN COMPARISON BY JAY KNABB.  THESE GUYS SHOULDN'T EVEN GO

16  TO PRISON, THEY SHOULD GET COMMUNITY SERVICE AT A LOCAL COLLEGE

17  TO TEACH THE FINER ARTS OF SCAMMING AND STOCK MANIPULATION AND

18  HOW PEOPLE CAN AVOID IT.

19         THE PROBLEM IS, THERE'S NO REAL REMORSE HERE.  SO,

20  JAY, THE THINGS I'M SAYING TO YOU TODAY I HOPE YOU TAKE THIS TO

21  PRISON WITH YOU AND YOU THINK ABOUT IT EVERYDAY, WHAT YOU HAVE

22  DONE TO YOUR VICTIMS.

23         AND YOU THINK ABOUT THE PAIN YOU'VE INFLICTED ON THEM,

24  AND AS YOUR SITTING THERE IN PRISON WONDERING WHEN IS THIS ALL

25  GOING TO STOP THINK ABOUT THEM AS VICTIMS.  WHEN IS THEIR PAIN

1   AND ACHE GOING TO STOP.  NEVER.

2          NOW, I KNOW THE FEDERAL GUIDELINES HAVE MADE IT REAL

3   EASY FOR SCAMMERS LIKE JAY AND THE REST OF THEM.  HE OR SHE CAN

4   ACTUALLY PLAN THEIR CRIME, THEIR PUNISHMENT AND THEIR RELEASE

5   MUCH LIKE YOU AND DURLAND DID, JAY.  IT'S TRULY THE BEST OF ALL

6   WORLDS THAT YOU SCAMMERS HAVE HERE.

7          HE PLAYED QUEEN FOR A DAY, DURLAND DID, TRYING TO TAKE

8   THE HEAT OFF JAY, MAYBE THINKING HE GET A LITTLE LIGHTER

9   SENTENCE FOR HIS BUDDY.  LET'S HOPE NOT.

10          TO BAD WE DIDN'T HAVE THE OLD SYSTEM WORKING FOR THE

11   VICTIM'S SIDE BECAUSE IN THOSE DAYS THERE WAS TRUE JUSTICE

12   DELIVERED TO THE CONVICTED.

13          BUT THIS IS MY PRESENTATION, THIS IS THE INFORMATION I

14   WOULD HAVE GIVEN TO A PAROLE BOARD AND THE PUBLIC PRIOR TO

15   JAY'S SENTENCING AND ANY SUBSEQUENT APPEALS BEFORE THE BOARD.

16          I MAKE THIS PROMISE TO YOU TODAY, JAY, IF THERE WERE A

17   PAROLE BOARD I WOULD BE YOUR WORST NIGHTMARE.  I WOULD BE THERE

18   EVERY TIME YOU COME UP.

19          BUT YOU SAT THERE WITH A SMIRK ON YOUR FACE KNOWING

20   THAT'S NEVER GOING TO HAPPEN.  WHAT GET HERE TODAY IS WHAT YOU

21   GET, MUCH TO OUR CHAGRIN.

22          I WOULD HAVE LISTED ALL THE DIVORCES YOU CREATED OF

23   THE PEOPLE YOU CHEATED AND DESTROYED THE FINANCIAL FOUNDATIONS

24   OF THEIR FAMILIES.

25          I WOULD HAVE LISTED THE SUICIDES AS THERE SOON WILL BE

1   SOME SUICIDES.  THE BLOOD WILL BE ON YOUR HANDS.  NOTICE I

2   DIDN'T SAY CONSCIOUS.

3        **THE COURT:**  SIR, EXCUSE ME, YOU HAVE RIGHT TO ADDRESS

4   THE COURT, BUT NOT ANYBODY ELSE.

5        **THE WITNESS:**  OKAY.

6        **THE COURT:**  PLEASE ADDRESS YOUR STATEMENTS TO THE

7   COURT.

8        **THE WITNESS:**  THE REASON THAT I SAID IT WASN'T GOING

9   TO BE ON HIS CONSCIOUS IS BECAUSE HE LACKS ONE.  AS MOST

10  CRIMINALS.

11       I WOULD HAVE LISTED ALL THE FAMILIES THAT WOULD NEVER

12  GET A CHANCE FOR A BETTER QUALITY OF LIFE, BUT YET YOUR CHILD

13  IS GOING TO HAVE A GREAT LIFE BECAUSE YOU GOT ALL THIS MONEY

14  STASHED AWAY.

15       WHAT A WONDERFUL THING THEY'RE GOING HAVE.  I WOULD

16  HAVE REMINDED THEM THERE IS NOTHING YOU CAN DO IN PRISON TO

17  REHABILITATE YOURSELF INTO A CONTRIBUTING MEMBER OF SOCIETY.

18       YOU LACK ALL THE CHARACTERISTICS OF BEING A WORTHWHILE

19  HUMAN BEING.  HAD YOU DONE THIS IN ANY OTHER COUNTRY, AND I

20  HAVE TRAVELED SOME 50 ODD COUNTRIES AROUND THE WORLD AND I KNOW

21  A LOT OF THEIR LAWS, YOU WOULD HAVE BEEN TAKEN OUT IN VILLAGE

22  SQUARE AND BEEN SHOT.

23       I WOULD HAVE REMINDED THEM OF THE SEVERAL HUNDRED

24  MILES OF DOLLARS THAT HAVE BEEN HIDDEN FROM THE COURT AND YOUR

25  VICTIMS.  I WOULD ABOUT BEGGED THEM IF NECESSARY TO KEEP YOU IN

1   PRISON AS LONG AS POSSIBLE, IF FOR NO OTHER REASON THEN WE KNOW

2   YOU'LL DO THIS AGAIN IF GIVEN A CHANCE.

3        YOU FOOLED NO ONE HERE, JAY, YOU'RE A CROOK AND ALWAYS

4   BE ONE.  THE SADDEST PART OF THIS WHOLE SCAM OF YOURS IS RIGHT

5   HERE IN THE COURTROOM TODAY.  TURN AROUND LOOK AT YOUR NEW

6   WIFE, THINK ABOUT YOUR NEW CHILD, AND NOW YOU'LL BE SEPARATED

7   FROM THEM FOR MANY YEARS TO COME.

8        HOPEFULLY YOUR NEW CHILD WILL NEVER KNOW YOU AND WILL

9   BE TOLD BY HER MOTHER AND GRANDPARENTS THAT SHE IS A RESULT OF

10  AN ANONYMOUS EGG DONOR RATHER THAN THE LYING CHEATING SCAM

11  ARTIST THAT HER FATHER REALLY IS.

12       WAS IT WORTH IT TO HURT THEM AS YOU DID TODAY?

13       IS THERE ANY REMORSE FOR THEIR LOSS?

14       I THINK NOT, JAY.  JUST SORRY YOU WERE CAUGHT.  THE

15  REASON BEING IS VERY SIMPLE.  I AS WELL AS MANY OF YOUR VICTIMS

16  FIRMLY BELIEVE THIS NEW LIFESTYLE OF YOURS IS JUST ANOTHER

17  SCAM.  TO SHOW THE COURT THAT THIS IS THE NEW JAY KNABB

18  REHABILITATED.  FREE OF A LIFE OF CRIME.

19       YOU PICKED A VERY RESPECTABLE FAMILY HERE IN THE AREA

20  AND TARGETED THIS FAMILY MUCH IN THE SAME FASHION AS YOU DID WE

21  INVESTORS IN YOUR COMPANY.  SO AS TO PUT UP A SMOKESCREEN FOR

22  THE DAY WHEN YOU FINALLY GET CAUGHT AND HAVE TO FACE THE COURT.

23  AFTER ALL YOU CHEATED ON YOUR FIRST FAMILY IN MYRTLE BEACH, YOU

24  DESTROYED THAT FAMILY.

25       SO WHERE IS THIS TO LEAD US TO BELIEVE YOU WOULDN'T DO

1    OR HAVEN'T ALREADY CHEATED ON THIS WIFE AND NEW BABY OF

2    YOURSELF.

3           NOW, YOU'VE EVEN GOT YOUR WIFE IN THE LIFESTYLE OF

4    CRIME BY HAVING HER FRONT FOR YOU BY SELLING YOUR ASSETS ON

5    E-BAY UNDER HER NAME.  YOU SAY THESE ARE HER THINGS.

6    SERIOUSLY, WHO HAS THREE ROLEX WATCHES.

7           I BET IF I COULD SEE ANY OF THESE WATCHES I WOULD

8    RECOGNIZE THE ONE THAT YOU SO PROUDLY WERE SHOWING OFF TO YOUR

9    INVESTORS HERE IN MYRTLE BEACH.

10           WHAT REALLY PUZZLES ME AND MY FELLOW INVESTORS HOW CAN

11    YOU AFFORD THIS NEW HOME HERE THIS CALIFORNIA WHEN YOU HAVE NO

12    FORM OF INCOME.  BECAUSE YOU PUT YOUR BANKRUPTCY IN -- YOUR

13    COURT -- YOUR COMPANY INTO BANKRUPTCY.

14           THIS NEW LIFESTYLE OF YOURS PLAYING WITH THE RICH AND

15    WELL HEALED HERE IN SAN FRANCISCO AMAZES US ALL.  I READ IN THE

16    NEWSPAPER A STATEMENT BY YOU WHERE YOU STATED YOU'VE BEEN

17    MISLEAD BY PEOPLE AND IN THE PROCESS THEN BASED ON THAT

18    INFORMATION MISLEAD OTHERS.

19           WHAT AN ABSOLUTELY STUPID STATEMENT YOU MADE HERE TO

20    THE COURT IN THE HOPES OF GETTING A LIGHTER SENTENCE OF SOME 40

21    MONTHS YOU ASKED FOR.

22           FOR YOU TO JUSTIFY YOUR CROOKED ACTIONS TOWARD YOUR

23    INVESTORS BECAUSE SOMEONE MISLEAD YOU IS ABOUT THE DUMBEST

24    REASON ANYONE COULD COME UP WITH.  YOU TRULY ARE ONE AMERICA'S

25    DUMBEST CROOKS, WITHOUT A DOUBT.

1    IF YOU THINK THE COURT WOULD EVEN TAKE THAT EXCUSE

2    INTO CONSIDERATION OF YOUR SENTENCE TODAY THEN YOU'RE REALLY AS

3    STUPID AS YOU APPEAR.  WAY BEYOND THAT.  I'M JUST -- IT'S

4    BEYOND BELIEF.

5    NOW, SPEAKING OF BEING MISLED, LET'S SET THE RECORD

6    STRAIGHT HERE AS TO WHO MISLED WHO.  ON THE 12TH OF AUGUST 2005

7    I SAT IN ATTENDANCE ON YOUR FIRST MEETING IN MYRTLE BEACH AT

8    MR. HERMAN JONES PANCAKE HOUSE RESTAURANT.

9    AT THIS MEETING YOU LAID OUT YOUR PLAN OF HOW WE

10   INVESTORS WITH A SMALL INVESTMENT OF SOME 10 THOUSAND SHARES AT

11   $3.75 A SHARE WOULD BE ABLE TO TURN THAT INTO A SUM OF 330,432

12   SHARES.

13   AS YOU SPELLED OUT YOUR PLAN AS TO HOW THIS WOULD BE

14   REACHED IN TOTAL SOUNDED ALMOST TOO GOOD TO BE TRUE.  YOU

15   GUARANTEED YOU WOULD ISSUE A TWO TO ONE STOCK SPLIT ON THE

16   NUMBERS OF SHARES IN THE FOLLOWING TIME FRAME.

17   THE FIRST SPLIT WOULD TAKE PLACE ON OR ABOUT

18   SEPTEMBER 2005, THEN AGAIN IN DECEMBER 2005, THEN AGAIN IN

19   AUGUST OF 2006, '7, AND '8.  HOWEVER, YOU ONLY ASKED US TO HOLD

20   OUR SHARES FOR TWO YEARS.

21   THIS WOULD ALLOW THE COMPANY TO GET A FAST FIRM

22   FOOTING IN THE MANUFACTURING OF THE PRODUCT LINE AND THEN WE

23   COULD, WITHIN REASON, START MAKING SOME PROFIT OFF THE SALE OF

24   OUR SHARES AND THAT WAS PRETTY REASONABLE.

25   YOU DID, HOWEVER, WARN US NOT TO DO -- YOU DID INFORM

1  US TO BE VERY CAREFUL IN SELLING OUR SHARES, SO AS NOT TO DRIVE

2  THE STOCK PRICE DOWN AND THEN HURT US ALL.

3      NOW, IN OUR RETROSPECT WE ALL UNDERSTAND THIS TIME

4  FRAME IS WHAT YOU STEVE DURLAND AND HERMAN JONES NEEDED IN

5  ORDER TO PULL OFF YOUR SCAM.

6      SO AT THIS TIME I WANTED IT TO BE KNOWN THAT I'M

7  ASKING FOR RESTITUTION OF MY ENTIRE INVESTMENT WITH YOU AND

8  YOUR COMPANY TO THE TUNE OF $190,040.78 IN CHANGE WHICH DOES

9  NOT TAKE INTO CONSIDERATION HAD I SOLD MY SHARES AT THE $18

10  LEVEL I HAD MADE A PROFIT OF SOME $680,000.

11      AT SUCH TIME YOU MAKE RESTITUTION I'LL GLADLY TURNOVER

12  TO YOU THE TOTAL SUM OF SHARES THAT I STILL HOLD IN MY STOCK

13  ACCOUNT TO THE TUNE OF SOME 5 MILLION SHARES.  162,163 SHARES.

14      IF I COULD TURNAROUND I COULD SEE THE STUNNED LOOK ON

15  YOUR FACE BECAUSE YOU KNOW I DIDN'T BUY 5 MILLION SHARES

16  THROUGH YOU.  AS TO HOW I GOT FROM 10,000 SHARE TO 5 MILLION

17  PLUS IS VERY SIMPLE.

18      THESE WERE NOT THE FRAUDULENT SHARES THAT YOU WERE

19  GIVING OUT TO ALL YOUR FRIENDS AND FAMILY, NO, THESE WERE

20  SHARES I ACTUALLY PURCHASED ON THE OPEN MARKET.  THE VERY SAME

21  MARKET YOU SOLD SOME 1.6 BILLION SHARES THAT WE SUSPECT TO BE

22  THE REAL TOTAL OF SHARES THAT YOU HAVE FLOODED THE MARKET WITH.

23      AFTER THE STOCK DROPPED DOWN UNDER 1 CENT PER SHARE

24  JUDGE HARRY MC DOWELL CALLED ME AND SAID THAT HERMAN JONES HAD

25  JUST GOTTEN OFF THE PHONE WITH JAY KNABB AND HE ADVISED HERMAN

1   TO SPREAD THE WORD THAT SHARES WE'RE GOING TO SPIKE TO AROUND A

2   DOLLAR A PIECE WITHIN THE NEXT 60 DAYS.  AND NOW IS THE TIME TO

3   GET BACK INTO MARKET TO RECOVER OUR LOSSES AND WE ALL WOULD

4   MAKE A LOT OF MONEY.

5        MR. HARRY TOLD ME HE WAS DONE WITH HIS LONG LIFE LONG

6   FRIEND MR. JONES AND HE WAS STAYING OUT.  I INSTEAD BOUGHT SOME

7   8 MILLION PLUS SHARES AND SAW REAL FAST THAT THIS WAS GOING IN

8   THE SAME DIRECTION AS THE FIRST INVESTMENT.

9        AND THEN GOT A CALL FROM MY E-TRADE BROKER THAT THEY

10  WOULD SUGGEST THAT I DUMP ALL MY SHARES WITHIN THE NEXT 48

11  HOURS WITH NO FURTHER DISCUSSION.  I DID MANAGE TO SELL DOWN TO

12  5.1 MILLION SHARES THAT DAY, BUT TRADING WAS STOPPED THE NEXT.

13       JAY ISN'T THIS MORE LIKELY WHAT REALLY HAPPENED.  YOU

14  WERE THE MONG THAT WAS MISPLEADING US.  AS THIS WAS A SCAM FROM

15  DAY ONE.

16       YOU NEVER HAD A PRODUCT THAT WORKED, THERE WAS NEVER A

17  PRODUCTION FACILITY HERE IN CALIFORNIA.  YOU DIDN'T BUY TWO

18  OTHER COMPANIES, ONE BEING IN CHINA.  YOU NEVER SOLD A $25

19  MILLION TELEPHONE COMMUNICATIONS SYSTEM TO THE RUSSIAN

20  GOVERNMENT AS YOU AND HERMAN TOLD THE GROUP, THIS WAS ALL

21  FABRICATION, JUST A SCHEME TO GET OUR MONEY AND THAT YOU DID.

22  WHAT A SKUNK YOU TURNED OUT TO BE AND THAT'S PUTTING IT MILDLY.

23       NOW, IN CONJUNCTION WITH MY CHARACTERIZATION OF

24  MR. KNABB, ABOUT THIS TIME HE FLED THE UNITED STATES AND WENT

25  TO THE BAHAMAS, AND HIS LAST CONVERSATION WITH WE INVESTORS WAS

1  THAT HE WAS GOING TO CONSOLIDATE EVERYTHING IN THE BAHAMAS AND

2  THIS WAS GOING TO BE THE NEW PRODUCTION FACILITY.

3         AT THIS TIME PRIME MINISTER PERRY KRISTIE WAS IN

4  CHARGE OF THE BAHAMIAN GOVERNMENT.  MR. KRISTIE HAS A NEFARIOUS

5  DOCUMENTED HISTORY.

6         JAY FACILITATED A $5 MILLION PAYMENT TO MR. KRISTIE

7  AND HIS LEGAL AID, TO SET UP WHATEVER HAD TO BE SET UP IN THE

8  BAHAMAS, SO THAT HE COULD RUN HIS BUSINESS THERE.

9         BUT LONG STORY SHORT, KRISTIE GETS THROWN OUT BECAUSE

10  HE'S VERY, VERY CORRUPT, NEW MAN COMES IN HE'S JUST AS CORRUPT,

11  NOW LAST MONTH MR. KRISTIE BACK IN OFFICE.  HE ONLY HAS ONE

12  PROBLEM.  HIS GOVERNMENT GOT A $504 MILLION DEFICIT STARING HIM

13  IN THE FACE.

14         SO AFTER THE HEARING IS OVER WITH AND THE SENTENCING

15  IS FINALIZED TODAY ON MR. KNABB, I'M GOING TO SEND MR. KRISTIE

16  AN E-MAIL AND TELLING HIM HERE'S THE WAY THAT YOUR COUNTRY CAN

17  BE BAILED OUT, JUST GO TO THE BANK THAT YOU FACILITATED THIS

18  TRANSFER OF HIS WEALTH TO AND TAKE YOUR MONEY.  YOUR DEBTS

19  PAID.

20         MR. KNABB HAS BEEN DESCRIBED AS A PERSON WITHOUT A

21  MORAL COMPASS.  I FURTHER LEARNED FROM ANOTHER ARTICLE THAT IS

22  QUOTED IN THE BAHAMIAN PAPER, MR. KNABB TOLD KRISTIE AND HIS

23  CRONIES THAT PEGASUS WIRELESS WAS A PROFITABLE COMPANY, HAD

24  EARNED A HUNDRED MILLION IN REVENUE.

25         ONE ASSUMED MR. KRISTIE AND HIS CRONIES HAD DONE DUE

DILIGENCE ON MR. KNABB.  BUT THE WRITER SAYS I REMEMBER WHAT

GRANDPA ALWAYS SAID, TO ASSUME MAKES A BUTT OUT OF ME AND YOU.

GRANDMA WAS RIGHT WITHIN WEEKS MR. KNABB DISAPPEARED FROM THE

BAHAMAS.

PEOPLE IN THE COMMUNITY SAID MANY TIMES AND HAVE BEEN

QUOTED IN THE PAPER, THERE WERE MANY WHO THOUGHT THAT HE WAS

NOT REAL, HE DID NOT HAVE THE SUBSTANCE NOR THE QUALITY OF WHAT

HE PRETENDED TO HAVE.

ONLY FOR US TO BELIEVE IN HIM AND TRUST HIM WOULD WIN

FAVOR FOR MANY OF THE BAHAMIANS.  WE SEE WHERE THAT WENT.  THE

BAHAMIANS LOST AS WE INVESTORS LOST.  SO HE'S ESTABLISHED A

CONTINUED PATTERN HERE.

THE SAD THING IS IN ONE OF OUR MEETINGS WE DISCUSSED A

PREVIOUS PUMP AND DUMP STOCK SCHEME THAT MR. KNABB WAS INVOLVED

WITH.  HE POO HOED IT, EVEN THOUGH WE HAD ENOUGH INFORMATION

FROM THE INTERNET THAT SAID OTHERWISE AND NOTHING EVER CAME OUT

OF IT.

THEN WE HAD INFORMATION FURNISHED TO US OF AN

INSURANCE FRAUD SCHEME THAT HE TRIED IN MYRTLE BEACH,

SUPPOSEDLY ON SOME $30,000 WORTH OF EQUIPMENT OFF HIS BOAT,

WHICH LATER CAME TO LIGHT HE ACTUALLY TAKEN THE STUFF HIMSELF.

NOW WE HAVE THIS MYSTERY THEFT IN HIS NEW HOME IN

CALIFORNIA.  AND HIS PRIZE POSSESSION, HIS WONDERFUL PEN SET IS

MISSING.  I SUSPECT THAT SOMEWHERE DOWN THE ROAD THIS IS

PROBABLY GOING TO BE PRESENTED TO HIS FATHER-IN-LAW AS GIFT FOR

1    FATHER'S DAY ONE OF THESE YEARS, WHEN THAT INFORMATION SURFACES

2    AS IT GENERALLY WILL NOTHING IS GOING TO HAPPEN.

3         AND THE BOTTOM LINE IS HE STOLE FROM 600 PLUS OF US.

4         **THE COURT:**  LET ME SUGGEST YOU BRING THIS TO A CLOSE.

5    I'VE GIVEN YOU THE OPPORTUNITY.  IT'S GONE ON TOO LONG.  I HAVE

6    TO, PLEASE, I'LL GIVE YOU ABOUT TWO MINUTE TO WRAP UP.

7         **THE WITNESS:**  I HAVE ONE DOCUMENT THAT I WOULD LIKE TO

8    READ INTO THE RECORD FROM JUDGE HARRY, AS ANOTHER VICTIM.

9         **THE COURT:**  ALL RIGHT.  PLEASE MOVE ALONG.  DON'T DO

10   IT BY SPEAKING QUICKLY BECAUSE THAT WON'T HELP.

11        **THE WITNESS:**  PARDON?

12        **THE COURT:**  DON'T DO IT BY SPEAKING TOO QUICKLY.

13        **THE WITNESS:**  NO.

14        **THE COURT:**  THAT WON'T HELP.

15        **THE WITNESS:**  IN CLOSING ON MY STATEMENT I ASKED YOUR

16   HONOR TO LOOK AT THE NATURE OF THIS CASE.  YES, ONLY TWO

17   VICTIMS HAVE COME FORWARD AND SPOKEN, BUT I THINK WE BOTH SPOKE

18   PRETTY LOUDLY.

19        AND THIS IS NOT A CASE THAT MAGNITUDES A SIMPLE

20   SENTENCE OF SOME 40 MONTHS.  WE ASK THAT HE BE GIVEN THE

21   MAXIMUM AND WITH SENTENCING STARTING TODAY, AND I WOULD ALSO

22   LIKE IF HE ISN'T INCARCERATED TODAY THAT I WOULD SUGGEST WE ASK

23   FOR HIS PASSPORT BECAUSE HE'S A FLIGHT RISK.

24        THE NEXT DOCUMENT I'M GOING TO READ TO YOU IS A

25   STATEMENT FROM JUDGE HARRY MC DOWELL RETIRED MAGISTRATE OF

1    LOWER SOUTH CAROLINA.  THIS IS SENT IN AND IS DOCUMENTED IN

2    DURLAND'S CASE FILE, TOO, BUT WE JUST WANT IT READ INTO HERE

3    BECAUSE MR. HARRY IS ASKING FOR RESTITUTION OF HIS LOSS.

4        I'M MAKING A FORMAL REQUEST FOR RESTITUTION IN THE

5    AMOUNT OF $37,500, SEE ATTACHED CHECK, FOR THE LOSS OF 10,000

6    SHARES OF STOCK THAT WERE PURCHASED IN THE FIRM KNOWN AS

7    PEGASUS.

8        THIS PURCHASE WAS FACILITATED THROUGH MR. HERMAN JONES

9    OF MYRTLE BEACH.  MR. JONES WAS THE ACTING AGENT FOR JASPER

10   KNABB AND WAS THE SOLE CONTACT DIRECTLY TO MR. KNABB AND

11   MR. DURLAND.

12       I ALSO AM REQUESTING THAT THIS STATEMENT BE READ INTO

13   THE RECORDS AS A PROCESSING OF HIS SENTENCE.  I FEEL THAT THIS

14   IS -- THERE IS NOT A PUNISHMENT HARSH ENOUGH THAT CAN BE

15   ADMINISTERED TO MR. KNABB THAT WOULD BE SATISFACTORY TO THE

16   DAMAGES HE'S INFLICTED UPON ME AND MY FAMILY DUE TO THE NATURE

17   OF HIS FRAUD.

18       THIS WILLFUL DESTRUCTION OF ONE'S TRUST CANNOT BE

19   REPAIRED WITH A SIMPLE JAIL TERM AND A SMALL PERCENTAGE OF

20   RETURN TO MY LOST INVESTMENT.  IF, INDEED, THERE ARE FUNDS

21   AVAILABLE THAT MR. KNABB HASN'T ALREADY DISPOSED OF, IN SUCH A

22   MANNER AS TO WHEN HIS TIME IS SERVED THAT HE WILL HAVE ENOUGH

23   MONEY TO LIVE OUT THE LIFE AT OUR EXPENSE IN A LIFESTYLE THAT

24   WILL BE BETTER THAN WHAT I HAVE INVESTED AT THIS TIME.

25       I THANK YOU AND YOUR STAFF FOR GIVING ME THIS

1  OPPORTUNITY.  KINDEST REGARDS JUDGE HARRY MC DOWELL, RETIRED

2  MAGISTRATE OF LOWER SOUTH CAROLINA.

3          THANK YOU, YOUR HONOR, FOR YOUR TIME AND THE COURT

4  TODAY.

5          **THE COURT:**  THANK YOU, SIR.

6          ALL RIGHT.  ANY OTHER PEOPLE WHO WISH TO SPEAK TO THE

7  COURT UNDER THE VICTIMS RIGHT ACT, MR. SCHMIDT?

8          **MR. SCHMIDT:**  NOT THAT I KNOW OF.

9          **THE COURT:**  ANYBODY ELSE?

10          THERE BEING NO RESPONSE, SO THE NEXT ORDER OF BUSINESS

11  IS THE DEFENDANT HAS -- BEFORE WE GET INTO DISCUSSING THE

12  GUIDELINE CALCULATIONS, THE DEFENDANT HAS REQUESTED AN

13  EVIDENTIARY HEARING ON THE NARROW ISSUE OF THE OBSTRUCTION

14  ENHANCEMENT ADJUSTMENT.

15          AND SO I DID READ ALL OF THE WRITTEN SUBMISSIONS THAT

16  COUNSEL SUBMITTED, BOTH SIDES, BUT IF THERE'S ADDITIONAL

17  EVIDENCE OR TESTIMONY YOU WISH TO ADDUCE, MR. GOLDROSEN, YOU

18  MAY DO SO.

19          **MR. GOLDROSEN:**  WELL, YOUR HONOR, IT SEEMS TO ME THAT

20  THE BURDEN OF THE HEARING WOULD BE ON THE PARTY SEEKING THE

21  ENHANCEMENT, SO WE WOULD WISH TO CROSS-EXAMINE INITIALLY

22  WHATEVER WITNESSES THE GOVERNMENT IS GOING TO PUT ONTO MEET ITS

23  BURDEN.

24          **THE COURT:**  ALL RIGHT.  SO I WAS UNDER THE IMPRESSION

25  THAT GIVEN THE INFORMATION CONTAINED IN THE VARIOUS

PRE-SENTENCE REPORTS, ESPECIALLY THE SECOND AMENDED ONE, YOU

HAD SUBMITTED EVIDENCE WHICH IS YOUR RIGHT TO DO AND MADE

OBJECTIONS TO CERTAIN OF THE CALCULATIONS AND STATEMENTS, AND

YOU INDICATE YOU MAY -- AT THE COURT'S ORDER YOU MADE OFFER OF

PROOF AS TO WHAT YOU WOULD ADDUCE.

ARE YOU NOW SAYING THAT IN THE ABSENCE OF ANY

TESTIMONY OR EVIDENCE FROM THE GOVERNMENT YOU'RE NOT GOING TO

DO THAT?

**MR. GOLDROSEN:**  WELL, WE THINK IN THE ABSENCE OF ANY

TESTIMONY OR EVIDENCE FROM THE GOVERNMENT, THEN BURDEN HAS BEEN

MET AND THE OBSTRUCTION OF JUSTICE HAS NOT BEEN ESTABLISHED.

**THE COURT:**  I DON'T AGREE WITH THAT AT ALL.  THE COURT

CAN RELY ON ANY INFORMATION, AS YOU KNOW, HEARSAY, THE

PRESENTENCE REPORT IS WELL DOCUMENTED, AND I THINK THAT THERE'S

BEEN SUBSTANTIAL CASE MADE IN THE PRESENTENCE REPORT OF THE

TRUTH OF THE ALLEGATIONS SUPPORTING THE ENHANCEMENT.

AND SO I'M TELLING YOU THAT IN FAIRNESS THAT I FEEL

THAT -- THAT'S THE WAY THIS WORKS, THE PROBATION DEPARTMENT

PRESENTS INFORMATION BASED UPON THEIR INVESTIGATION, THE COURT

LAST THE RIGHT UNDER WELL HE ESTABLISHED NINTH CIRCUIT TEACHING

TO CONSIDER VIRTUALLY ANY INFORMATION, HEARSAY, EVEN

INFORMATION ILLEGALLY OBTAINED UNDER THE FOURTH AMENDMENT.

AND SO I FIND THAT BASED UPON -- THERE WAS A PRIMA

FACIE SHOWING IN THE RECORD, IRRESPECTIVE WHO NEEDS TO MAKE IT,

TO SUPPORT IT.  IF YOU WANT -- THIS IS YOUR OPPORTUNITY, YOU

1    DON'T HAVE UNLIMITED RIGHT, BUT I'M GOING TO GIVE YOU A RIGHT

2    TO ADDUCE ANY TESTIMONY THAT GOES DIRECTLY TO THOSE ISSUES.

3            IF YOU DON'T, THEN I'LL HEAR ARGUMENT ABOUT THE WEIGHT

4    TO BE GIVEN TO THE EVIDENCE, BUT I WOULD TAKE THE EVIDENCE AS I

5    FIND IT, BOTH THAT THE GOVERNMENT SUBMITTED, THE PROBATION

6    OFFICE HAS SUBMITTED IN THEIR INVESTIGATION AND DEFENDANT HAS

7    SUBMITTED IN THE OPPOSITION.

8            **MR. GOLDROSEN:**  THEN, I THINK, WE WOULD LIKE TO

9    INITIALLY THEN CROSS-EXAMINE MS. CARUBA.

10           **THE COURT:**  DENIED.  SHE'S A MEMBER OF THE PROBATION

11   DEPARTMENT AND SHE'S APART OF THE COURT'S ORGANIZATION, YOU

12   DON'T HAVE THE RIGHT TO DO THAT.  SO THAT IS DENIED.

13           **MR. GOLDROSEN:**  MAY I HAVE ONE MOMENT?

14           **THE COURT:**  SHE'S NOT A PERCIPIENT WITNESS, IF YOU

15   HAVE ANYTHING SPECIFIC YOU WANT TO SAY, YOU CAN PUT IT ON, BUT

16   I'M NOT ALLOWING YOU TO CROSS-EXAMINE THE PROBATION OFFICER.

17           **MR. GOLDROSEN:**  MAY I HAVE ONE MOMENT?

18           **THE COURT:**  CERTAINLY.

19                   (PAUSE IN PROCEEDINGS.)

20           **MR. GOLDROSEN:**  WE WILL PRESENT EVIDENCE.

21           **THE COURT:**  ALL RIGHT.  VERY WELL.  CALL YOUR FIRST

22   WITNESS.

23           **MR. GOLDROSEN:**  WE'LL CALL LAURA VALAAS TO THE WITNESS

24   STAND.  WOULD YOU PLEASE APPROACH AND BE SWORN AS A WITNESS.

25                   (OATH ADMINISTERED:)

1            THE WITNESS:  I DO.

2            THE CLERK:  THANK YOU.  PLEASE BE SEATED.  STATE AND

3    SPELL YOUR FULL NAME FOR THE RECORD?

4            THE WITNESS:  MY NAME IS LAURA, L-A-U-R-A, V AS IN

5    VICTOR A-L-A-A-S.

6            THE COURT:  ARE YOU REPRESENTING THIS WITNESS?

7            MR. GOLDROSEN:  AM I REPRESENTING THIS WITNESS?

8            THE COURT:  HAS SHE BEEN ADVISED OF HER CONSTITUTIONAL

9    RIGHT TO REMAIN SILENT, THAT ANYTHING SHE SAYS CAN BE USED --

10           MR. GOLDROSEN:  NO, SHE HAS NOT.

11           THE COURT:  DO YOU UNDERSTAND, YOUR TESTIFYING

12   VOLUNTARILY; IS THAT CORRECT?

13           THE WITNESS:  YES.

14           THE COURT:  YOU UNDERSTAND YOU HAVE A 5TH AMENDMENT

15   RIGHT TO REFUSE TO TESTIFY IF YOU BELIEVE THE ANSWER MY TEND TO

16   INCRIMINATE YOU?

17           THE WITNESS:  YES.

18           THE COURT:  ARE YOU FULLY AWARE OF THAT RIGHT?

19           THE WITNESS:  I AM NOW, YOUR HONOR.

20           THE COURT:  ALL RIGHT.  UNDERSTANDING YOU HAVE A RIGHT

21   TO REMAIN SILENT AND NOT ANSWER QUESTIONS, YOU CANNOT BE

22   COMPELLED IF THE ANSWER WOULD INCRIMINATE YOU, DO YOU STILL

23   WISH TO TESTIFY?

24           THE WITNESS:  YES.

25           THE COURT:  ALL RIGHT.  YOU MAY PROCEED.

1          **DIRECT EXAMINATION**

2     **BY MR. GOLDROSEN:  Q.**  THANK YOU, MS. VALAAS, ARE YOU RELATED

3     TO MR. JAY KNABB?

4     **A.**  HE'S MY HUSBAND.

5     **Q.**  WHEN DID THE TWO OF YOU MARRY?

6     **A.**  WE WERE MARRIED IN OCTOBER OF 2010.

7     **Q.**  WHEN DID THE TWO OF YOU FIRST MEET?

8     **A.**  WE MET MID-2009.

9     **Q.**  AND APPROXIMATELY WHEN -- LET ME ASK THIS:  DID TWO OF YOU

10    START TO LIVE TOGETHER BEFORE YOU WERE MARRIED?

11    **A.**  WE DID.

12    **Q.**  AND APPROXIMATELY WHEN WAS THAT?

13    **A.**  LATE IN 2009.

14    **Q.**  AND I WANT TO ASK YOU, MS. VALAAS, DO YOU RUN A BUSINESS

15    THROUGH E-BAY?

16    **A.**  I DO.

17    **Q.**  AND HOW LONG HAVE YOU OPERATED THIS BUSINESS THROUGH E-BAY?

18    **A.**  SINCE LATE 2011.

19    **Q.**  LATE 2011?

20    **A.**  YES.

21    **Q.**  AND WHAT IS NATURE OF THE BUSINESS THAT YOU HAVE THAT YOU

22    RUN FOR E-BAY?

23    **A.**  I SELL MODEL RAILROAD SUPPLIES, BOTH USED AND NEW THROUGH

24    E-BAY.

25    **Q.**  BEFORE LATE 2011 DID YOU ALSO SELL ITEMS THROUGH E-BAY?

1   **A.**  I DID.  I STARTED MY BUSINESS ON E-BAY SELLING WHATEVER I

2   COULD PICK UP ON CRAIG'S LIST, OR ESTATE SALES, OR ON E-BAY

3   ALSO TO RESELL FOR A PROFIT.

4   **Q.**  APPROXIMATELY, WHEN DID YOU FIRST START SELLING ITEMS

5   THROUGH E-BAY FOR PROFIT?

6   **A.**  IN JUNE OF 2010.  2011.

7   **Q.**  NOW, WHEN YOU SAY, LET ME MAKE SURE I UNDERSTAND, YOU

8   STARTED IN JUNE 2010?

9   **A.**  '11.

10  **Q.**  JUST LAST YEAR OR THE YEAR BEFORE?

11  **A.**  JUST LAST YEAR.

12  **Q.**  AND WHAT E-BAY ACCOUNT DO YOU USE FOR YOUR BUSINESS?

13  **A.**  I USE -- I HAVE TWO E-BAY ACCOUNTS I USE, LULU'S TRAINS AND

14  LULU'S TRAIN MANIA.

15  **Q.**  THOSE ARE THE NAMES ON THOSE ACCOUNTS?

16  **A.**  CORRECT.

17  **Q.**  AND WAS ONE OF THOSE ACCOUNTS FORMALLY AN ACCOUNT OPENED BY

18  YOUR HUSBAND?

19  **A.**  IT WAS.  LULU'S MANIA WAS ORIGINALLY OPENED BY MY HUSBAND,

20  WHEN I START MY BUSINESS I BEGAN USING IT.

21  **Q.**  AND ABOUT WHEN DID YOU START USING IT?

22  **A.**  I THINK, THAT WAS THE 2010.

23  **Q.**  AND WHAT ITEMS DO YOU SELL ON THE ACCOUNT, E-BAY ACCOUNT

24  THAT USED TO BE USED OR -- I'M SORRY, WAS OPENED BY YOUR

25  HUSBAND?

**A.**  IT'S ALL CURRENTLY MODEL RAILROAD SUPPLIES.

**Q.**  AND ARE THERE OTHER ITEMS THAT YOU SOLD IN THE PAST IN ADDITION TO THESE MODEL RAILROAD SUPPLIES?

**A.**  YES.

**Q.**  AND WHAT OTHER ITEMS HAVE YOU SOLD IN THOSE ACCOUNTS, ON THAT ACCOUNT?

**A.**  OTHER RESALE ITEMS.

**Q.**  SUCH AS?

**A.**  SUCH AS I SOLD A COUPLE OF WATCHES, I BELIEVE, IS CAUSING SOME CONFUSION.

**Q.**  AND OTHER THINGS?

**A.**  YES, OTHER THINGS.

**Q.**  DO YOU RECALL WHAT THOSE WERE AT THIS TIME, JUST THE NATURE OF WHAT THOSE WERE?

**A.**  I SOLD SOME WATCHES, I SOLD A COUPLE OF GUITARS.

**Q.**  NOW, WERE ANY OF THE ITEMS YOU HAVE SOLD ON THE ACCOUNT THAT WAS OPENED BY MR. KNABB ITEMS THAT HE GAVE TO YOU?

**A.**  NO.

**Q.**  WERE ANY OF THE ITEMS YOU SOLD ON THE ACCOUNT ITEMS THAT WERE IN HIS POSSESSION BEFORE YOU SOLD THEM ON THE ACCOUNT?

**A.**  NO.

**Q.**  AND TELL ME AGAIN THE WAY YOU OBTAINED THESE ITEMS WERE HOW?

**A.**  THROUGH CRAIG'S LIST PURCHASES, ESTATE SALES, E-BAY.

**Q.**  AND SPECIFICALLY --

1    A.   AND THROUGH VENDORS.

2    Q.   SPECIFICALLY LET'S TALK ABOUT THE MODEL TRAINS, THAT'S

3    PRIMARILY WHAT YOU SELL NOW, CORRECT?

4    A.   CORRECT.

5    Q.   THE MODEL TRAINS, DID ANY OF THOSE MODEL TRAINS COME FROM

6    MR. KNABB THAT YOU SOLD?

7    A.   NO.

8    Q.   AND YOU SOLD SOME WATCHES?

9    A.   CORRECT.

10   Q.   DID ANY WATCHES THAT YOU SOLD ON THIS ACCOUNT THAT WAS IN

11   THE NAME, ORIGINALLY OPENED BY MR. KNABB, DID ANY OF THOSE

12   WATCHES COME FROM MR. KNABB?

13   A.   NO.

14   Q.   HOW DID YOU GET THE WATCHES THAT YOU SOLD ON E-BAY?

15   A.   I SOLD FOUR WATCHES ON E-BAY, I SOLD TWO ROLEXES GIVEN TO

16   ME BY HIS BROTHER AND HIS SISTER-IN-LAW.  IN ORDER TO SELL TO

17   USE THE FUNDS TO PAY FOR HIS RETAINER.

18   Q.   AND THAT WAS HIS RETAINER FOR WHAT?

19   A.   FOR KIRK AND YOURSELF.

20   Q.   WHEN DID YOU SELL THE TWO ROLEX WATCHES?

21   A.   DURING THE FALL OF 2011.

22   Q.   AND THOSE ARE OBTAINED FROM MR. KNABB'S BROTHER AND

23   SISTER-IN-LAW?

24   A.   AND HIS WIFE, CORRECT.

25   Q.   APPROXIMATELY, HOW MUCH MONEY DID YOU GET WHEN YOU SOLD

1   THOSE TWO WATCHES?

2   **A.** I BELIEVE, IT WAS AROUND $22,000.

3   **Q.** AND YOU SAID YOU SOLD TWO OTHER WATCHES IN ADDITION TO

4   THOSE TWO ROLEX WATCHES?

5   **A.** CORRECT, I ALSO SOLD TWO OTHER WATCHES LATE 2000 -- ABOUT

6   THE SAME TIME PERIOD THAT I PICKED UP AT A SECOND HAND SHOP.

7   **Q.** THESE OTHER WATCHES THAT YOU SOLD WERE THEY ROLEX WATCHES?

8   **A.** THEY WERE NOT.

9   **Q.** DO YOU REMEMBER WHAT KIND OF WATCHES THEY WERE?

10  **A.** I THINK, ONE WAS A -- LIKE A MONACO, I CAN'T REMEMBER THE

11  BRANDS.

12  **Q.** ABOUT HOW MUCH DID YOU SELL THESE WATCHES FOR?

13  **A.** I BELIEVE THEY WERE SOLD FOR ABOUT $6,000, THE TWO OF THEM

14  SEPARATE SALES.  BUT COMBINED $6,000.

15  **Q.** YOU SAID YOU BEGAN USING THIS ACCOUNT IN 2010, THIS ACCOUNT

16  THAT HAD BEEN OPENED BY MR. KNABB, AM I RIGHT ABOUT THAT?

17  **A.** YES.

18  **Q.** AND AFTER YOU STARTED USING IT IN 2010, TO YOUR KNOWLEDGE,

19  HAS MR. KNABB USED THIS E-BAY ACCOUNT TO SELL ANY ITEMS?

20  **A.** HE HAS NOT.

21  **Q.** HAS HE USED THE E-BAY ACCOUNT THAT WAS OPENED IN HIS NAME

22  TO BUY ANY ITEMS, TO YOUR KNOWLEDGE?

23  **A.** JUST, I BELIEVE, A COUPLE OF CHRISTMAS PRESENTS LAST

24  CHRISTMAS.

25  **Q.** THIS E-BAY ACCOUNT THAT WAS OPENED BY MR. KNABB THAT YOU'VE

1    BEEN USING, IS THAT THE ACCOUNT CURRENTLY IN YOUR NAME?

2    **A.**  YES.

3    **Q.**  AND WHEN DID IT CHANGE INTO YOUR NAME?

4    **A.**  I BELIEVE, JANUARY OF 2012 I CHANGED IT TO MY NAME.

5    **Q.**  AND EVEN THOUGH THE ACCOUNT WAS NOT IN YOUR NAME BEFORE

6    JANUARY OF 2012 ARE YOU SAYING YOU ALONE USED THE ACCOUNT?

7    **A.**  CORRECT.

8    **Q.**  TO SELL ITEMS?

9    **A.**  YES.

10   **Q.**  WHY WAS IT NOT UNTIL JANUARY OF 2012 THAT YOU ACTUALLY

11   CHANGED THE NAME OF THE ACCOUNT INTO YOUR NAME?

12   **A.**  I HAD THE E-BAY ACCOUNT UNDER AN ALIAS AND IT WAS BROUGHT

13   TO MY ATTENTION THAT WAS PERCEIVED AS BEING DECEPTIVE AND I

14   THOUGHT THE PROTECTION OF MY PRIVACY WAS NOT ONE IMPRESSION OF

15   DECEPTION, SO I CHANGED IT TO MY REAL NAME.

16   **Q.**  SO BEFORE JANUARY 2012 DO YOU RECALL THE NAME WHICH THE

17   E-BAY ACCOUNT WAS LISTED UNDER?

18   **A.**  IT WAS GARY MATTHEWS.

19   **Q.**  AND WHO WAS IT THAT DESIGNATED THAT TO BE THE NAME OF THE

20   ACCOUNT?

21   **A.**  I CHANGED THE NAME, I MADE THAT NAME THAT I GOT IT FROM

22   JAY.  BECAUSE I WAS HAVING TROUBLE COMING UP WITH AN ALIAS HE

23   SUGGESTED THAT NAME.

24   **Q.**  DO YOU REMEMBER APPROXIMATELY WHEN YOU PUT THE ACCOUNT INTO

25   GARY MATTHEW'S NAME?

1    **A.**   I DO NOT REMEMBER.

2    **Q.**   BEFORE THE ACCOUNT WAS IN THE GARY MATTHEW'S NAME DO YOU

3    KNOW WHAT NAME IT WAS UNDER?

4    **A.**   IT WAS UNDER JAY'S NAME.

5    **Q.**   AND WAS THERE ANY PARTICULAR REASON THAT WHEN YOU STARTED

6    USING HIS ACCOUNT YOU KEPT IT IN HIS NAME?

7    **A.**   NO, IT DIDN'T -- WASN'T PERTINENT TO THE BUSINESS.  SO IT

8    NEVER CROSSED MY MIND TO CHANGE IT.

9    **Q.**   NOW, THE INCOME THAT YOU RECEIVED FROM THE SALES YOU HAVE

10   MADE ON E-BAY WHO'S INCOME IS THAT?

11   **A.**   THAT'S MY INCOME.

12   **Q.**   YOUR INCOME ALONE?

13   **A.**   CORRECT.

14   **Q.**   AND WHY DO YOU SAY THAT IS YOUR INCOME ALONE?

15   **A.**   JAY AND I HAVE A PRENUP THAT OUTLINES THAT SEPARATE INCOME

16   EARNED DURING THE MARRIAGE IS MAINTAINED AS SEPARATE INCOME.

17   **Q.**   WAS THAT PRENUPTIAL AGREEMENT, LET ME WITHDRAW THAT

18   QUESTION.

19          WOULD THE COURT MIND IF I MARK THIS AS AN EXHIBIT?

20          **THE COURT:**  GO AHEAD.

21          **MR. GOLDROSEN:**  THANK YOU.

22          **THE COURT:**  HAS THE GOVERNMENT SEEN THIS?

23          **MR. GOLDROSEN:**  I HAVE DESCRIBED IT, I'LL GLADLY SHOW

24   MR. SCHMIDT WHAT I'M GOING TO PRESENT.

25          MAY I APPROACH THE WITNESS TO SHOW HER THE EXHIBIT?

1          **THE COURT:**  YES, WHAT'S THE NUMBER?

2          **MR. GOLDROSEN:**  THIS IS DEFENDANT'S EXHIBIT A.

3          **THE COURT:**  OKAY.  PLEASE CALL IT THAT.

4          **MR. GOLDROSEN:**  I WILL.  THANK YOU.

5   **Q.**  MS. VALAAS, SHOWING YOU DEFENDANT'S EXHIBIT A, WHICH IS A

6   MULTI -- NINE PAGE DOCUMENT.  COULD YOU TAKE A LOOK AT

7   DEFENDANT'S EXHIBIT A TELL US IF YOU RECOGNIZE WHAT THAT IS?

8   **A.**  I DO.

9   **Q.**  AND WHAT IS DEFENDANT'S EXHIBIT A, WOULD YOU TELL THE JUDGE

10  WHAT THAT IS?

11  **A.**  IT WAS OUR PRENUPTIAL AGREEMENT.

12         **THE COURT:**  WHAT'S THE DATE OF THAT NOW?

13         **THE WITNESS:**  THE DATE ON IT, I THINK, IT WAS THE 17TH

14  OF THE -- 21ST OF OCTOBER 2010.

15  **BY MR. GOLDROSEN:  Q.**  AND WAS THAT SIGNED BEFORE YOU MARRIED

16  OR RIGHT AROUND THE TIME YOU MARRIED MR. KNAPP?

17  **A.**  YEAH, IT WAS SIGNED A COUPLE OF DAYS BEFORE, I BELIEVE, WE

18  WERE MARRIED ON A SATURDAY, I HAVE TO LOOK AT A CALENDAR.

19  **Q.**  SO IS THAT A TRUE AND ACCURATE COPY OF THE PRENUPTIAL

20  AGREEMENT?

21  **A.**  YES.

22  **Q.**  DOES IT CONTAIN YOUR SIGNATURE ON IT?

23  **A.**  YES.

24  **Q.**  DOES IT CONTAIN MR. KNABB'S SIGNATURE ON IT?

25  **A.**  YES.

1    Q.  VERY WELL.  I CAN GET THAT BACK FROM YOU.

2         NOW, LET ME ASK YOU, WHEN YOU MAKE PURCHASES OF THE

3    TRAINS THAT YOU SELL ON E-BAY, DO YOU GET DOCUMENTATION TO

4    CORROBORATE OR CONFIRM OR VERIFY THOSE PURCHASES?

5    A.  I DO.  I DO A LOT OF PURCHASES THROUGH ACTUAL VENDORS AT

6    WHOLESALE, I HAVE STANDARD RECEIPTS AND INVOICES FOR THOSE.

7    MOST OF MY BIG COLLECTIONS COME OUT FROM E-BAY OR CRAIG'S LIST

8    AND I PRINT OFF THE CRAIG'S LIST AFTER WHEN I PURCHASE THOSE

9    AND I BROUGHT MY RECEIPTS.

10   Q.  SO GOT AN ENVELOPE?

11   A.  CRAIG'S LIST ADVERTISEMENTS, FROM COLLECTIONS THAT I

12   PURCHASED ON CRAIG'S LIST, E-BAY COLLECTIONS WHICH I BELIEVE

13   THE COURT HAS RECORD OF THE E-BAY PURCHASES.

14   Q.  SO YOU HAVE A FOLDER IN FRONT OF YOU NOW THAT CONTAINS,

15   LOOKS LIKE A LARGE NUMBER OF DOCUMENTS, WHAT ARE THOSE?

16   A.  THESE ARE MY RECEIPTS.

17   Q.  FOR YOUR PURCHASES?

18   A.  CORRECT.

19   Q.  AND PREVIOUSLY WHEN -- PREVIOUSLY YOU WERE CONTACTED BY

20   MS. CARUBA THE PROBATION OFFICER?

21   A.  CORRECT.

22   Q.  ASKED ABOUT YOUR INCOME AND ASSETS; IS THAT RIGHT?

23   A.  YES.

24   Q.  DID YOU AT THAT TIME PROVIDE MS. CARUBA WITH SOME OF THE

25   RECEIPTS SHOWING YOUR PURCHASES OF TRAINS FOR RESALE ON E-BAY?

1    **A.**  I DID.

2    **Q.**  YOU REMEMBER HOW MANY PAGES APPROXIMATELY OF RECEIPTS YOU

3    PROVIDED TO MS. CARUBA?

4    **A.**  I DO NOT REMEMBER.

5    **Q.**  WOULD --

6    **A.**  IT WAS SUBSTANTIAL.

7    **Q.**  THAT'S FINE.  NOW, WE RECEIVED A DOCUMENT FROM THE

8    GOVERNMENT WHICH LISTED A NUMBER OF SALES ON E-BAY THAT WERE

9    GREATER THAN A THOUSAND DOLLARS, AND COULD I HAVE THIS MARKED

10   AS DEFENSE EXHIBIT B.

11          THIS DEFENDANT'S EXHIBIT B IS SUMMARY PROVIDED BY THE

12   GOVERNMENT E-BAY SALES FROM THE E-BAY ACCOUNT ORIGINALLY OPENED

13   BY MR. KNABB.  AND IT'S A LISTING OF THE SALES OF ITEMS THAT --

14   OF ITEMS THAT WERE SOLD FOR A THOUSAND DOLLARS OR MORE.

15          MAY I APPROACH THE WITNESS?

16          **THE COURT:**  YES.

17          **MR. GOLDROSEN:**  I'M SURE MR. SCHMIDT LAST SEEN THIS,

18   HE GAVE IT TO US.

19   **Q.**  LET ME ASK YOU, MS. VALAAS, ABOUT A COUPLE OF ITEMS ON THAT

20   LIST.  THE TOP ITEM YOU SEE THERE IS A TRUCK?

21   **A.**  CORRECT.

22   **Q.**  A SALES PRICE OF $40,000, APPROXIMATELY?

23   **A.**  YES.

24   **Q.**  WAS THAT AN ITEM THAT WAS, IN FACT, SOLD ON E-BAY?

25   **A.**  IT WAS NOT.

Q.   FIRST OF ALL, WAS THAT AN ITEM THAT YOU'RE FAMILIAR WITH?

A.   YES.

Q.   WHOSE TRUCK IS THAT?

A.   THAT'S MY TRUCK.

Q.   DID YOU ATTEMPT TO SELL THAT ON E-BAY?

A.   I DID.

Q.   HOW MUCH DID YOU TRY TO SELL IT FOR?

A.   I BELIEVE, I SAID SET A RESERVE PRICE OF $42,000.

Q.   DID IT IN FACT SELL?

A.   IT DID NOT SELL.

Q.   DID YOU GET ANY INCOME THROUGH YOUR E-BAY ACCOUNT FOR THAT
TRUCK?

A.   I DID NOT.

Q.   IF YOU LOOK FURTHER DOWN THE LIST DO YOU SEE ROLEX WATCHES
LISTED?

A.   I DO.

Q.   AND HOW MANY ROLEX WATCHES DO YOU SEE LISTED THERE?

A.   THERE'S THREE LINE ITEMS.

Q.   AND ARE THOSE THREE LINE ITEMS FOR THREE DIFFERENT ROLEX
WATCHES?

A.   THEY'RE NOT DUPLICATE, THE 2006 MEN'S GOLD DAY BULOVA ROLEX
IS BLACK FACE IS LISTED TWICE.

Q.   THEY LISTED FOR DIFFERENT PRICES, THOSE TWO WATCHES?

A.   THEY DO.  I BELIEVE LOOKING AT THIS THAT -- I DON'T
REMEMBER EXACTLY THE CIRCUMSTANCES OF THIS SALE, BUT IT LOOKS

```
1    LIKE THE WATCH SOLD, THE ORIGINAL BUYER BACKED OUT, DECIDED NOT

2    TO PURCHASE AND IT WAS OFFERED AS A SECOND CHANCE AT THE

3    $17,000 PRICE.

4    Q.  AND DO YOU THINK THAT'S WHY IT APPEARS TWICE ON THIS

5    SUMMARY PREPARED BY THE GOVERNMENT?

6    A.  I BELIEVE SO, AS THERE WAS ONLY ONE SOLD.

7    Q.  ARE THERE ANY ITEMS -- TAKING A LOOK AT THAT LIST, ARE

8    THOSE ALL ITEMS THAT YOU SOLD?

9    A.  YES.

10   Q.  AND IS THE INCOME FROM THE SALES ON ALL THE ITEMS IN THIS

11   LIST INCOME YOU RECEIVED ALONE?

12   A.  YES, WITH THE CAVEAT THAT IT APPEARS THE TRUCK AND THE

13   WATCHES WERE LISTED TWICE WERE IN ERROR.

14   Q.  TAKING OUT THE TRUCK WHICH DIDN'T SELL, TAKING OUT THE

15   DUPLICATE LISTING OF THE WATCH --

16   A.  YES.

17   Q.  -- IS EVERYTHING ELSE ON THAT LIST AN ITEM THAT YOU SOLD?

18   A.  YES.

19   Q.  ITEM THAT FOR WHICH THE INCOME WENT TO YOU ALONE?

20   A.  CORRECT.

21   Q.  LET ME RETRIEVE THAT.  MS. VALLAAS, ARE YOU FAMILIAR WITH

22   THE SKY MOUNTAIN TRUST?

23   A.  I AM.

24   Q.  HOW ARE YOU FAMILIAR WITH THAT TRUST?

25   A.  CAN YOU BE MORE SPECIFIC?
```

1  **Q.** LET ME ASK THIS QUESTION.  HAVE YOU HAD ANY INVOLVEMENT

2  WITH THE SKY MOUNTAIN TRUST?

3  **A.** I HAVE.

4  **Q.** WHEN DID YOU BECOME INVOLVED WITH THE SKY MOUNTAIN TRUST?

5  **A.** YOU'LL HAVE TO CHECK THE DATES ON THE DOCUMENTS, BUT IT WAS

6  SOME TIME THIS SPRING, THE CURRENT AND THEN TRUSTEE WAS TRYING

7  TO GET A LOAN TO FIX UP THE PROPERTY AND PRESERVE IT AND GET IT

8  IN A STATE WHERE IT COULD BE RENTED OR SOLD.

9  **Q.** THIS WAS THE SPRING OF THIS YEAR?

10  **A.** CORRECT.  2012.

11  **Q.** WHO WAS THE TRUSTEE AT THIS TIME?

12  **A.** KEVIN DIXON.

13  **Q.** KEVIN DIXON WAS THE TRUSTEE OF SKY MOUNTAIN TRUST?

14  **A.** CORRECT.

15  **Q.** IN THE SPRING OF THIS YEAR 2012 WAS THERE ANY BENEFICIARY

16  DESIGNATED FOR THE TRUST?

17  **A.** AT THE TIME KEVIN CONTACTS ME THERE WAS NO BENEFICIARY.

18  **Q.** AND WHAT HAPPENED WHEN KEVIN CONTACTED YOU?

19  **A.** KEVIN REQUESTED THAT I GO SIGN ON THE LOAN TO OBTAIN THE

20  FUNDS NECESSARY TO PAY THE TAXES AND DO UPKEEP ON THE HOUSE.

21  **Q.** WHERE WAS THE PROPERTY LOCATED THAT WAS OWNED BY THE TRUST?

22  **A.** ANCHORAGE.

23  **Q.** WHAT WAS THE CONDITION OF THAT PROPERTY, TO YOUR KNOWLEDGE?

24  **A.** I HADN'T SEEN IT SINCE, 2009 BUT FROM REPORTS IT HAD BEEN

25  ABANDONED, NOT CARED FOR.

1   **Q.**   TO YOUR KNOWLEDGE, WAS THERE TAXES OWED TO THE HOUSE?

2   **A.**   YES, THERE WERE TAXES OWED.

3   **Q.**   AND WAS THERE -- THE HOUSE IN FORECLOSURE OR ABOUT TO BE

4   FORECLOSED?

5   **A.**   YES, IT'S STILL IN FORECLOSURE.   AND TAXES DUE.

6   **Q.**   WHEN MR. DIXON CONTACTED YOU ABOUT OBTAINING A LOAN COULD

7   YOU EXPLAIN FURTHER WHAT THE PLAN WAS OR WHAT WAS INVOLVED?

8   **A.**   YES, THE PLAN WAS TO -- FOR HIM TO TAKE OUT A LOAN, I WAS

9   GOING TO COSIGN SINCE HE DIDN'T HAVE THE NECESSARY CREDIT TO

10  OBTAIN THE LOAN BY HIMSELF, PAY OFF THE TAXES AND FIX UP THE

11  HOUSE SO IT COULD BE RENTED OR SOLD, AND THEN I WOULD BE -- AT

12  THAT TIME THE PROCEEDS WE'RE GOING TO GO TO THE RESTITUTION FOR

13  THE VICTIMS FROM JAY'S CASE.

14  **Q.**   WERE YOU EVER ABLE TO GET A LOAN?

15  **A.**   NO.

16  **Q.**   AND WAS A DESIGNATED -- WAS A BENEFICIARY DESIGNATED SOME

17  TIME AFTER YOU WERE CONTACTED BY THE TRUSTEE MR. DIXON?

18  **A.**   YES, KEVIN DESIGNATE MY SON'S TRUST AS THE BENEFICIARY, SO

19  THAT THE CAPITAL OUTPUT I HAD TO PAY TO PREPARE FOR THE LOAN

20  COULD BE RETURNED.

21  **Q.**   COULD YOU EXPLAIN THAT?

22  **A.**   COULD BE PUT INTO HIS TRUST.

23  **Q.**   LET'S BACK UP.   WHY -- WAS THERE A REASON THAT THERE HAD TO

24  BE A BENEFICIARY DESIGNATED?

25  **A.**   I BELIEVE SO, I'M NOT A TRUST ATTORNEY, I BELIEVE IN ORDER

```
1   TO INTERACT WITH THE BANK THE TRUST HAD TO BE A FULL AND

2   COMPLETE FUNCTIONING TRUST, WHICH INCLUDED HAVING A TRUSTEE,

3   HAVING THE BENEFICIARY AND, YOU KNOW, HAVING CONTROL OF THE

4   HOUSE.

5   Q.  DID SOMEONE TELL YOU THAT?

6   A.  YES.

7   Q.  WHO TOLD YOU THAT?

8   A.  I BELIEVE, IT WAS THE TRUST ATTORNEYS.

9   Q.  WHO WERE THE TRUST ATTORNEYS?

10  A.  GENE LEWIS.

11  Q.  AND THESE TRUST ATTORNEYS WERE HELPING WITH THE TRUST AT

12  THIS TIME?

13  A.  THE TRUST, YES.

14  Q.  SO WHEN YOU WERE TOLD THERE HAD TO BE A BENEFICIARY, WHY

15  DIDN'T YOU BECOME A BENEFICIARY?

16  A.  BECAUSE MY SON'S TRUST IS SET UP SO THAT THAT MONEY ONLY

17  GOES TO HIS -- CAN ONLY BE SPENT ON HIS EDUCATION, I DIDN'T

18  WANT TO GIVE THE IMPRESSION I WAS TRYING TO MAKE MONEY.

19  Q.  THERE WAS A TRUST ALREADY SET UP FOR YOUR SON?

20  A.  YES.

21  Q.  WHEN WAS THAT SET UP?

22  A.  IN 2011.

23  Q.  AND YOUR SON'S THE BENEFICIARY, YOUR SON TRISTEN THE

24  BENEFICIARY FOR THAT TRUST?

25  A.  YES.
```

1   Q.  IS THE MONEY IN THAT TRUST OR WHATEVER MONEY THAT TRUST HAS

2   DESIGNATED FOR CERTAIN PURPOSE?

3   A.  CORRECT, YES.

4   Q.  WHAT IS THAT?

5   A.  HIS EDUCATION.

6   Q.  AND SO WHEN A BENEFICIARY WAS NEEDED TO BE DESIGNATED FOR

7   THE SKY MOUNTAIN TRUST IN ORDER TO ATTEMPT TO GET A LOAN FOR

8   THE PROPERTY TO PAYOFF THE BACK TAXES, WHY DID YOU SELECT YOUR

9   SON'S TRUST TO BE THE BENEFICIARY?

10  A.  THERE WAS NO OTHER BENEFICIARY.

11  Q.  AND SO DID THAT HAPPEN THAT YOUR SON'S TRUST WAS MADE THE

12  BENEFICIARY?

13  A.  IT DID.

14  Q.  AND, TO YOUR KNOWLEDGE, IS YOUR SON'S TRUST STILL A

15  BENEFICIARY?

16  A.  TO MY KNOWLEDGE, YES.

17  Q.  DID THE TRUSTEE AT SOME POINT CHANGE?

18  A.  TRUSTEESHIP HAS CHANGED.

19  Q.  WHO -- WHY DID IT CHANGE?

20  A.  KEVIN DIXON THEN TRUSTEE WAS LEAVING ALASKA, I BELIEVE, FOR

21  CAREER CHANGE AND HE ASKED ME TO HELP HIM FIND A NEW TRUSTEE.

22  I SUGGESTED SOMEONE FOR HIM.

23  Q.  AND WHO DID YOU CHANGE TO?

24  A.  I CHANGED IT TO GLENN ROBERTS.

25  Q.  AND, TO YOUR KNOWLEDGE, IS MR. ROBERTS STILL THE TRUSTEE?

1    **A.**  TO MY KNOWLEDGE, HE IS.

2    **Q.**  NOW, AT ANY TIME YOU WERE INVOLVED DEALING WITH SKY

3    MOUNTAIN TRUST, DID YOUR HUSBAND JAY KNABB HAVE ANY -- LET ME

4    REPHRASE IT.

5            WAS HE A BENEFICIARY OF THE TRUST?

6    **A.**  NO.

7    **Q.**  TO YOUR KNOWLEDGE, DID JAY KNABB HAVE ANY DIRECT FINANCIAL

8    INTEREST?

9    **A.**  HE DOES NOT.

10   **Q.**  IN THE TRUST?

11   **A.**  NO.

12   **Q.**  YOU'VE KNOWN MR. KNABB NOW SINCE 2009?

13   **A.**  YES.

14   **Q.**  YOU'VE BEEN MARRIED SINCE 2010; IS THAT CORRECT?

15   **A.**  YES.

16   **Q.**  DO YOU BELIEVE MR. KNABB HAVE A PROBLEM WITH ALCOHOL?

17   **A.**  I DO.

18   **Q.**  WHY DO YOU SAY THAT?

19   **A.**  I'VE WATCHED HIS RELATIONSHIP WITH IT AND WHEN HE'S NOT

20   WITH IT, I WATCHED HIM FIGHT IT AND BE VERY OUTWARDLY

21   ANTI-ALCOHOL AND BECAUSE HE'S SEEN HOW IMPACT ON HIS MOTHER AND

22   HIS FAMILY AND HIS BROTHER.

23            AND I'VE ALSO WATCHED HIM ONCE HE STARTED TO DRINK NOT

24   BE ABLE TO STOP AND EFFECT THAT'S HAD.

25   **Q.**  WHAT KIND OF EFFECT HAS THAT HAD?

1    **A.**  IT'S EFFECTED ON HIM IS HE STARTS TO LOOSE CONTROL OF, YOU

2    KNOW, NOT BEING THE SAME PERSON THAT I KNOW.  BUT HE'S VERY

3    ADAMANT ABOUT BEING ANTI-ALCOHOL, MOST PEOPLE DON'T THINK HE

4    DRINKS AT ALL.

5    **Q.**  LET ME GO BACK FOR ONE MOMENT ON SKY MOUNTAIN TRUST.  I'M

6    SORRY, YOU SAID MOST PEOPLE DON'T --

7    **A.**  DON'T THINK HE DRINKS AT ALL.

8    **Q.**  WHY IS THAT?

9    **A.**  BECAUSE HE INFREQUENTLY DRINKS IN PUBLIC.

10   **Q.**  WHERE DOES HE DRINK?

11   **A.**  UNLESS IT'S VERY SOCIAL WHERE HE WOULD BE, YOU KNOW, NOT TO

12   DRINK.

13   **Q.**  WHERE DOES HE TYPICALLY DRINK?

14   **A.**  AT HOME.

15   **Q.**  WHAT DOES HE TYPICALLY DRINK?

16   **A.**  WHATEVER, USUALLY WHATEVER IS AROUND.

17   **Q.**  WHATEVER ALCOHOL IS AROUND?

18   **A.**  YES.

19   **Q.**  LET ME GO BACK TO THE TRUST FOR ONE OR TWO MORE QUESTIONS.

20   WHEN YOU WERE CONSIDERING OR WHEN YOU WERE ATTEMPTING TO GET A

21   LOAN WITH TRUSTEE DIXON, DID YOU HAVE TO PUT ANY OR PAY

22   ANYTHING OUT-OF-POCKET, ANY EXPENSES?

23   **A.**  I DID, AND THAT I SUPPOSE TO ONE OF YOUR PREVIOUS

24   QUESTIONS, THAT'S REASON WHY KRISTAN'S TRUST WAS NAMED AS THE

25   BENEFICIARY, SO THAT MY UP-FRONT EXPENSES COULD BE PAID BACK IN

1   THAT MANNER.

2   **Q.**  WHAT DID YOU HAVE TO PAY?

3   **A.**  I HAD TO PAY OFF SOME OF THE UTILITY BILLS AND OBTAIN

4   INSURANCE ON THE HOUSE, SO THAT THE BANK WOULD WRITE A LOAN ON

5   IT.  ALTHOUGH, NO LOAN WAS -- I NEVER MADE THAT HAPPEN.

6   **Q.**  AT THIS TIME WHEN YOU WERE CONSULTING OR WORKING WITH

7   MR. DIXON, DID YOU HAVE ANY KNOWLEDGE ABOUT THE SEC PUTTING OR

8   THE TRUST BEING PART OF A JUDGMENT THAT THE SEC HAD OBTAINED

9   AGAINST TAMMY KNABB?

10   **A.**  I THOUGHT THAT THEIR JUDGMENT WITH HER HAD BEEN RESOLVED.

11   I THOUGHT THAT HAD BEEN FINISHED, SO I DIDN'T THINK THIS WAS

12   CONTINUING TO BE APART OF IT.

13   **Q.**  WHY DID YOU THINK THAT?

14   **A.**  BECAUSE ONE OF JAY'S PREVIOUS ATTORNEYS HAD TOLD US THAT

15   THIS HOUSE COULD BE USED TO -- COULD BE SOLD TO HELP PAYBACK

16   HIS VICTIMS.

17   **Q.**  ALL RIGHT. I HAVE NO OTHER QUESTIONS.

18          **THE COURT:**  MR. SCHMIDT, ANY QUESTIONS?

19          **MR. SCHMIDT:**  CAN I HAVE A MOMENT, YOUR HONOR?

20          **THE COURT:**  YES.

21                  (PAUSE IN PROCEEDINGS.)

22          **THE COURT:**  WOULD YOU TAKE THE EXHIBITS BACK FROM THE

23   WITNESS?

24          **MR. GOLDROSEN:**  I GAVE ONE TO MR. SCHMIDT.

25          **THE COURT:**  YOU SHOULD GIVE THEM TO THE CLERK.

1          THE CLERK:  ARE THEY ADMITTED?

2          THE COURT:  ARE YOU OFFERING THOSE INTO EVIDENCE?

3          MR. GOLDROSEN:  YES.  THE OTHER ONE IS RIGHT HERE ON

4     MY DESK.

5          THE COURT:  YOU'RE OFFERING BOTH IN EVIDENCE?

6          MR. GOLDROSEN:  YES.

7          THE COURT:  ANY OBJECTION.

8          MR. SCHMIDT:  NO, YOUR HONOR.

9          THE COURT:  THEY'RE ADMITTED.

10                              (DEFENDANT'S EXHIBITS, A, B

11                               RECEIVED IN EVIDENCE)

12          MR. SCHMIDT:  THE GOVERNMENT HAS NO QUESTIONS.

13          THE COURT:  ALL RIGHT.  THE COURT HAS A FEW QUESTIONS.

14     WHEN DID YOU MEET MR. KNABB?

15          THE WITNESS:  2009.

16          THE COURT:  DO YOU REMEMBER APPROXIMATELY WHEN?

17          THE WITNESS:  I THINK, IT WAS MAY.

18          THE COURT:  AND YOU HAVE THE EXHIBITS, MS. OTTOLINI,

19     PLEASE.  EXHIBIT A YOU IDENTIFIED AS YOUR PRENUPTIAL AGREEMENT;

20     IS THAT CORRECT?

21          THE WITNESS:  YES.

22          THE COURT:  THAT WAS -- IT'S DATED -- SAYS MADE ON

23     OCTOBER 21ST 2010; IS THAT CORRECT?

24          THE WITNESS:  YES.

25          THE COURT:  IS THAT APPROXIMATELY THE DATE THAT YOU

1   RECALL YOU EXECUTED THAT?

2          THE WITNESS:  YES.

3          THE COURT:  WHO SUGGESTED THAT YOU ENTER INTO A

4   PRENUPTIAL AGREEMENT?

5          THE WITNESS:  I BELIEVE JAY DID, BUT IT WAS UNDERSTOOD

6   WE WOULD DO THIS BEFORE WE GOT MARRIED.  IT WAS SOMETHING WE

7   DISCUSSED BEFORE GETTING MARRIED.

8          THE COURT:  WHEN YOU ENTERED INTO THIS PRENUPTIAL

9   AGREEMENT, WERE YOU PERSONALLY AWARE AS TO WHETHER OR NOT THERE

10  WAS AN INVESTIGATION ABOUT MR. KNABB'S BUSINESS ACTIVITIES?

11         THE WITNESS:  I WAS.

12         THE COURT:  AND WHAT WAS THE LEVEL -- WHAT DID YOU

13  KNOW ABOUT THAT INVESTIGATION WHEN YOU ENTERED INTO THIS

14  PRENUPTIAL AGREEMENT?

15         THE WITNESS:  EVERYTHING UP TO THAT POINT.

16         THE COURT:  THAT THERE WAS ALLEGATION OF FRAUD?

17         THE WITNESS:  YES.

18         THE COURT:  YOU UNDERSTOOD MR. KNABB'S ASSETS MIGHT BE

19  AT RISK BECAUSE OF THIS INVESTIGATION?

20         THE WITNESS:  YES.

21         THE COURT:  YOU UNDERSTOOD YOUR ASSETS MIGHT BE AT

22  RISK BECAUSE OF THIS INVESTIGATION?

23         THE WITNESS:  I BELIEVE THAT'S WHY WE ENTERED INTO THE

24  PRENUP.

25         THE COURT:  NOW, WITH RESPECT TO -- YOU TESTIFIED ON

DIRECT EXAMINATION ABOUT THIS E-BAY ACCOUNT, WHEN YOU -- AFTER

YOU MET MR. KNABB DID YOU BECOME AWARE OF THE EXISTENCE OF THIS

E-BAY ACCOUNT?

       **THE WITNESS:**  NOT UNTIL I STARTED TRYING TO SELL

THINGS.

       **THE COURT:**  APPROXIMATELY WHEN WAS THAT?

       **THE WITNESS:**  IN 2000 -- I STARTED REALLY SELLING IN

2011.

       **THE COURT:**  SO YOU WERE NOT AWARE OF THIS -- THAT

MR. KNABB HAD THIS E-BAY ACCOUNT UNTIL 2011?

       **THE WITNESS:**  NO, I DID KNOW HE HAD IT, BUT IT WASN'T

AN ENTITY, WASN'T --

       **THE COURT:**  ALL RIGHT.  LET ME ASK YOU THIS.  WERE

AWARE AS TO WHETHER OR NOT THE NAME OF THE ACCOUNT THAT EXISTED

AT THE TIME YOU -- THE E-BAY ACCOUNT AT THE TIME YOU MET

MR. KNABB THAT ANY OF IT WAS REALLY ALASKA?

       **THE WITNESS:**  YES.

       **THE COURT:**  AND WERE YOU AWARE THAT IT WAS UNDER THE

NAME OF PERSON NAMED PAUL JACKSON?

       **THE WITNESS:**  YES.

       **THE COURT:**  WHO IS MR. JACKSON?

       **THE WITNESS:**  IT WAS JAY'S CHARACTER ON CSI?

       **THE COURT:**  SO THAT'S WHAT YOU CALL ALIAS OR AVATAR, I

DON'T KNOW WHAT NAME IS, JUST A NAME HE WAS USING FOR HIMSELF?

       **THE WITNESS:**  IT'S THE CHARACTER THAT HE PLAYED IN THE

```
1    CSI EPISODE.

2              THE COURT:  SO NO REAL PERSON NAMED PAUL JACKSON?

3              THE WITNESS:  NO, NOT THAT I KNOW.

4              THE COURT:  AND WERE YOU AWARE THAT AS OF EARLY 2009

5    THAT ON THIS ACCOUNT YOUR DATE OF BIRTH, YOUR E-MAIL ADDRESS

6    AND YOUR ADDRESS 8100 SKY MOUNTAIN LANE WAS LISTED ON THE

7    ACCOUNT?

8              THE WITNESS:  I'M SORRY, MY ADDRESS WASN'T 100 SKY

9    MOUNTAIN LANE.

10             THE COURT:  WERE YOU AWARE THE ACCOUNT, E-BAY'S

11   RECORDS THAT THIS ACCOUNT MR. KNABB HAD WAS ASSOCIATED WITH

12   YOUR DATE OF BIRTH AND YOUR E-MAIL ADDRESS?

13             THE WITNESS:  WE USED TO -- SAY THAT AGAIN?

14             THE COURT:  LET ME ASK IT A DIFFERENT WAY.

15             THE WITNESS:  CURRENTLY HAS MY NAME ON IT.

16           MR. GOLDROSEN:  MAYBE I SUGGEST THAT MAYBE WE COULD

17   REFRESH THE WITNESS' RECOLLECTION WITH THE DOCUMENT.

18             THE COURT:  SURE, JUST TELL US WHAT WE'RE DOING, WHAT

19   DOCUMENT IT IS.

20           MR. GOLDROSEN:  WHY DON'T WE MARK THIS AS EXHIBIT,

21   DEFENDANT'S EXHIBIT C, AND THEN EVERYONE CAN BE CLEAR ABOUT THE

22   QUESTIONS AND ANSWERS AND --

23             THE CLERK:  THIS IS?

24           MR. GOLDROSEN:  THIS IS A DOCUMENT PROVIDED BY THE

25   GOVERNMENT, IT'S A FOUR PAGE SUMMARY OF THE REGISTRATION
```

1    INFORMATION, FINANCIAL INFORMATION, CONTACT INFORMATION

2    REGARDING AND SHIPPING ADDRESS INFORMATION REGARDING THE

3    ACCOUNT INITIALLY KNOWN AS REALLY ALASKA AND THEN CHANGED TO --

4             **THE COURT:**  IS THAT PREPARED BY THE WITNESS?

5             **MR. GOLDROSEN:**  THAT WAS PREPARED BY THE GOVERNMENT.

6             **THE COURT:**  WOULD YOU PLEASE HAND THAT TO THE WITNESS.

7    WOULD THAT HELP REFRESH YOUR MEMORY?

8             **THE WITNESS:**  THANKS.  YES.

9             **MR. GOLDROSEN:**  SO I'M HANDING THE WITNESS DEFENDANT

10   EXHIBIT C.

11            **THE COURT:**  NOW, YOU HAVE THAT IN FRONT OF YOU I'LL

12   ASK YOU SOME ADDITIONAL QUESTIONS.

13            SO IS IT CORRECT, THAT ON MARCH 25TH 2010 CONTACT

14   INFORMATION IN THE E-BAY ACCOUNT WHICH WAS PREVIOUS CALLED

15   ALASKA CHANGED TO JAY KNABB?

16            **THE WITNESS:**  YES.

17            **THE COURT:**  AND WAS THE SHIPPING ADDRESS SHORTLY

18   THEREAFTER ABOUT MARCH 29TH, THE SHIPPING ADDRESS ON THE E-BAY

19   ACCOUNT CHANGED IN YOUR NAME?

20            **THE WITNESS:**  YES.

21            **THE COURT:**  AND FROM MARCH 29TH 2010 TO DECEMBER 7TH

22   2011 WAS YOUR NAME LISTED AS THE SHIPPING ADDRESS?

23            **THE WITNESS:**  YES.

24            **THE COURT:**  AND WAS MR. KNABB'S NAME LISTED AS THE

25   CONTACT INFORMATION?

1           THE WITNESS:  IT HAS THAT HERE.

2           THE COURT:  THAT'S WHAT IT SAYS ON THE EXHIBIT THAT

3    YOU'RE LOOKING AT, CORRECT?

4           THE WITNESS:  YES.

5           THE COURT:  IS THAT TRUE?

6           THE WITNESS:  YES, I'M LOOKING AT THE SAME.

7           THE COURT:  PUT THE DOCUMENT DOWN, THAT WASN'T

8    PREPARED, AS FAR AS YOU KNOW, FROM MARCH 29TH 2010 TO DECEMBER

9    7TH 2011, WAS MR. KNABB'S NAME LISTED AS THE CONTACT ON THE

10   ACCOUNT?

11          THE WITNESS:  YES.  IT WAS.  GARY MATTHEWS HE HAD A

12   COUPLE OF PROBLEMS WITH SOME HARASSMENT ON-LINE STALKING, SO HE

13   DOESN'T HAVE JAY KNABB, HE HAD JAY VALLAAS.  I USED GARY

14   MATTHEWS AS AN ALIAS.

15          THE COURT:  IS IT CORRECT, AS FAR AS THAT -- AS A

16   RESULT OF THIS CONTACT INFORMATION BEING IN THE NAME OF JASPER

17   KNABB BETWEEN DECEMBER 29TH 2010 AND DECEMBER 7TH 2011, MR.

18   KNABB HAD INTEREST IN THIS ACCOUNT?

19          THE WITNESS:  NO.

20          THE COURT:  ALL RIGHT.  WHO DECIDED TO USE THIS GARY

21   MATTHEWS, I'LL USE YOUR TERM NOW, ALIAS?

22          THE WITNESS:  JAY SUGGESTED THE ACTUAL NAME, I

23   COULDN'T COME UP WITH ANYTHING.

24          THE COURT:  AND YOU WENT ALONG WITH IT?

25          YOU WENT ALONG WITH USING THIS ALIAS, CORRECT?

1        **THE WITNESS:** CORRECT. MOST PEOPLE ON THE E-BAY

2    ACCOUNT USE A MODIFIED NAME, SO THAT THEY CAN'T BE -- TO

3    PROTECT THEIR PRIVACY.

4        **THE COURT:** NOW, YOU TESTIFIED, IS IT CORRECT, THAT IT

5    WAS ON APPROXIMATELY JANUARY 7TH 2012 THAT FOR THE FIRST TIME

6    ONLY YOUR NAME WAS LISTED ON THIS E-BAY ACCOUNT, NOW UNDER THE

7    DIFFERENT NAME PIPE FREEZE USING THIS ALIAS GARY MATTHEWS,

8    CORRECT?

9        **THE WITNESS:** IT WAS GARY MATTHEWS THEN IT SWITCHED IN

10   JANUARY, CORRECT.

11       **THE COURT:** THEN YOU STARTED USING YOUR OWN NAME?

12       **THE WITNESS:** CORRECT.

13       **THE COURT:** YOU STOPPED USING THE ALIAS?

14       **THE WITNESS:** CORRECT.

15       **THE COURT:** NOW, WERE YOU AWARE -- NOW, WERE YOU

16   PRESENT ON JANUARY 7TH 2012 WHEN THE REPRESENTATIVE OF THE

17   PROBATION DEPARTMENT CAME TO THE HOME TO DO A SITE VISIT?

18       **THE WITNESS:** YES.

19       **THE COURT:** WERE YOU AWARE THAT THE PROBATION OFFICER

20   WAS COMING TO YOUR HOME?

21       **THE WITNESS:** I BELIEVE THEY SAID SOME POINT

22   INSPECTION WOULD BE DONE, BUT I DIDN'T KNOW THAT DAY HE WOULD

23   HAVE SHOWED UP THAT DAY.

24       **THE COURT:** SHORTLY AFTER YOU CHANGED THE NAME ON THE

25   ACCOUNT TO YOUR NAME THAT THIS SITE VISIT BY PROBATION

```
 1    HAPPENED, CORRECT?
 2              THE WITNESS:  YEAH, APPEARS A COUPLE DAYS AFTER THAT
 3    HE CAME.
 4              THE COURT:  WAS THE REASON THAT YOU PUT THE NAME IN
 5    YOUR ACCOUNT BECAUSE YOU DIDN'T WANT PROBATION DEPARTMENT TO
 6    KNOW THAT YOUR HUSBAND WAS ASSOCIATED WITH THIS ACCOUNT?
 7              THE WITNESS:  I BELIEVE, I EXPLAINED THIS TO MARK.
 8              THE COURT:  EXPLAIN IT TO ME NOW.
 9              THE WITNESS:  I WAS TOLD TO THROUGH JAY'S ATTORNEYS
10    THAT IT WAS -- THAT HAVING GARY MATTHEWS ON THE MY E-BAY
11    ACCOUNT WAS BEING VIEWED AS BEING DECEPTIVE, AND I DIDN'T WANT
12    TO DO THAT.  I WAS JUST PROTECTING MY PRIVACY, TO HAVE A BUFFER
13    OF PRIVACY BETWEEN THE E-BAY WORLD AND MY PERSONAL WORLD.
14              THE COURT:  LET ME ASK YOU THIS QUESTION.  YOU CAN
15    ANSWER THIS ANYWAY YOU WANT, YES OR NO WILL BE FINE.
16              WERE YOU AWARE ONE WAY OR THE OTHER ABOUT WHETHER
17    YOUR -- MR. KNABB EVER TOLD PROBATION DEPARTMENT BEFORE JANUARY
18    OF 2012 HE HAD AN INTEREST IN THIS EBAY ACCOUNT?  DO YOU KNOW
19    ONE WAY OR ANOTHER?
20              THE WITNESS:  I'M SORRY, DID -- SAY ASK THAT AGAIN?
21              THE COURT:  DO YOU KNOW OF YOUR OWN KNOWLEDGE BECAUSE
22    YOU WERE PRESENT OR MR. KNABB TOLD YOU, DO YOU KNOW WHETHER
23    MR. KNABB EVER TOLD THE PROBATION DEPARTMENT THAT HE HAD HAD
24    THIS INTEREST IN THIS E-BAY ACCOUNT?
25              THE WITNESS:  HE DOESN'T HAVE AN INTEREST IN THIS
```

1   E-BAY ACCOUNT.

2          THE COURT:  NOT THAT HE DOESN'T, THAT HE NEVER HAD AN

3   INTEREST OR DO YOU KNOW WHETHER OR NOT HE EVER TOLD THEM THAT.

4          THE WITNESS:  I DO NOT.

5          THE COURT:  YOU EVER KNOW WHETHER HE VOLUNTEERED HE

6   HAD THIS ACCOUNT IN THE PAST TO THE PROBATION DEPARTMENT IN THE

7   PAST.

8          THE WITNESS:  I DON'T BELIEVE HE VOLUNTEERED BECAUSE

9   BY THE TIME HE HAD AN INTERVIEW WITH THE PROBATION DEPARTMENT I

10  WAS USING IT SOLELY FOR MY BUSINESS.

11         THE COURT:  ALL RIGHT.  JUST A FEW QUESTIONS ABOUT THE

12  SKY MOUNTAIN TRUST.  WHO HAS LEGAL CUSTODY, YOUR SON'S NAME IS

13  KRISTAN?

14         THE WITNESS:  KRISTAN.

15         THE COURT:  WHO HAS LEGAL CUSTODY?

16         THE WITNESS:  I DO.

17         THE COURT:  MR. KNABB DOESN'T HAVE LEGAL CUSTODY?

18         THE WITNESS:  YOU KNOW, HE'S NEVER DONE ANYTHING, I

19  HAVE NO IDEA.

20         THE COURT:  YOU DON'T KNOW IF MR. KNABB HAS LEGAL

21  CUSTODY?

22         THE WITNESS:  I'VE DONE EVERYTHING FOR MY SON, I

23  DON'T -- JAY HAS NEVER BEEN INVOLVED, DOES HE HAVE CUSTODY BY

24  DEFAULT?

25         THE COURT:  JUST ASKING WHAT YOU KNOW.  YOU'RE THE ONE

1   ON THE STAND, I'M ASKING YOU IF YOU KNOW.

2                **THE WITNESS:**  I DON'T KNOW.

3                **THE COURT:**  MR. -- AND KRISTAN IS THE BENEFICIARY OF

4   THE SKY MOUNTAIN TRUST?

5                **THE WITNESS:**  KIRSTEN TRUST, CORRECT.

6                **THE COURT:**  IS TRISTAN ALSO THE BENEFICIARY OF THE

7   SUMMIT FINANCIAL TRUST?

8                **THE WITNESS:**  NO.

9                **THE COURT:**  WHO IS?

10               **THE WITNESS:**  I HAVE NO IDEA.

11               **THE COURT:**  AND IS THE SOLE ASSET IN THE SKY MOUNTAIN

12   TRUST THE HOME IN ALASKA?

13               **THE WITNESS:**  YES.

14               **THE COURT:**  ALL RIGHT.  I DON'T HAVE ANYTHING FURTHER.

15   ANY QUESTIONS BY MR. GOLDROSEN IN LIGHT OF THE COURT QUESTIONS?

16               **MR. GOLDROSEN:**  THANK YOU, YOUR HONOR.

17   **Q.**  MS. VALLAAS, YOU INDICATED TO THE COURT THAT AT VARIOUS

18   TIMES THE CONTACT INFORMATION ON THE EBAY ACCOUNT WAS IN NAMES

19   OTHER THAN YOURS AND OTHER THAN YOUR HUSBAND'S?

20   **A.**  YES.

21   **Q.**  SUCH AS PAUL JACKSON JAY VALLAAS AND GARY MATTHEWS?

22   **A.**  YES.

23   **Q.**  WHAT WAS THE REASON FOR THAT E-BAY ACCOUNT CONTACT

24   INFORMATION WAS IN NAMES OTHER THEN YOURS AND YOUR HUSBAND'S?

25   **A.**  TO PROTECT MY IDENTITY FROM OTHERS.

1    **Q.**  DID YOU HAVE SOME SPECIFIC CONCERNS?

2    **A.**  YES, ABSOLUTELY.

3    **Q.**  CAN YOU TELL THE COURT WHAT THOSE CONCERNS WERE?

4    **A.**  I'VE BEEN STALKED AND HARASSED AND I GET -- HAVE PEOPLE

5    CREATING TWITTER ACCOUNTS JUST TO HARASS ME AND MY BUSINESSES,

6    AND HAD TO FILE RESTRAINING ORDER AGAINST SOMEONE WHO WAS

7    FOLLOWING ME AROUND AND PORTRAYING HIMSELF AS -- CONDUCTING

8    INVESTIGATION GATHERING PERSONAL INFORMATION.  THERE'S ALL

9    KINDS OF REASONS WHY I DON'T WANT TO HAVE MY TRUE IDENTITY OUT.

10   **Q.**  AND WAS THAT TRUE FOR MR. KNABB WHEN HE HAD THE ACCOUNT?

11   **A.**  ABSOLUTELY.

12   **Q.**  AND WHAT'S THE REASON THAT YOU -- THAT THIS ACCOUNT WAS

13   HELD IN NAMES OTHER THAN YOURS OR YOUR HUSBAND'S BECAUSE YOU

14   WERE TRYING TO HIDE INCOME THAT BELONG TO JAY KNABB?

15   **A.**  NO.  PEOPLE ACTUALLY ISSUED SCHEDULE, SO THE INCOME IS VERY

16   EASY TO SEE.

17   **Q.**  WHEN YOU HAD -- YOU SUBMITTED A FINANCIAL DISCLOSURE FORM

18   TO THE PROBATION OFFICER, DIDN'T YOU?

19   **A.**  I DID.

20   **Q.**  IN THAT FINANCIAL DISCLOSURE FORM DID YOU INCLUDE INCOME

21   YOU EARNED FROM YOUR E-BAY BUSINESS?

22   **A.**  I DID.

23   **Q.**  DID YOU INCLUDE EXPENSES THAT YOU HAD RELATED TO E-BAY?

24   **A.**  I DID.

25   **Q.**  DID UP INCLUDE YOUR INVENTORY?

1    **A.**  I DID.

2    **Q.**  LET ME FINISH THE QUESTION -- DID YOU INCLUDE THE PRODUCTS

3    THAT CONSTITUTED YOUR E-BAY INVENTORY?

4    **A.**  I DID.

5              **MR. GOLDROSEN:**  ALL RIGHT.  NO OTHER QUESTIONS.

6              **THE COURT:**  ALL RIGHT.  ANYTHING FURTHER?

7              **MR. SCHMIDT:**  NO, YOUR HONOR.  WE HAVE ONE CAVEAT

8    ABOUT THE E-BAY RECORDS, BUT NOT FOR THIS WITNESS.

9              **THE COURT:**  ALL RIGHT.  ARE YOU OFFERING -- EXHIBIT C

10   IS THE GOVERNMENT EXHIBIT, YOU'RE NOT OFFERING THAT, YOU JUST

11   USED THAT TO REFRESH THIS WITNESS' RECOLLECTION?

12             **MR. GOLDROSEN:**  THAT'S CORRECT, I WAS JUST USING IT TO

13   HELP THE QUESTIONS BE MORE UNDERSTANDABLE.

14             **THE COURT:**  WE'RE GOING TO TAKE -- MAY THIS WITNESS BE

15   EXCUSED?

16             **MR. GOLDROSEN:**  YES.

17             **THE COURT:**  MR. SCHMIDT, MAY THIS WITNESS BE EXCUSED?

18             **MR. SCHMIDT:**  YES.

19             **THE COURT:**  THANK YOU VERY MUCH.  WE'RE GOING TO TAKE

20   ABOUT A 10 MINUTE BREAK.

21                        (WITNESS EXCUSED.)

22                        (RECESS TAKEN.)

23                        (PROCEEDINGS RESUMED.)

24             **THE COURT:**  ALL RIGHT.  WE'RE BACK ON THE RECORD.

25             MR. GOLDROSEN, HAVE ANY ADDITIONAL EVIDENCE OR

```
 1  WITNESSES?

 2         MR. GOLDROSEN:  THERE IS ONE ADDITIONAL WITNESS I

 3  HAVE, WILL BE A BRIEF WITNESS.  SHE WAS NOT IN OUR SUBMISSION

 4  TO THE COURT.

 5         I'VE DISCUSSED WITH MR. SCHMIDT THAT SHE'S A BRIEF

 6  WITNESS AND THAT ADDRESSES -- THIS IS A WITNESS WHOSE

 7  INTERVIEWED FROM THE PROBATION REPORT AND I WANT TO CLARIFY

 8  SOME THINGS REGARDING ALCOHOLISM.

 9         I DON'T BELIEVE MR. SCHMIDT HAS AN OBJECTION.  I

10  BELIEVE SHE'LL BE VERY SHORT.

11         MS. TERANOVA.  WE CALL LYNN TERANOVA TO THE WITNESS

12  STAND.  ASK YOU TO COME FORWARD AND BE SWORN AS A WITNESS.

13                    LYNN TERANOVA,

14  CALLED AS A WITNESS FOR THE DEFENDANT, HAVING BEEN DULY SWORN,

15  TESTIFIED AS FOLLOWS:

16         THE WITNESS:  I DO.

17         THE CLERK:  THANK YOU.  STATE AND SPELL YOUR FULL NAME

18  FOR THE RECORD.

19         THE WITNESS:  MY NAME IS PATRICIA LYNN TERANOVA,

20  P-A-T-R-I-C-I-A, L-Y-N-N, TERANOVA, T-E-R-A-N-O-V-A.

21         THE CLERK:  THANK YOU.

22                  DIRECT EXAMINATION

23  BY MR. GOLDROSEN:  Q.  GOOD MORNING.

24  A.  GOOD MORNING.

25  Q.  MS. TERANOVA, DO YOU KNOW MR. JAY KNABB?
```

1    **A.**  I DO.

2    **Q.**  HOW DO YOU KNOW HIM?

3    **A.**  HE'S MY NEPHEW.

4    **Q.**  ARE YOU RELATED TO HIS MOTHER?

5    **A.**  YES.

6    **Q.**  ARE YOU THE SISTER OF HIS MOTHER?

7    **A.**  YES.

8    **Q.**  HER NAME IS?

9    **A.**  LORAINE ADELL KNABB.

10   **Q.**  AND WERE YOU CONTACTED PREVIOUSLY BY PROBATION OFFICER

11   CARUBA REGARDING THIS CASE?

12   **A.**  ACTUALLY, SHE CAME TO MY HOME AND MY HUSBAND ANSWERED THE

13   DOOR.  SHE WAS ACTUAL LOOKING FOR MY OTHER SISTER WHO WAS NOT

14   THERE AND LEFT HER CARD FOR ME TO CONTACT HER AND I CALLED.

15   **Q.**  AND DID YOU HAVE A TELEPHONE CONVERSATION WITH HER OR IN

16   PERSON CONVERSATION?

17   **A.**  I HAD A TELEPHONE CONVERSATION AND I FOLLOWED UP WITH

18   E-MAIL.

19   **Q.**  AND DURING YOUR CONVERSATION WITH MS. CARUBA WERE YOU ASKED

20   QUESTIONS ABOUT WHETHER YOU WERE AWARE OF MR. KNABB USING

21   ALCOHOL?

22   **A.**  YES.

23   **Q.**  AND WOULD THAT HAVE BEEN DURING THE TIME PERIOD -- LET ME

24   ASK IT THIS WAY.

25          WAS THERE A SPECIFIC TIME PERIOD SHE ASKED ABOUT?

1    **A.**  SHE -- I HAD TOLD HER THAT I HADN'T SEEN J.C. FOR MANY

2    YEARS AND IN 2000 --

3              **THE COURT:**  COULD YOU SAY WHO'S J.C. IS, MA'AM?

4              **THE WITNESS:**  I'M SORRY, THAT'S JAY.

5              **THE COURT:**  PLEASE USE HIS LEGAL NAME OTHERWISE WE'RE

6    TAKING THIS DOWN ON THE RECORD AND SOMEBODY READING THIS MIGHT

7    NOT KNOW WHO J.C. WAS, MIGHT THINK IT'S SOMEBODY ELSE ACTUALLY.

8              **THE WITNESS:**  THANK YOU FOR THE CORRECTION.  SHE ASKED

9    ME IF JAY -- I TOLD HER THAT JAY HAD CONTACTED ME AND WE WENT

10   TO DINNER.  WE HAD DINNER FOR ABOUT AN HOUR AND A HALF.  SHE

11   ASKED ME IF HE DRANK AND I SAID TO BE VERY HONEST WITH YOU I

12   CANNOT REMEMBER.

13   **BY MR. GOLDROSEN:  Q.**  NOW, WHAT YEAR DID YOU HAVE DINNER WITH

14   MR. KNABB?

15   **A.**  2006.

16   **Q.**  AND PRIOR TO THE DINNER THAT YOU HAD WITH MR. KNABB IN 2006

17   HOW LONG HAD IT BEEN SINCE YOU'D ACTUALLY SEEN HIM?

18   **A.**  I HADN'T SEEN J.C. SINCE --

19   **Q.**  DIRECT YOU, J.C. IS MR. KNABB, RIGHT?

20   **A.**  MR. KNABB, THANK YOU.  SINCE 11 --

21   **Q.**  SINCE HE WAS 11 YEARS OLD?

22   **A.**  11 YEARS, YEAH.

23   **Q.**  LET ME BACK UP.  SINCE HE WAS 11 YEARS OLD OR YOU HADN'T

24   SEEN HIM IN 11 YEARS PRIOR?

25   **A.**  11 YEARS OLD.

1    Q.  SO FROM THE TIME MR. KNABB WAS 11 YEARS OLD UNTIL THIS

2    OCCASION IN 2006 WHEN YOU HAD DINNER WITH HIM, YOU HAD

3    ABSOLUTELY NO CONTACT WITH MR. KNABB?

4    A.  NO.

5    Q.  ASK YOU A NEGATIVE AND YOU ANSWER WITH A NEGATIVE.  DID YOU

6    HAVE ANY CONTACT WITH MR. KNABB FROM TIME HE WAS 11 YEARS OLD

7    UNTIL YOU HAD DINNER WITH HIM IN 2006?

8    A.  NO, I DID NOT.

9    Q.  AND YOU SPENT HOW LONG WITH HIM AT DINNER?

10   A.  ABOUT AN HOUR AND A HALF.

11   Q.  AFTER YOU HAD DINNER WITH MR. KNABB FOR AN HOUR AND A HALF

12   IN 2006, WHEN WAS THE NEXT TIME YOU HAD CONTACT WITH MR. KNABB?

13   A.  WELL, TODAY IS THE FIRST TIME I'VE SEEN MR. KNABB AND HE

14   CALLED ME TOLD ME THAT THE TRIAL WAS GOING TO BE GOING ON, AS

15   WE'LL AS MS. CARUBA.  I ASKED HER THE DATE AND TIME AND HERE I

16   AM.

17   Q.  SO FROM THE TIME MR. KNABB WAS 11 YEARS OLD YOU'VE SEEN HIM

18   TWICE?

19   A.  YES, SIR.

20   Q.  AND BASED ON THAT YOU FEEL YOU HAVE A BASIS TO RENDER AN

21   ACCURATE OPINION AS THE WHETHER MR. KNABB --

22   A.  NO.

23   Q.  LET ME FINISH THE QUESTION.

24   A.  SORRY.

25   Q.  BASED ON YOUR HISTORY OF CONTACT WITH MR. KNABB, DO YOU

1    FEEL YOU HAVE ENOUGH INFORMATION TO GIVE A RELIABLE OPINION

2    ABOUT WHETHER HE HAD ALCOHOL PROBLEMS DURING THE YEARS 2004 AND

3    2007?

4    **A.**  NO, I DO NOT.

5            **MR. GOLDROSEN:**  ALL RIGHT.  I HAVE NO OTHER QUESTIONS.

6            **THE COURT:**  THANK YOU VERY MUCH.  THE COURT DOESN'T

7    HAVE ANY QUESTIONS.

8            DO YOU HAVE ANY QUESTIONS, MR. SCHMIDT?

9            **MR. SCHMIDT:**  NO, YOUR HONOR.

10           **THE COURT:**  MAY THIS WITNESS BE EXCUSED?

11           **MR. GOLDROSEN:**  YES.

12           **THE COURT:**  THANK YOU VERY MUCH, YOU MAY BE EXCUSED.

13                    (WITNESS EXCUSED.)

14           **THE COURT:**  ANY FURTHER WITNESSES OR EVIDENCE?

15           **MR. GOLDROSEN:**  YOUR HONOR, WE HAVE NO OTHER

16   WITNESSES.  WE WOULD ASK THE COURT, HOWEVER, THAT THE COURT

17   CONSIDER ALL THE DOCUMENTATION THAT'S BEEN SUBMITTED AS

18   EXHIBITS TO ALL OF OUR SENTENCING MEMORANDA PREVIOUSLY

19   SUBMITTED TO THE COURT.

20           **THE COURT:**  IT WILL BE SO.  I WILL REVIEW IT AND

21   CONSIDERED IT AND I WILL CONTINUE TO DO SO THROUGHOUT THESE

22   PROCEEDINGS.

23           **MR. GOLDROSEN:**  TO COMPLETE THE RECORD, WE ASK THAT

24   THE, IF THEY HAVEN'T ALREADY BEEN, DEFENDANT'S A AND B BE

25   ADMITTED INTO EVIDENCE?

1     **THE COURT:**  ANY OBJECTION?

2     **MR. SCHMIDT:**  NO.

3     **THE COURT:**  THEY'RE ADMITTED.  WE DIDN'T ADMIT C, THE

4  WITNESS COULDN'T POSSIBLY AUTHENTICATE THAT DOCUMENT.

5     MR. GOLDROSEN, I HAD A COUPLE OF QUESTIONS AND YOUR

6  CLIENT, I THINK, IT'S APPROPRIATE FOR YOU TO ANSWER THE

7  QUESTION BECAUSE THERE'S A FACTUAL QUESTION.

8     AND, AGAIN, DEFENDANT HAS A FIFTH AMENDMENT RIGHT,

9  DOESN'T HAVE TO TESTIFY HERE.  CERTAINLY I'M NOT GOING TO TAKE

10  THAT AGAINST HIM.

11     BUT I WANTED TO KNOW THERE WAS -- IN THE RECORDS FROM

12  THIS CASE THERE WAS A QUESTIONNAIRE THAT WAS FILLED OUT BY

13  MR. KNABB OR SOMEBODY ON HIS BEHALF, WAS ACTUALLY TYPED, BUT

14  TYPED, INFORMATION WAS ADDED BY HIM, AND IN THAT DOCUMENT IT

15  WAS SUBMITTED TO THE PROBATION DEPARTMENT ON OR ABOUT

16  DECEMBER 15TH 2011 AND IT ASKED FOR INFORMATION, OBVIOUSLY,

17  TYPICAL INFORMATION YOU WOULD ASK FOR WITH RESPECT TO A

18  PRESENTENCE REPORT.

19     AND ONE OF THE FORM QUESTIONS ASKED DESCRIBE

20  EMPLOYMENT OF CURRENT PARTNER AND THE ANSWER WAS LAURA MANAGERS

21  SKAEI, S-K-A-E-I, NORDIC, N-O-R-D-I-C, A SKI ACCESSORY DESIGN

22  AND MANUFACTURING FACILITY IN EAST WENATCHEE WWW DOT SKAEI

23  NORDIC DOT COM.

24     IS THERE ANY REASON THAT YOUR AWARE OF THAT MR. KNABB

25  DIDN'T IN ANY WAY REFER TO HIS WIFE'S BUSINESS SHE'S NOW

1   TESTIFIED ABOUT THAT SHE HAD ON E-BAY?

2            **MR. GOLDROSEN:**  I DON'T HAVE ANY.

3            **THE COURT:**  YOU CAN CONSULT WITH HIM IF YOU WANT.  IF

4   YOU DON'T WANT TO ANSWER IT, THAT'S FINE.  I'M JUST TRYING TO

5   COMPLETE THE RECORD HERE.

6            **MR. GOLDROSEN:**  I WOULD LIKE TO MAKE ONE COMMENT AND

7   CONSULT WITH MY CLIENT.

8            **THE COURT:**  PLEASE DO.

9            **MR. GOLDROSEN:**  THE COMMENT I WISH TO MAKE, AND I

10  THIS -- BROUGHT THIS OUT DURING MS. VALLAAS EXAMINATION, IS

11  THAT SHE HERSELF DID SUBMIT A FINANCIAL STATEMENT IN WHICH SHE

12  DID MAKE MENTION OF HER E-BAY BUSINESS IN THAT FINANCIAL

13  STATEMENT.

14           SHE INCLUDED A BUSINESS INCOME, ALTHOUGH SHE DIDN'T

15  BREAKDOWN WHAT WAS E-BAY AND WHAT WAS SKAEI NORDIC, BUT SHE DID

16  INCLUDE IN HER DISCLOSURE THAT SHE PAID E-BAY FEES AND THAT SHE

17  ALSO LISTED IN HER ASSETS INVENTORY FOR E-BAY SHE LISTED

18  $27,000.

19           AND THAT SHE TAKEN OUT A LOAN AND WAS MAKING MONTHLY

20  PAYMENTS BASED ON HER INVENTORY.  I DO WANT TO POINT OUT TO THE

21  COURT, ALTHOUGH IT WASN'T IN MR. KNABB'S, IT WAS IN HIS WIFE'S

22  FINANCIAL.

23           **THE COURT:**  AND BEFORE YOU, IF YOU WISH TO CONSULT

24  WITH YOUR CLIENT YOU MAY DO SO, BUT THERE WAS ANOTHER ISSUE

25  THAT WAS A LITTLE BIT AMBIGUOUS, I DID NOT WANT TO DELVE INTO

1    THIS WITH MS. VALAAS.

2         IN THAT SAME DOCUMENT WHEN ASKED FOR THE NAME OF THE

3    CHILDREN MENTIONS KRISTAN JASPER KNABB AND IT SAYS AGE FOUR

4    MONTHS, LISTS AS CUSTODY AND SAYS JOINT, AND THEN IT SAYS WIFE

5    TAKES NIGHTS, DEFENDANT TAKES DAYS, SO HE CAN REST DOCTORS

6    SUGGESTION.

7         DOES THE COUPLE HAVE JOINT?  MS. VALAAS NOT BEING

8    CLEAR ABOUT WHETHER OR NOT THE COUPLE HAS CUSTODY, ISN'T THIS

9    THEIR BIOLOGICAL CHILD, DON'T THEY LIVE WITH THIS CHILD?

10        **MR. GOLDROSEN:**  YES.

11        **THE COURT:**  I KNOW SHE WAS NERVOUS, I GIVE HER THAT

12   CREDIT, BUT I WAS A LITTLE CONFUSED.  I DIDN'T WANT TO DELVE

13   INTO HER PRIVACY, BUT I'D LIKE TO KNOW THE ANSWER TO THAT

14   QUESTION.  SEEMS KIND OF ODD TO THE COURT THAT ANSWER.

15        **MR. GOLDROSEN:**  I THINK, I UNDERSTAND WHAT HAPPENED,

16   BUT I THINK I'LL SPEAK WITH MY CLIENT BEFORE I ANSWER.

17        **THE COURT:**  OKAY.  PLEASE DO.

18        MS. VALAAS, YOU DON'T HAVE PERMISSION TO GO INSIDE THE

19   BAR OF THE COURT.  PLEASE STEP BACK INTO THE GALLERY.

20        COUNSEL.

21        **MR. GOLDROSEN:**  YES, YOUR HONOR.  IF I TAKE THE LAST

22   QUESTION FIRST.  NO, THERE IS -- THEY HAVE JOINT CUSTODY

23   THERE'S NO ISSUE REGARDING THAT.

24        MY READ OF WHAT THE WITNESS, THE WITNESS WAS TRYING TO

25   ANSWER YOUR QUESTION, SHE'S CONFUSED BY THE LEGAL TERMINOLOGY

1    AND THOUGHT THERE WAS SOME LEGAL PROCEEDING THAT DISTINGUISHES

2    JOINT CUSTODY FROM INDIVIDUAL CUSTODY, BUT, NO.

3          **THE COURT:**  FAIR ENOUGH.

4          **MR. GOLDROSEN:**  AND THE REFERENCE IN THE -- IN HIS

5    SUBMISSION TO PROBATION WAS, I BELIEVE, AT THAT TIME

6    MS. VALLAAS WAS HAVING HEALTH ISSUES JUST RELATED TO THE BIRTH.

7    AND THAT'S WHY THE EXPLANATION HE HAD THE CHILD CERTAIN PARTS

8    OF THE DAY, IS NOT SEPARATE CUSTODY JOINT CUSTODY, BUT AT THE

9    TIME SHE WAS RESTING AND HE HAD PRIMARY CARE OF THE CHILD AT

10   THAT TIME.

11         **THE COURT:**  THE EXPLANATION FOR THE STATEMENT IN

12   RESPONSE TO THE QUESTION.

13         **MR. GOLDROSEN:**  YES, IT WAS NOT AN INTENTIONAL ATTEMPT

14   TO MYSELF MISLEAD OR HIDE WHAT WAS GOING ON AT EBAY.  MR. KNABB

15   USED SKAEI NORDIC AS HIS WIFE'S BUSINESS AND THAT IN HIS VIEW

16   INCLUDED NOT ONLY THE SKI ACCESSORY BUSINESS, BUT HER OTHER

17   BUSINESSES SHE RAN FOR E-BAY.

18         WHICH AT THAT TIME BACK IN 2011 THE COURT SHOULD KEEP

19   IN MIND WAS NOT AS SUBSTANTIAL AS IT HAS BECOME SINCE THEN.

20   IT'S 2012 THAT SHE ESTABLISHED THESE NEW NAMES FOR THE BUSINESS

21   LOOSE TRAINS AND IT'S BECOME A FULL BLOSSOM BUSINESS IN WHICH

22   SHE'S EXCLUSIVELY BUYING AND SELLING TRAINS.

23         PART OF THAT TIME IT WAS MORE OF A KIND OF A LOOSE

24   THING WHERE SHE DIDN'T ACTUALLY HAVE A SPECIFIC BUSINESS NAME

25   FOR WHAT SHE WAS DOING, BUT SHE WAS BUYING AND SELLING THINGS

1    AND SUPPLEMENTING HER INCOME IN THAT FASHION.

2            **THE COURT:**  VERY WELL.  SO OTHER THAN WHAT YOU

3    SUBMITTED TO THE COURT AND THE COURT HAS CONSIDERED AND THE

4    TESTIMONY AND EVIDENCE SUBMITTED TODAY, ANY FURTHER EVIDENCE

5    THAT DEFENDANT WISHES TO SUBMIT?

6            **MR. GOLDROSEN:**  NO, YOUR HONOR.

7            **THE COURT:**  ALL RIGHT.  SO HOW ABOUT -- IS THERE

8    ANYTHING THAT THE GOVERNMENT WISHES TO, ANY FORM OF EVIDENCE

9    THE GOVERNMENT WISHES TO SUBMIT?

10           **MR. SCHMIDT:**  NO FURTHER EVIDENCE OTHER THAN OUR

11   SUBMISSIONS.

12           THERE WAS A DISCUSSION IN THE E-BAY RECORDS WHICH WE

13   SUMMARIZED FOR THE COURT IN ITS ATTACHMENT TO ONE OF OUR

14   SUBMISSIONS, AND THERE'S A DISCUSSION OF -- WE LIST FOUR

15   VEHICLE AND THE TWO ROLEX WATCHES SOLD FOR 17,000.

16           BASED ON THAT TESTIMONY WE RECHECKED A LARGE

17   SPREADSHEET WHICH WE SUPPLIED WHICH WE TOOK THAT INFORMATION

18   SUMMARIZED IT FOR THE COURT.  IT APPEARS THAT THE TESTIMONY ON

19   THAT POINT IS ACCURATE.

20           THE FORD WAS NEVER SOLD ON E-BAY AND WE LIST TWO ROLEX

21   WATCHES ONE FOR 1,700 AND ONE FOR 1,700 AND $200, IT APPEARS

22   THE 1,700, 200 THERE WAS NEVER -- THE SALE WAS NEVER

23   CONSUMMATED.

24           **THE COURT:**  VERY WELL.

25           **MR. GOLDROSEN:**  MAY I JUST --

1          **THE COURT:**  CAN I HAVE THAT EXHIBIT FOR IDENTIFICATION

2     THE ONE THAT WAS JUST MARKED, THE LAST ONE?

3          **THE CLERK:**  C.

4          **MR. GOLDROSEN:**  IT'S B, YOUR HONOR.  THAT WAS THE LIST

5     OF --

6          **THE COURT:**  ITEMS SOLD.  WASN'T THERE A SPREADSHEET

7     THAT SHOWED THE VARIOUS ADDRESSES?

8          **MR. GOLDROSEN:**  YES, THAT'S C.  I TAKE THAT BACK.

9          **THE COURT:**  THAT'S THE ONE I WAS LOOKING FOR.

10         **MR. GOLDROSEN:**  MR. SCHMIDT COMMENTS WERE DIRECTED TO

11    EXHIBIT B.  I WANTED TO MAKE ONE FOLLOW-UP COMMENT ON THAT

12    POINT, IF I COULD.

13         **THE COURT:**  BUT BEFORE WE GET TO THAT, I WAS -- SAW

14    THIS SUBMISSION AND I UNDERSTAND SOME OF THIS INFORMATION

15    ABOUT -- THIS HAS TO DO WITH E-BAY ACCOUNT IS NOT -- IN THE

16    PRESENTENCE REPORT, IT'S ALSO FURTHER AMPLIFIED IN THE

17    GOVERNMENT'S SPREADSHEET, WHICH IS EXHIBIT C MARKED FOR

18    IDENTIFICATION, IT LOOKS TO THE COURT LIKE -- AND I UNDERSTAND

19    THAT MS. VALAAS SHE WOULD NOT HAVE A FOUNDATION TO ANSWER THIS

20    QUESTION, BUT THE RECORDS SEEM TO INDICATE THAT THIS E-BAY

21    ACCOUNT WAS CREATED IN APPROXIMATELY NOVEMBER OF 2008 UNDER THE

22    NAME OF PAUL JACKSON; IS THAT CORRECT?

23         **MR. GOLDROSEN:**  YES.

24         **THE COURT:**  AND WITH THE IDENTIFY INFORMATION WITH

25    RESPECT TO THE DEFENDANT, HIS DATE OF BIRTH, HIS E-MAIL ADDRESS

1   AND HIS HOME ADDRESS, CORRECT, SIR?

2            MR. GOLDROSEN:  YES.

3            THE COURT:  AND THEN ON MARCH APPEARS FROM THE

4   DOCUMENTATION AND SOME EXTENT FROM THE TESTIMONY THAT WE HEARD

5   THAT ON MARCH 29TH THE SHIPPING ADDRESS INFORMATION ON THE

6   ACCOUNT WAS TRANSFERRED FROM PAUL JACKSON TO MS. VALAAS' NAME,

7   CORRECT?

8            MR. GOLDROSEN:  THAT IS CORRECT, YES, YOUR HONOR.

9            THE COURT:  THEN AS OF JUNE 24TH 2010 MR. KNABB WAS

10  LISTED AS THE CONTACT INFORMATION ON E-BAY ACCOUNT UNDER THE

11  NAME QUOTE JAY VALAAS; IS THAT CORRECT?

12           MR. GOLDROSEN:  YES.

13           THE COURT:  AND THEN ON DECEMBER 7TH 2011 THE

14  ACCOUNT -- THE CONTACT INFORMATION WAS CHANGED ON THE ACCOUNT

15  TO GARY MATTHEWS, CORRECT?

16           MR. GOLDROSEN:  YES.

17           THE COURT:  GARY MATTHEWS IS THE DEFENDANT'S

18  BIOLOGICAL FATHER?

19           MR. GOLDROSEN:  YES.

20           THE COURT:  AND THE NAME ON THE ACCOUNT WAS THEN

21  CHANGED TO PIPE FREEZE ON THE SAME DATE, CORRECT?

22           MR. GOLDROSEN:  YES.

23           THE COURT:  NOW, WHEN -- FROM MY NOTES THE PROBATION

24  OFFICE -- PROBATION OFFICER'S REPORT IT APPEARS THAT WHEN THE

25  DEFENDANT WAS INTERVIEWED BY PROBATION ON DECEMBER 19TH 2011

1    THE CONTACT INFORMATION ON THE ACCOUNT WAS IN THE NAME OF GARY

2    MATTHEWS, BUT IT CONTINUED TO LIST MR. KNABB'S DATE OF BIRTH

3    AND TELEPHONE NUMBER; IS THAT RIGHT?

4         **MR. GOLDROSEN:**  YES.

5         **THE COURT:**  ALL RIGHT.  I JUST WANT TO COMPLETE THE

6    RECORD, SO I APPRECIATE THAT.  THAT'S MY UNDERSTANDING OF THE

7    SPREADSHEET AND THE INFORMATION THE PROBATION DEVELOPS.  YOU

8    WERE GOING TO MAKE ANOTHER POINT?

9         **MR. GOLDROSEN:**  IN RESPONSE TO WHAT MR. SCHMIDT

10   INFORMED THE COURT THERE WERE TWO ITEMS ON THE LIST OF EXHIBIT

11   B THAT WERE NOT IN FACT SOLD.  THAT'S $57,000 WORTH OF SALES.

12        THE TOTAL AMOUNT OF SALES IS APPROXIMATELY $240,000,

13   SO THAT'S SUBSTANTIALLY REDUCES BY 1/5TH IF MY MATH IS CORRECT,

14   MORE THAN 1/5TH THE AMOUNT OF INCOME THAT WAS RECEIVED ON THAT

15   ACCOUNT FROM 240,000 TO $185,000, I BELIEVE IT WOULD BE.

16        SO I WANT TO MAKE THAT POINT TO THE COURT, THAT DOUBLE

17   COUNTING OR THE FAILURE TO NOTICE THAT THERE WAS NO SALE OF THE

18   TRUCK IT'S A SIGNIFICANT REDUCTION IN MY OPINION THAT WAS

19   RECEIVED IN THE E-BAY ACCOUNT.

20        **THE COURT:**  VERY WELL.  SO WHAT I'M GOING TO DO NOW, I

21   THINK, PROCEDURALLY THE APPROPRIATE THING TO DO IS TO -- I KNOW

22   THERE ARE NUMEROUS -- WELL, ASK -- OBVIOUSLY THE GOVERNMENT HAS

23   RECEIVED ALL OF THE PRESENTENCE REPORT AND ALL THE SUPPLEMENTS,

24   CORRECT?

25        **MR. SCHMIDT:**  YES, YOUR HONOR.

1              **THE COURT:**  OTHER THAN AS STATED IN THE LAST

2     PRESENTENCE, SECOND AMENDED PRESENTENCE REPORT, DOES THE

3     GOVERNMENT HAVE ANY FURTHER OBJECTIONS?

4              **MR. SCHMIDT:**  OBJECTIONS, NO.

5              **THE COURT:**  ALL RIGHT.  I'LL TURN TO YOU,

6     MR. GOLDROSEN, YOU RECEIVED -- GONE OVER WITH YOUR CLIENT ALL

7     OF THE VARIOUS ITERATIONS OF THE PRESENTENCE REPORT?

8              **MR. GOLDROSEN:**  WE HAVE.

9              **THE COURT:**  AND OTHER THAN AS STATED IN THE

10    PRESENTENCE REPORT, THE SECOND AMENDED PRE-SENTENCE REPORT

11    WHICH PURPORTS TO STATE THE NUMBER OF OBJECTIONS, ARE THERE ANY

12    OTHER OBJECTIONS THAT YOU HAVE?

13             **MR. GOLDROSEN:**  ALL OF OUR OBJECTIONS ARE EITHER

14    SPECIFIED IN THE PRE-SENTENCE REPORT OR HAVE BEEN PUT IN

15    WRITING IN VARIOUS SENTENCING MEMORANDA.  SO THERE'S NOTHING NO

16    OTHER OBJECTIONS THAT HAVE NOT BEEN STATED EITHER IN THE

17    MEMORANDA OR IN THE REPORT.

18             **THE COURT:**  LET ME ASK YOU.  ARE THERE ANY OTHER

19    FACTUAL ASSERTIONS IN THE SECOND AMENDED REPORT, WHICH IS THE

20    MOST, I THINK, THE OPERATIVE ONE AT THIS POINT, THAT YOU WISH

21    TO MAKE?

22             **MR. GOLDROSEN:**  WELL, IN OUR -- THERE ARE A NUMBER OF

23    FACTUAL ASSERTIONS REGARDING MR. KNABB'S BACKGROUND THAT WE

24    HAVE GENERALLY OBJECTED TO IN OUR LAST SENTENCING MEMORANDA.

25             AND I -- SINCE THEY DON'T EFFECT GUIDELINES I HAVE NOT

1   PUT ON ANY EVIDENCE OTHER THAN MAKE A GENERAL OBJECTION, AND I

2   CAN SPECIFY TO THE COURT SPECIFICALLY WHAT THEY ARE.  THE COURT

3   JUST GIVES ME A MOMENT.

4           **THE COURT:**  IF THEY'RE IN ONE OF THE DOCUMENTS YOU

5   SUBMITTED THEN THAT'S FINE, I CONSIDERED IT AND YOU PRESERVE

6   THE RECORD.  I JUST WANTED TO KNOW IF THERE ARE ANY ADDITIONAL

7   ONES.

8           **MR. GOLDROSEN:**  NO.

9           **THE COURT:**  THAT'S WHAT I REALLY WANT TO KNOW.

10          **MR. GOLDROSEN:**  IT'S A FOOTNOTE IN MY LAST MEMORANDA.

11          **THE COURT:**  ALL RIGHT.  WHAT I'D LIKE TO DO NOW IS GO

12  THROUGH THE OFFENSE LEVEL CALCULATION.

13          FIRST OF ALL, THERE'S NO DISPUTE FROM THE GOVERNMENT,

14  I ASSUME, THAT THE DEFENDANT IS AT A CRIMINAL HISTORY CATEGORY

15  ONE; IS THAT CORRECT?

16          **MR. SCHMIDT:**  NO DISPUTE.

17          **THE COURT:**  OBVIOUSLY, YOU DON'T CONTEND OTHERWISE?

18          **MR. GOLDROSEN:**  THAT'S CORRECT.

19          **THE COURT:**  WE'RE DEALING WITH THE OFFENSE LEVEL HERE.

20  THE BASE OFFENSE LEVEL IS STATED TO BE -- SEEMS LIKE IN ALL THE

21  PAPERS AT LEVEL SEVEN; IS THAT CORRECT, MR. SCHMIDT?

22          **MR. SCHMIDT:**  IT IS.

23          **THE COURT:**  MR. GOLDROSEN?

24          **MR. GOLDROSEN:**  YES.

25          **THE COURT:**  WITH RESPECT TO THE GAIN, THE GAIN BEING

1   MORE THAN $20 MILLION, BUT LESS THEN 50 MILLION THAT YIELDS A

2   ADJUSTMENT OF PLUS 22; IS THAT CORRECT, MR. SCHMIDT?

3          **MR. SCHMIDT:**  IT IS.

4          **THE COURT:**  MR. GOLDROSEN?

5          **MR. GOLDROSEN:**  YES.

6          **THE COURT:**  THE COURT UNLESS OTHERWISE SPECIFIED

7   ACCEPTS THOSE CALCULATIONS BECAUSE I HAVE TO MAKE A FINAL

8   DETERMINATION, THOSE ARE THE DETERMINATIONS I'M MAKING.

9          THERE'S NO ISSUES WITH RESPECT TO NUMBER OF VICTIMS

10  BECAUSE THE PARTIES AGREE BASED UPON THE INTERPRETATION OF THE

11  GUIDELINES THAT YOU CAN'T ASSESS POINTS BASED UPON THE AMOUNT

12  OF GAIN AND ALSO THAN ASSESS NUMBERS OF VICTIMS.

13         THAT DOESN'T MEAN THERE AREN'T PEOPLE WHO ARE

14  FACTUALLY OR LEGALLY VICTIMS, BUT FOR PURPOSE OF THE GUIDELINES

15  THERE ARE NO VICTIM ENHANCEMENTS THAT APPLY.  DO YOU AGREE WITH

16  THAT?

17         **MR. SCHMIDT:**  I DO.

18         **THE COURT:**  YOU?

19         **MR. GOLDROSEN:**  YES.

20         **THE COURT:**  SO NOW WE GET TO THE SPECIFIC OFFENSE

21  CHARACTERISTICS.  AND THE FIRST ONE IS UNDER GUIDELINE

22  2(B)1.1(B)18(A) IF THE OFFENSE INVOLVED A VIOLATION OF THE

23  SECURITIES LAWS AND AT THE TIME OF THE OFFENSE THE DEFENDANT

24  WAS, ONE, AN OFFICER OR DIRECTOR OF A PUBLICLY TRADED COMPANY

25  INCREASE BY FOUR LEVELS.

1          AND THE DEFENDANT HAS OBJECTED, THE GOVERNMENT STATED

2    ITS POSITION THE DEFENDANT OBJECTS BASED EXCLUSIVELY ON THE

3    FACT THIS ENHANCEMENT WAS NOT APPLIED IN THIS.

4          **MR. GOLDROSEN:**  THAT'S CORRECT.

5          **THE COURT:**  OBJECTION OVERRULED.  I'LL SPEAK ABOUT

6    THAT MORE LATER.  THAT FOUR POINT ENHANCEMENT APPLIES.

7          THERE'S NO VICTIM RELATED ADJUSTMENT, AS I MENTIONED

8    BEFORE.

9          WITH RESPECT TO THE ADJUSTMENT FOR ROLE IN THE OFFENSE

10   UNDER GUIDELINE 3(B)(1).1(A) FOUR LEVELS ARE ADDED, AT LEAST,

11   THE PROBATION OFFICER SAYS, WOULD SUGGEST BECAUSE THE DEFENDANT

12   WAS AN ORGANIZER OR LEADER OF AN ACTIVITY, IN AN ACTIVITY

13   INVOLVING FIVE OR MORE PARTICIPANTS OR WAS OTHERWISE EXTENSIVE.

14          AND THEN IT GOES ONTO TALK ABOUT THE NOTE WITH RESPECT

15   TO THIS PARTICULAR SET OF EVENTS.  THE GOVERNMENT ARGUES THAT

16   THIS ENHANCEMENT DOESN'T APPLY; IS THAT CORRECT?

17          **MR. SCHMIDT:**  THAT'S CORRECT.

18          **THE COURT:**  AND DEFENDANT OBJECTS BASED UPON THE FACT

19   THAT THIS WAS NOT -- DEFENDANT WAS NOT A LEADER OF AN ACTIVITY

20   INVOLVING FIVE OR MORE PARTICIPANTS; IS THAT RIGHT?

21          **MR. GOLDROSEN:**  ACTUALLY, MAJOR OBJECTION THIS WAS NOT

22   EXTENSIVE.  I THINK, THERE'S NO ONE IS SAYING THERE'S FIVE OR

23   MORE PARTICIPANTS, CRIMINAL PARTICIPANTS IN THE CASE, THE ISSUE

24   WAS THIS EXTENSIVE.

25          CERTAINLY NOT FIVE OR MORE PEOPLE, HASN'T BEEN SHOWN

1    FIVE OR MORE PEOPLE WHO ARE CRIMINALLY LIABLE, THEREFORE,

2    PARTICIPANTS IN THE DEFINITION, SO THE QUESTION REALLY IS THIS

3    OTHERWISE EXTENSIVE?

4             **THE COURT:**  I DON'T -- FIRST OF ALL, THE OBJECTION IS

5    OVERRULED.  BECAUSE THE WAY I READ THE PAPERS HERE THIS

6    INVOLVED EIGHT PARTICIPANTS AT LEAST THAT WE KNOW ABOUT.  I'M

7    NOT TALKING ABOUT THE PEOPLE WHO LOST MONEY, I'M TALKING ABOUT

8    THE FRIENDS, RELATIVES, MISTRESSES AND ALL THE OTHERS WHO THE

9    DEFENDANT MANIPULATED AS PART OF THE SCHEME.

10            WHETHER THEY WERE UNWITTING OR NOT I DON'T KNOW, THEY

11   MAY VERY WELL, SOME OF THEM REALIZED SOME MONEY OUT OF THIS,

12   IT'S UP TO THE JUSTICE DEPARTMENT TO DETERMINE WHETHER THERE

13   ANY FURTHER ACTIONS TAKEN AGAINST THESE OTHER PEOPLE.  THAT

14   OBJECTION IS OVERRULED AND I'M APPLYING THE FOUR LEVEL

15   ENHANCEMENT.

16            THERE'S NO ADJUSTMENT FOR UNDER 3(B)1.3 WITH RESPECT

17   TO POSITION OF TRUST, I AGREE WITH THAT.

18            NOW, WITH RESPECT TO THE ADJUSTMENT FOR OBSTRUCTION OF

19   JUSTICE, AS I UNDERSTAND THE GOVERNMENT'S POSITION, THE

20   GOVERNMENT SAYS THAT AS A LEGAL MATTER PROVIDING FALSE

21   INFORMATION TO THE PROBATION OFFICE CAN BE OBSTRUCTION OF

22   JUSTICE -- TO THE PROBATION OFFICER IN THE COURSE OF THE

23   INVESTIGATION CAN BE A -- CONSTITUTE OBSTRUCTION OF JUSTICE; IS

24   THAT CORRECT?

25            **MR. SCHMIDT:**  THAT'S CORRECT.

1          **THE COURT:**  BUT YOU CONTEND THAT DOESN'T APPLY OR ARE

2     YOU SAYING THAT JUST BECAUSE YOU ARE LIMITED BY THE PLEA

3     AGREEMENT, WHICH ONE?

4          **MR. SCHMIDT:**  YOUR HONOR, I THINK AT THE END, WE

5     DIDN'T TAKE A POSITION IN OUR PAPERS.

6          **THE COURT:**  I KNOW, BUT I'M ASKING YOU TO DO THAT.

7     IT'S PERFECTLY APPROPRIATE FOR YOU TO SAY, IF YOU THINK IT'S

8     LEGALLY REQUIRED THAT YOU CAN'T TAKE A POSITION BECAUSE YOU'RE

9     BOUND BY THE PLEA AGREEMENT, BUT AS AN OFFICER OF THE COURT IF

10    THAT'S YOUR ANSWER THAT'S THE END OF THE INQUIRY.

11         **MR. SCHMIDT:**  THAT'S OUR ANSWER.

12         **THE COURT:**  OKAY.  NOW, THIS IS ONE WHERE I WOULD LIKE

13    TO, PERHAPS, HEAR A LITTLE BIT MORE ARGUMENT FROM YOU.  BECAUSE

14    WE'VE HAD TESTIMONY IN THIS CASE WITH RESPECT TO SOME OF THESE

15    ISSUES, YOU PUT ON TESTIMONY AND I'D REALLY LIKE TO HEAR YOUR

16    BEST ARGUMENT ON THIS BECAUSE I HAVE TWO CONCERNS WITH THIS.

17         AND THAT HAS DO WITH E-BAY OBVIOUSLY.  I THINK, THAT

18    THE WAY THIS -- THE TOTALITY OF THE EVIDENCE THAT WAS SUBMITTED

19    WITH RESPECT TO THE FINANCIAL ASSETS STARTING WITH, MAYBE

20    STARTING WELL BEFORE, STARTING WITH THE ORIGINAL CREATION OF

21    THIS E-BAY ACCOUNT RIGHT AT THE TIME THE DEFENDANT WAS EITHER

22    IN THE CUSP OF THIS FRAUD OR ABOUT TO GET CAUGHT, WHICH HE THEN

23    TRANSFERS TO HIS WIFE AND SHE BEGINS USING IT.

24         YET THERE ARE OVERLAYS USING THE NAME OF THE

25    BIOLOGICAL FATHER AND IN THIS OTHER ALIAS WHICH THE DEFENDANT

1  INSTRUCTED HIS WIFE TO GIVE.

2       AND IN THE CONTEXT OF -- AT THE TIME THIS

3  INVESTIGATION WAS GOING ON IN FULL SWING THE DEFENDANT HAD

4  ESSENTIALLY BEEN CAUGHT ENTERING INTO THIS PRENUPTIAL AGREEMENT

5  WHICH I THINK ARGUABLY IS A FRAUD ON CREDITORS AND ON THE

6  VICTIMS IN THIS CASE.

7       AND THIS WAS ALL A CONSPIRACY, IF YOU WILL, BETWEEN

8  THE DEFENDANT AND HIS WIFE WHOSE TESTIMONY I FOUND TO BE WHOLLY

9  INCREDIBLE.  AND NOT JUST STARTING WITH HER NOT EVEN KNOWING

10  WHETHER SHE HAD CUSTODY OF HER CHILD, SO I DISREGARDED MOST OF

11  HER TESTIMONY AND FIND TO BE INCREDIBLE BORDERING ON PERJURY.

12       SO I HAVE A HARD TIME WITH GIVING THE DEFENDANT

13  ANYTHING OTHER THAN FINDING OF OBSTRUCTION OF JUSTICE.

14       THE FINANCIAL STATEMENT WHICH DID NOT MENTION IN ANY

15  WAY SHAPE OR FORM THE E-BAY ACCOUNT, I UNDERSTAND YOU BELIEVE

16  THAT, MR. GOLDROSEN, AND IT'S A GOOD FAITH REPRESENTATION ON

17  YOUR PART, BUT WITH ALL THAT'S HAPPENED IN THIS CASE AND THE

18  FACT THAT SUBSTANTIAL PART OF THIS MONEY HAS NEVER BEEN FOUND,

19  I'M NOT BUYING ANY OF IT.  SO BUT I'LL HEAR YOUR ARGUMENT.

20       **MR. GOLDROSEN:**  SURE.  I THINK, LET'S START THE E-BAY

21  ACCOUNT IN AND OF ITSELF IS NOT AN ASSET.  IT IS NOT AN INCOME

22  OR NECESSARILY A SOURCE OF INCOME, UNLESS IT IS USED IN THAT

23  WAY.

24       FOR SOMEONE TO NOT DISCLOSE TO A PROBATION OFFICER

25  THAT I HAVE AN E-BAY ACCOUNT IS OF NO MATERIALITY UNLESS

1    SOMEONE IS USING THAT ACCOUNT FOR INCOME.  AND I THINK WE COULD

2    ALL AGREE ON THAT.

3          THE ONLY SIGNIFICANCE OF THE EBAY ACCOUNT IS IF

4    MR. KNABB USED IT IN ONE OF TWO WAYS.  IF USED IT, ONE, TO SELL

5    OFF ASSETS THAT HE OBTAINED THROUGH FUNDS THAT HE GOT THROUGH

6    HIS CRIME.

7          OR, TWO, IF HE'S USING IT FOR HIS INCOME AND NOT

8    DISCLOSING INCOME THAT COULD BE USE FOR RESTITUTION OR TO PAY A

9    FINE.

10          AND SO I THINK TO BREAK IT DOWN TO WHAT IS REALLY OF

11    CONCERN HERE AND LOOK AT THOSE QUESTIONS AND SEE IS THERE PROOF

12    THAT ANYONE OF THOSE TWO THINGS ACTUALLY OCCURRED.

13    **THE COURT:**  WHY COULDN'T THE COURT FIND FOR PURPOSE OF

14    ALL OF THESE MACHINATIONS AND LYING ABOUT IT, EVEN IF IT WASN'T

15    USED TO LAUNDER THE ILL-GOTTEN GAINS, WAS TO PREVENT THE

16    CREDITORS, VICTIMS, WHATEVER YOU WANT TO CALL THEM, SEC FROM

17    OBTAINING ANY OF THIS MONEY.

18          BECAUSE FIRST THING THEY WOULD DO IS TRY TO PIERCE

19    WHATEVER SHAM FRONT WAS BEING PUT UP AND GO AFTER THE MONEY.

20    WHY CAN'T THE COURT FIND THAT?  THAT SEEMS TO BE RIFE IN THIS

21    CASE.

22    **MR. GOLDROSEN:**  LET'S BACK UP AND TAKE A LOOK.  THE

23    RECORDS WE GOT, THE ACCOUNT GETS OPENED IN 2008.  NO SALES WERE

24    MADE IN THAT ACCOUNT BASED UPON -- THE GOVERNMENT GAVE US 600

25    PAGES OF DOCUMENTS LISTING EVERY SINGLE SALE ON THAT ACCOUNT,

1   6,500 SALES.

2            NO SALE IS MADE ON THAT ACCOUNT UNTIL LAURA STARTS TO

3   USE THE ACCOUNT IN 2010, WHICH INDICATES UP UNTIL THAT POINT

4   WHEN THE ACCOUNT WAS ONLY USED BY MR. KNABB HE NEVER SOLD

5   ANYTHING ON IT.  ONLY BOUGHT SOMETHING.

6            **THE COURT:**  SHORTLY AFTER THAT HE ENTERS IN A

7   PRENUPTIAL AGREEMENT, THEREFORE, INSULATING ANY PROCEEDS OF HER

8   SALES FROM ANYBODY ARGUABLY WHO MIGHT HAVE BEEN INJURED IN THE

9   CASE FROM THE SEC.

10           **MR. GOLDROSEN:**  BUT I DON'T THINK THAT'S A CRIME TO DO

11  THAT.

12           **THE COURT:**  IT'S NOT A CRIME IN AND OF ITSELF, BUT

13  DOESN'T HAVE TO BE CRIME, IT'S THE ENTIRE -- IT'S THE TOTALITY

14  OF THE EVENTS THAT HAVE BEEN PUT BEFORE THE COURT IN THE RECORD

15  OF THIS CASE.

16           **MR. GOLDROSEN:**  WHY SHOULD HE SAY, DOES HE HAVE AN

17  OBLIGATION TO SAY I COMMITTED THESE CRIMES THROUGH HIS WIFE,

18  I'M GOING TO MARRY AND I'M GOING TO MAKE YOU LIABLE FOR WHAT I

19  OWE EVERYBODY ELSE, I DON'T THINK HE HAS TO TAKE THAT STEP.

20           I DON'T THINK THAT'S AN OBLIGATION.  I DON'T THINK

21  THAT'S THE ACCEPTANCE OF RESPONSIBILITY.  I THINK THAT'S

22  TOTALLY PROPER FOR HIM TO SAY THAT.

23           TO SAY, YOU MARRY ME, I'M BEING INVESTIGATED, I MAY

24  OWE A LOT OF MONEY, THEREFORE, THE INCOME YOU HAVE YOU KEEP FOR

25  YOURSELF.  I DON'T WANT YOU TO HAVE TO PAY FOR MY CRIMES.

1       I DON'T THINK THAT THERE'S ANYTHING WRONG WITH THAT

2  AND THE COURT SHOULD CASTIGATE MR. KNABB FOR HAVING SET UP THAT

3  ARRANGEMENT.  I THINK, THE QUESTION WE HAVE TO REALLY FOCUS ON

4  WAS E-BAY ACCOUNT USED.

5       **THE COURT:**  THAT WERE TRUE WHY WERE THESE CROSS-OVERS

6  BETWEEN ADDRESSES AND NAMES OF BIOLOGICAL FATHER AND INSTRUCT

7  HER TO USE AN ALIAS.  SHE SAID, ALTHOUGH THEY WERE BEING

8  HARASSED, BUT I FOUND HER TESTIMONY TO BE LESS THAN CREDIBLE,

9  QUITE FRANKLY.

10      **MR. GOLDROSEN:**  YOU KNOW, I CAN'T --

11      **THE COURT:**  I HAVE TO SAY IN THIS CASE I'M REALLY NOT

12  UNDERSTANDING WHY THE GOVERNMENT HAS NOT DONE ITS JOB IN THIS

13  CASE AND QUESTIONED THE WITNESSES.  REPREHENSIBLE IN MY VIEW.

14      **MR. GOLDROSEN:**  WHATEVER NAME IS USED, I THINK, THE

15  COURT IS GETTING CAUGHT UP IN WHAT NAME WAS ON THE ACCOUNT.

16  PEOPLE DO OPEN UP ACCOUNTS ON LINE IN VARIOUS BUSINESSES

17  WITHOUT USING THEIR TRUE AND FULL NAME FOR VARIOUS REASONS OF

18  PRIVACY.  I THINK THAT'S LEGITIMATE.

19      BUT WHAT I WANT TO ASK THE COURT TO DO IS NOT GET

20  CAUGHT UP IN WHOSE THE NAME THE ACCOUNT WAS IN AND WHEN DID THE

21  ACCOUNT GO FROM MR. KNABB TO HIS WIFE, BUT WHAT IS THE PROOF

22  THAT MR. KNABB DERIVED INCOME FROM THIS ACCOUNT.

23      WE HAVE EVERY SINGLE THING THAT WAS EVERY SOLD IN THAT

24  ACCOUNT.  NOTHING HAS BEEN MATCHED UP TO ANY ASSET THAT WAS

25  TAKEN, THAT WAS PURCHASED WITH THE PROCEEDS FROM THE CRIME.

1          THERE IS NOTHING.  WHEN YOU TAKEOFF THE $57,000 WE

2     JUST TOOK OFF, WE'RE ONLY TALKING $185,000 WORTH OF THINGS SOLD

3     AND THAT'S WITHOUT THE PURCHASE PRICES.  SO THE NET INCOME IS,

4     I SUBMIT TO THE COURT, EXTREMELY SMALL.  I THINK, THERE WERE

5     MAYBE 30 TO 40,000 IN PURCHASES OFF OF THE E-BAY THAT WAS THEN

6     RESOLD IN E-BAY.

7          **THE COURT:**  SEEMS TO ME STRANGE TO THE COURT THAT THE

8     DEFENDANT WOULD, TO THE EXTENT HIS VIEW IS MY WIFE'S INCOME IS

9     NOT RELEVANT, MY WIFE'S BUSINESS INTERESTS ARE NOT RELEVANT

10    BECAUSE WE HAVE THIS PRENUPTIAL AGREEMENT, YET HE DOESN'T

11    MENTION THIS OTHER, YOU CALL IT NOT A BUSINESS, YOU CALL IT

12    MAYBE CASUAL THING, BUT IT WOULD SEEM TO THE COURT THAT IT

13    WOULD HAVE BEEN HONEST THING TO SAY AND, YES, SHE'S EARNING

14    INCOME FROM SELLING ITEMS ON E-BAY.  SHE'S GOT A TRADE NAME OR

15    E-BAY NAME, WHATEVER YOU WANT TO CALL IT.  IT'S JUST THE

16    TOTALITY OF IT.

17         **MR. GOLDROSEN:**  I WANT TO BRING THE COURT BACK TO, THE

18    BUSINESS DOESN'T EXPAND OR BECOME A REAL NAMED BUSINESS UNTIL

19    AFTER THAT INTERVIEW.

20         IF YOUR TALK ABOUT THE HUNDRED -- AND I DO HAVE A

21    BREAKDOWN WHEN THINGS ARE SOLD, BUT THE SIGNIFICANT PART, MY

22    UNDERSTANDING SIGNIFICANT PART OF THESE SALES OCCURRED AFTER

23    THAT INTERVIEW.

24         WHAT MR. KNABB COMES INTO THE FIRST INTERVIEW HE SAYS,

25    LOOK, I'M SUPPORTED BY MY WIFE, SHE HAS THIS BUSINESS THE SKAEI

NORDIC, SO WE'RE NOT HIDING THAT.  THE WAY HE'S SUPPORTED FROM

HIS WIFE.

     **THE COURT:**  HOW IS THE COURT SUPPOSED TO LOOK AT THAT,

WHEN THERE ARE ALIASES BEING USED -- IF YOU TAKE EACH ONE,

YOU'RE VERY, VERY GOOD LAWYER AND YOU'RE VERY GOOD AT IT, AND I

COMPLIMENT YOU I'M NOT SAYING SARCASTICALLY, THERE WERE THIS

FACT, THEY WERE BEING HARASSED, SO THEY CHANGE THE NAMES.

     THE FACT THAT THERE'S OVERLAPPING ADDRESSES AND THE

ALIAS LIKE JAY VALAAS AND ALL THAT, THAT'S JUST PART OF DOING

BUSINESS ON E-BAY.

     THE FACT THAT HE DIDN'T DISCLOSE THIS E-BAY SITUATION

ON THE STATEMENT IT JUST SEEMS LIKE, AT BEST, IT'S CUTTING THIS

WHOLE SERIES OF TRANSACTIONS VERY, VERY FINE.

     **MR. GOLDROSEN:**  BUT LET ME -- THE NEXT STEP IS,

MS. CARUBA ASKED FOR THE FINANCIAL STATEMENT FROM JAY'S WIFE,

IT'S DISCLOSED AND E-BAY INFORMATION IS PROVIDED.

     SO WHEN YOU GO BACK TO THE OBSTRUCTION OF JUSTICE

GUIDELINE, THOUGH, THERE'S A DISTINCTION IN THE APPLICATION

NOTES.  DISTINCTION BETWEEN PROVIDING MATERIAL FALSE

INFORMATION WITH PROVIDING INCOMPLETE OR MISLEADING

INFORMATION.

     AND WHAT THE APPLICATION NOTE SAYS, AND I'M REFERRING

NOW TO 5(C), PROVIDING INCOMPLETE OR MISLEADING INFORMATION NOT

AMOUNTING TO A MATERIAL FALSEHOOD IN RESPECT TO PRESENTENCE

INVESTIGATION IS AN EXAMPLE OF CONDUCT ORDINARILY NOT COVERED

1    BY THIS ENHANCEMENT.  SO I DON'T THINK IT GOES THAT FAR.

2          I THINK, HE WAS TOTALLY FORTHRIGHT, BUT THE CONCERNS I

3    HEAR THE COURT RAISING IN MY MIND FIT UNDER THE CATEGORY OF

4    PROVIDING INCOMPLETE.

5          HE TOLD HER ABOUT SKAEI NORDIC, HE DIDN'T TELL HER

6    ABOUT E-BAY OR MISLEADING INFORMATION, BUT IT DOESN'T RISE TO

7    THE LEVEL OF PROVIDING FALSE INFORMATION, WHICH WOULD HAVE BEEN

8    SUCH AS MY WIFE DOESN'T HAVE AN E-BAY ACCOUNT FOR WHICH SHE IS

9    EARNING INCOME, THAT'S FALSE INFORMATION.

10          BUT WHEN HE DOESN'T MENTION IT BECAUSE HE TELLS THE

11    COURT BECAUSE HE'S SUBSUMED IT UNDER THE MAJOR BUSINESS, THAT

12    AT BEST OR AT WORSE IS INCOMPLETE INFORMATION.

13          **THE COURT:**  I HEARD ENOUGH ON THAT ISSUE.  I WANT TO

14    ASK YOU ABOUT THE SKY MOUNTAIN ISSUES.  AND ACCEPTING

15    EVERYTHING THAT THE DEFENDANT ARGUES TO BE TRUE, THAT IS TO

16    SAY, THAT THE LEASING AND -- I'M SORRY, NOT THE LEASING, THE

17    ENTERING INTO THE TRUST DOCUMENTS AND ALL THAT, TWO CONCERNS.

18          THE NET EFFECT THAT WE'VE GOT TO HERE BASED UPON THE

19    SUBMISSIONS AND THE TESTIMONY OF MS. VALAAS IS THAT THIS

20    PROPERTY ULTIMATELY IS OWNED BY A TRUST OF WHOM THE SOLE

21    BENEFICIARY IS THE INFANT SON OF THE DEFENDANT AND HIS WIFE,

22    CORRECT?

23          **MR. GOLDROSEN:**  YES.

24          **THE COURT:**  IT'S ALSO CORRECT THAT THE SEC MUCH LESS

25    THE PROBATION OFFICER WAS NEVER GIVEN ALL THE INFORMATION THAT

1  YOU HAVE NOW SUBMITTED ABOUT THE INFANT SON OF THE DEFENDANT

2  BEING THE SOLE BENEFICIARY OF A SUBSTANTIAL ASSET, ISN'T THAT

3  CORRECT?

4          **MR. GOLDROSEN:**  IT WAS CERTAINLY SUBMITTED IN OUR

5  SENTENCING MEMORANDA, I DON'T KNOW --

6          **THE COURT:**  I'M NOT SAYING YOU SUBMITTED ANY INCORRECT

7  INFORMATION, BUT IT CONCERNS THE COURT THAT HERE WE HAVE YET

8  ANOTHER APPARENT EXAMPLE POTENTIALLY OF HIDING ASSETS.

9          WE HAVE AN IS ASSET THAT WENT THROUGH ALL THESE

10  FINANCIAL TRANSACTIONS, YES, THE REASONS GIVEN THERE WAS

11  CONCERN ABOUT SATISFYING THE DEBT, SATISFYING THE LIEN OR THE

12  CLAIM BY THE SEC, THE FIRST WIFE WANTED TO GET HER NAME OFF,

13  SHE TO TRANSFER ASSETS.

14          BUT AT THE END OF THE DAY UNBEKNOWNST TO THE SEC WE

15  WIND UP WITH A SITUATION WHERE AS WE SIT TODAY, I DON'T KNOW IF

16  IT'S CHANGED, THE INFANT SON OF THE -- OVER WHOM BOTH PARTIES

17  HAVE CUSTODY, THE DEFENDANT HAS CUSTODY, IS THE BENEFICIARY OF

18  THIS ASSET.

19          **MR. GOLDROSEN:**  LET'S GO BACK AGAIN TO OUR STANDARD.

20  THE DISTINCTION BETWEEN PROVIDING MATERIAL FALSE INFORMATION

21  AND INCOMPLETE OR MISLEADING INFORMATION OR NOT PROVIDING

22  INFORMATION AT ALL.

23          CAN'T GET OBSTRUCTION OF JUSTICE FOR NOT PROVIDING

24  INFORMATION, ONLY GET IT FOR LYING.  AND NOVEMBER 16TH 2011 IS

25  THE DATE THAT MR. KNABB BENEFICIARY INTEREST WAS EXTINGUISHED

1    FROM THE TRUST.  THAT DOCUMENTATION HAS BEEN PROVIDED TO THE

2    COURT.

3            THE MEETING WITH MS. CARUBA IN DECEMBER OF 2011 AT

4    THAT TIME MR. KNABB WAS TOTALLY CORRECT WHEN HE SAID I'M NOT A

5    BENEFICIARY TO THE TRUST.

6            WE PROVIDED -- MY RECOLLECTION IS WE PROVIDED THAT

7    SINGLE DOCUMENT TO MS. CARUBA AT APPROXIMATELY THAT TIME.

8    BECAUSE AT THAT TIME DECEMBER OF 2011 THERE WAS NO BENEFICIARY

9    TO THE TRUST.

10           SO LATER ON, SEVERAL MONTHS LATER A CHANGE OCCURS

11   THROUGH LAURA VALLAAS AS SHE TESTIFIED TO THE COURT.  THERE'S

12   NO DISPUTE ABOUT THIS BECAUSE THE DOCUMENTS SHOW THAT THE CHILD

13   DIDN'T BECOME A BENEFICIARY UNTIL MARCH.  SEVERAL MONTHS AFTER

14   THE INTERVIEW WITH MS. CARUBA.

15           SO WHAT WE'RE TELLING YOU IS DID YOU FIND OBSTRUCTION

16   OF JUSTICE BECAUSE, AGAIN, MR. KNABB NEVER DENIED AT THAT POINT

17   THAT THE SON WAS NOW THE BENEFICIARY OF THE TRUST, HE NEVER

18   FALSELY DENIED THAT.  HE JUST DIDN'T COME FORWARD WITH IT AT

19   THAT TIME.

20           **THE COURT:**  WOULDN'T YOU AGREE THEN, LET'S ASSUME

21   YOU'RE RIGHT, THAT THE OBSTRUCTION PART AFFIRMATIVE FALSE

22   STATEMENT AND ABSENT THAT IT'S JUST A MATTER OF NOW SUPPLYING

23   ALL INFORMATION, WOULD YOU AGREE WITH THAT, THAT'S YOUR

24   ARGUMENT?

25           **MR. GOLDROSEN:**  YES, THAT'S MY ARGUMENT.

1        **THE COURT:**  BEFORE YOU DO THAT, I ASSUME YOU FURTHER

2   ADMIT THAT OR YOU WOULD AGREE, I'M NOT SAYING YOU SHOULD ADMIT

3   ANYTHING, YOU AGREE THAT THE WAY THE DEFENDANT HAS CONDUCTED

4   HIMSELF WITH THESE MACHINATIONS, THE THINGS WE'VE BEEN TALKING

5   ABOUT, DO NOT RISE TO THE HIGHEST LEVEL OF CANDOR A COURT WOULD

6   EXPECT FROM A DEFENDANT WHO'S FACING UP TO 25 YEARS IN PRISON.

7        AND WHO'S ALLEGEDLY REMORSEFUL FOR HIS ACTION.  I

8   DON'T SEE IT THAT WAY.  I SEE IT, THE FACT WE'RE HAVING THIS

9   ARGUMENT AND HAVING UNRAVEL OR PEEL BACK THIS ONION AS WE'RE

10  DOING IT YOU'RE DOING IT VERY EFFECTIVELY, BUT THERE'S A -- I'M

11  NOT SAYING YOU'RE LOSING, BUT THERE'S AN EXPRESSION I LEARNED

12  IN LAW SCHOOL, WHEN YOU'RE EXPLAINING YOU'RE LOSING.  THERE'S A

13  LOT TO BE EXPLAINED HERE.

14       **THE COURT:**  IT TROUBLES THE COURT, TROUBLES THE COURT

15  GREATLY WE HAVE THIS -- WHERE NOT EVEN A LOT OF MONEY INVOLVED,

16  ALTHOUGH WE HAVE THE HOUSE WHERE THERE THESE CONFLUENCE OF

17  EVENTS THAT SEEM TO TELL THE COURT THAT THERE'S A CONTINUING

18  HIDING OF THE BALL GOING ON HERE.

19       THAT'S MY CONCERN.  MAYBE THAT'S, YOU KNOW, WHEN DID

20  YOU STOP BEATING YOUR SPOUSE KIND OF STATEMENT OR QUESTION BUT

21  THE COURT IS TROUBLED BY THAT, MR. GOLDROSEN, I REALLY AM.

22       ALL RIGHT.  I HEARD ENOUGH.  YOU WANT TO SAY ONE MORE

23  THING?

24       **MR. GOLDROSEN:**  WELL, TWO ADDITIONAL POINTS I WANT TO

25  MAKE REGARDING THE TRUST.  THAT I THINK AGAIN THE FOCUS IS, IS

1   THIS AN INCOME OR ASSET EVEN IN ITS CURRENT STATE FROM

2   MR. KNABB, SOMEHOW IS BEING WITHHELD OR I SHOULDN'T SAY

3   WITHHELD OR SOMEHOW BEING TAKEN OUT OF THE CALCULATION OF THE

4   COURT'S ABILITY TO ASSESS WHETHER HE CAN PAY A FINE OR

5   RESTITUTION.

6           I THINK, IT'S NOT BECAUSE HE STILL DOESN'T HAVE, THE

7   COURT MAY HAVE CONCERNS ABOUT WE DIDN'T DISCLOSE THIS IT'S NOW

8   HIS SON THE BENEFICIARY OF THIS COLLEGE TRUST, BUT IT'S STILL

9   NOT MR. KNABB WHO HAS ANY RIGHT TO INCOME FROM THAT PROPERTY OR

10  ANY POSSESSION OF THAT ASSET.

11          **THE COURT:**  BECAUSE HE'S DIVESTED HIMSELF OF THAT

12  ASSET, CORRECT, EFFECTIVELY?

13          **MR. GOLDROSEN:**  HE WAS REMOVED AS -- THE ASSET WAS

14  NEVER -- WHEN THE DIVORCE CAME THAT PROPERTY WENT TO -- BECAME

15  THE SOLE PROPERTY OF THE EX-WIFE.

16          SO IT WASN'T -- HASN'T BEEN HIS FOR A LONG TIME.  SHE

17  HAD A TRUST AND THE BENEFICIARY IS THEN REMOVED.

18          THE SECOND POINT IS SINCE THIS IS PART OF THE SEC

19  JUDGMENT, WHATEVER MACHINATIONS HAVE GONE ON THE PROPERTY STILL

20  THERE WAITING FOR THE SEC.

21          **THE COURT:**  THEY MAY HAVE TO WAIT A LONG TIME THE WAY

22  THE SEC IS PROCEEDING IN THIS CASE.  AS A CITIZEN I FIND THAT

23  VERY TROUBLING, BUT THAT'S NOT YOUR ISSUE, IT'S NOT MR. KNABB'S

24  FAULT.

25          I'M SATISFIED, ESPECIALLY IN THE ABSENCE OF ANY

1    SUPPORT BY THE GOVERNMENT HERE, THIS IS AN ADVERSARY PROCEEDING

2    THE OBSTRUCTION DOES NOT -- I THINK, IT PROBABLY HAPPENED, BUT

3    THAT'S NOT THE STANDARD HERE.

4         THE STANDARD HERE WHAT THE GUIDELINES STATE.  SO I'M

5    NOT GOING TO APPLY THE OBSTRUCTION BECAUSE I THINK IT'S

6    AMBIGUOUS ENOUGH AND THE GOVERNMENT HAS NOT ASSISTED THE COURT

7    IN ANY WAY SHAPE OR FORM, SO THAT DOES NOT APPLY.

8         I'D LIKE TO MOVE ONTO THE ACCEPTANCE OF RESPONSIBILITY

9    WHEREIN THE GOVERNMENT NOW TAKES THE POSITION WHICH WAS

10   DIFFERENT FROM THE BEGINNING THAT THE DEFENDANT SHOULD RECEIVE

11   IS IT TWO LEVEL ADJUSTMENT?

12        **MR. SCHMIDT:**  YOUR HONOR, WE TOOK THAT POSITION IN OUR

13   PAPERS.  I ACTUALLY HAVE RECONSIDERED THAT POSITION.

14        **THE COURT:**  WHAT IS IT NOW?

15        **MR. SCHMIDT:**  I THINK, THAT POSITION WAS -- ORIGINALLY

16   I TOOK THAT POSITION BECAUSE I LOOKED AT OUR PLEA AGREEMENT,

17   THE PLEA AGREEMENT SAYS IF THE DEFENDANT IS NOT FORTHRIGHT WITH

18   PROBATION THAT IT'S IN THE GOVERNMENT'S DISCRETION TO AWARD

19   THOSE POINTS.

20        BUT I THEN LOOKED A LITTLE CLOSER AT THE GUIDELINES,

21   THE GUIDELINES SUGGEST THAT THERE POINT REALLY HAS TO DO WITH

22   TIMELINESS AND NOTHING MORE.

23        **THE COURT:**  EXCUSE ME.

24        **MR. SCHMIDT:**  THE THIRD POINT HAS TO DO WITH

25   TIMELINESS AND NOTHING MORE.  AND IN MY OPINION THE DEFENDANT

1    HAS -- HE PLED GUILTY IN A TIMELY FASHION, HE PLED GUILTY

2    BEFORE THE CASE WAS CHARGED.

3            AND SO I THINK HE DESERVES THAT POINT FOR ACCEPTANCE

4    OF RESPONSIBILITY AND AS IN OUR PAPERS, I THINK, THE TWO POINTS

5    HE DESERVES AS WELL.

6            **THE COURT:**  I'D LIKE TO HEAR YOUR ARGUMENT.  YOU'VE

7    ALREADY ARGUED THE ISSUE WITH RESPECT TO THE E-BAY ACCOUNT, I

8    DON'T WANT TO HEAR FURTHER ARGUMENT ON THAT.

9            WE HAVE THE OTHER -- WE HAVE OTHER ISSUES, WE HAVE THE

10   ISSUE WITH RESPECT TO, FIRST OF ALL, THE DEFENDANT'S STATEMENT

11   OF CONTRITION OR RESPONSIBILITY WHERE HE SEEMS TO BE TAKING THE

12   POSITION THAT HE WAS THE CAUSES OF THIS.

13           THE FACT THAT, AT LEAST, IN SUBSTANTIAL PART HE WAS

14   UNDER THE INFLUENCE OF ALCOHOL OR ABUSING ALCOHOL OR DRUGS

15   DURING THE RELEVANT TIME PERIOD, AND THAT HE WAS MISLEAD BY

16   OTHERS, AND DOES NOT SEEM TO BE VERY MUCH OF A STATEMENT OF

17   RESPONSIBILITY EXCEPT THOSE OF OTHERS AND OF ALCOHOL.

18           AND, FRANKLY, ON THE ISSUE OF ALCOHOL, I FIND IT

19   VERY -- I THINK, THIS -- AND LET ME SAY FOR THE RECORD, THAT

20   I'M DISREGARDING COMPLETELY THE TESTIMONY OR THE STATEMENT MADE

21   BY THE DEFENDANT'S MOTHER.  I THINK, IT'S INHERENTLY

22   INCREDIBLE.

23           SHE'S GOT AN AX TO GRIND, IT'S SAID IN SO MANY WAYS MY

24   MOTHER COME IN AND FEELS THE NEED TO DO WHAT SHE DID, BUT MAYBE

25   THE DEFENDANT DOESN'T BEAR ANY FAULT FOR THAT.

1          BUT THAT ASIDE THE ISSUE OF WHETHER OR NOT ALCOHOL WAS

2     A SUBSTANTIAL CONTRIBUTING FACTOR IS A SIGNIFICANT FACTOR, AND

3     QUITE HONESTLY I FIND EXTREMELY HARD TO BELIEVE.

4          ESPECIALLY THE DEFENDANT HE SUBMITS A STATEMENT BY A

5     THERAPIST THAT SAYS HE'S TAKING THERAPY OR HE'S IN THERAPY

6     BECAUSE OF HIS ALCOHOL ABUSE CURRENTLY AND HE BEGAN SEEING THE

7     THERAPIST AFTER THE PROBATION OFFICER SUGGESTED THAT IF HE

8     REALLY HAD A PROBLEM HE SHOULD SEEK THERAPY.

9          AND NOW WE HEAR FOR THE FIRST TIME FROM HIS WIFE HE'S

10    CONTINUING TO DRINK, EVEN THOUGH HE'S IN THERAPY.  HIS

11    RELIABILITY IS VERY QUESTIONABLE.

12         THERE'S ABSOLUTELY NO EVIDENCE IN THIS REGARD OTHER

13    THAN THE LATE FILED STATEMENT BY THE DEFENDANT'S BROTHER.

14    THERE'S NO TESTIMONY UNDER OATH BY THE DEFENDANT, NOT ONE

15    SINGLE WITNESS TO COME HERE AND TESTIFY THAT THE DEFENDANT HAD

16    AN ALCOHOL PROBLEM.

17         I ALSO FIND IT VERY INTERESTING WITH THE MORE THAN 20

18    SOME ODD CONVICTIONS THAT THE DEFENDANT HAS, WHICH WAS NOT

19    REVEALED IN THE FIRST PRESENTENCE REPORT, INVOLVING VEHICLE

20    OFFENSES, SOME DURING THE RELEVANT PERIOD, NONE OF THEM INVOLVE

21    ALCOHOL, NOT ONE.

22         AND GIVEN HIS COMPLETE AND UTTER DISRESPECT OR LACK

23    RESPECT FOR THE TRAFFIC LAWS, WHATEVER STATE HE LIVES IN, I

24    CAN'T IMAGINE HOW HE COULD HAVE AVOIDED A DUI DURING THAT

25    RELEVANT PERIOD OF TIME.

1          SO THERE'S NO EVIDENCE IN THIS RECORD, ANY CREDIBLE

2     EVIDENCE IN THIS RECORD AT ALL THIS DEFENDANT HAD A DRINKING

3     PROBLEM, OTHER THAN THE STATEMENT HE MADE THAT THE ALCOHOL WAS

4     A FACTOR IN HIS COMMISSION OF THE CRIME.

5          SO FOR THOSE REASONS I'D LIKE TO HEAR FROM YOU.  I

6     THINK, THE EVIDENCE A LACK OF REMORSE, LACK OF CANDOR, BLAMING

7     OTHERS, BLAMING SUBSTANCES, AND DO NOT DESERVE ANY DOWNWARD

8     ADJUSTMENT, BUT OBVIOUSLY LIKE TO HEAR FROM YOU, MR. GOLDROSEN.

9          **MR. GOLDROSEN:**  I JUST WANT TO POINT OUT TO THE COURT

10    THIS LIST OF, I AGREE LONG LIST OF OFFENSES THAT ARE IN THE

11    PRESENTENCE REPORT.

12         ACTUALLY, ONLY ONE OFFENSE THAT TAKES PLACE DURING THE

13    TIME PERIOD OF RELEVANCE TO THE CRIMES, SO THERE'S JUST ONE,

14    AND THAT THE COURT IS CORRECT IT DIDN'T INVOLVE ALCOHOL, BUT

15    ONLY ONE DRIVING OFFENSE AND THAT WAS IN THE YEAR 2005, A

16    RECKLESS DRIVING AND THE MOST RECENT ONE BEFORE THAT IS 2002.

17         SO, I THINK, WE'VE GOTTEN A LITTLE BIT AWAY FROM WHERE

18    WE ARE WERE BEFORE WITH THE ALCOHOL.  MR. KNABB HAS NEVER IN

19    HIS ACCEPTANCE OF RESPONSIBILITY STATEMENT, WHICH IS PAGE TWO,

20    HE NEVER BLAMES ALCOHOL AS THE REASON WHY HE COMMITTED THESE

21    CRIMES.

22         HE SAYS HERE -- THIS IS THE FORM HE FILLED OUT, DO YOU

23    ACCEPT RESPONSIBILITY FOR COMMITTING OFFENSES, HE SAYS, YES.

24    SUMMARY IS SET FORTH IN PLEA AGREEMENT.

25         OKAY.  SO HE ADMITS THAT HE COMMITTED THE CRIME AND

1    THAT BY ITSELF IS SUBSTANTIAL EVIDENCE OF ACCEPTANCE OF

2    RESPONSIBILITY BECAUSE THE GUIDELINE STATES -- AND THE

3    GUIDELINE STATES, AND I'M LOOKING NOW AT APPLICATION NOTE

4    THREE, THAT ENTRY OF A PLEA OF GUILTY PRIOR TO COMMENCEMENT OF

5    TRIAL COMBINED WITH TRUTHY ADMITTING THE CONDUCT COMPRISED IN

6    THE OFFENSE OF CONVICTION.

7           THERE'S NO DISPUTE HE'S DONE THAT, BECAUSE HE ADMITTED

8    IT, VERY LENGTHY STATEMENT OF FACTS IN HIS PLEA AGREEMENT, AND

9    THEN MADE REFERENCE TO THAT IN THE ACCEPTANCE OF RESPONSIBILITY

10   PAGE IN THE PROBATION DOCUMENTS.

11          THE FACT, AND TRUTHFULLY ADMITTING OR NOT FALSELY

12   DENYING ANY ADDITIONAL RELEVANT CONDUCT FOR WHICH HE'S

13   ACCOUNTABLE, CONSTITUTES SIGNIFICANT EVIDENCE OF ACCEPTANCE OF

14   RESPONSIBILITY FOR PURPOSE OF SUBSECTION DIVISION A.

15          SO, I THINK, WE START WITH SIGNIFICANT EVIDENCE OF

16   ACCEPTANCE OF RESPONSIBILITY, AND THE QUESTION IS, HAS ANYTHING

17   THAT HAS OCCURRED SINCE THEN, ANYTHING HE'S SAID OR DONE,

18   OUTWEIGH THAT SIGNIFICANT EVIDENCE.

19          WHEN WE START WITH SIGNIFICANT EVIDENCE WE NEED A LOT

20   OF EVIDENCE A LOT OF PROOF HE HAS ENGAGED IN CONDUCT OR SAID

21   THINGS THAT'S INCONSISTENT WITH THAT ACCEPTANCE OF

22   RESPONSIBILITY.

23          NOW, I NOTE MS. CARUBA HAS RELIED ON THIS STATEMENT OF

24   I FELT MISLED BY PEOPLE, BUT THAT HAS TO BE TAKEN INTO CONTEXT

25   OF WHAT ELSE HE SAID IN THIS STATEMENT.

1    HE SAID, YES, I ACCEPT RESPONSIBILITY, SUMMARY SET

2    FORTH IN PLEA AGREEMENT.  NEXT QUESTION HOW DO YOU FEEL ABOUT

3    HAVING COMMITTED THE OFFENSE.  I FEEL REMORSEFUL ABOUT HAVING

4    COMMITTED THIS OFFENSE.

5        I RECOGNIZE THAT I FOLLOWED THE WRONG COURSE OF ACTION

6    AND REGRET THE DECISION I WAS MAKING AT THIS TIME IN MY LIFE.

7    THOSE TWO SENTENCES COMPLETELY CONSISTENT WITH ACCEPTANCE OF

8    RESPONSIBILITY AND ACKNOWLEDGMENT OF HIS CRIME.

9        NOW, THEN SAYS HE FEEL I'M MISLEAD BY PEOPLE WHO I

10   MISTAKENLY TRUSTED, NOW THAT -- NO KIND OF AMBIGUOUS STATEMENT

11   DOESN'T SPECIFY WHAT HE WAS MISLEAD ABOUT, AND I FEEL LIKE I IN

12   TURN MISLEAD PEOPLE WHO TRUSTED ME.

13       HE'S ACKNOWLEDGING THAT A LOT OF PEOPLE TRUSTED HIM

14   AND HE IS ACKNOWLEDGING HE MISLEAD THEM, HE LIED TO THEM.

15       AND HE GOES ON, WHAT IMPACT HAS YOUR BEHAVIOR HAD IN

16   OTHERS, MY ACTIONS IN THE PAST THAT MAKE IT EXTREMELY DIFFICULT

17   FOR OTHERS TO TRUST ME.  THAT, AGAIN, IS AN ACKNOWLEDGMENT THAT

18   HE HAS LIED AND DECEIVED PEOPLE AND HE UNDERSTANDS THE

19   CONSEQUENCES OF THAT.

20       SO WHEN YOU ISOLATE THIS STATEMENT I FEEL MISLEAD BY

21   PEOPLE YOU'RE NOT GETTING THE TOTAL OVERALL PICTURE OF WHAT HE

22   SAID, AND NOWHERE IN HERE IN THIS ACCEPTANCE OF RESPONSIBILITY

23   PAGE DOES HE SAY I DID IT BECAUSE I DRANK ALCOHOL.

24       LATER ON THERE'S ANOTHER PORTION OF THIS WHERE THEY

25   ASKED HIM FOR HISTORY OF SUBSTANCE ABUSE AND HE SAYS, YOU KNOW,

1    BETWEEN 2004 AND 2007 I WAS DRINKING DAILY AND EXCESSIVE.

2              THE QUESTION IS ASKED, DID YOUR ALCOHOL CONTRIBUTE TO

3    YOUR COMMISSION OF THE OFFENSE.  AND HE SAYS IN WHAT WAY, MY

4    ALCOHOL ABUSE CONTRIBUTED TO MY OFFENSE.

5              HE'S NOT SAYING THIS IS THE SOLE REASON WHY HE DID IT,

6    HE'S NOT PUTTING IT ALL OFF ON HIS ALCOHOLISM, HE'S STATING

7    WHAT IS TRUE, HE WAS DRINKING A LOT.

8              **THE COURT:**  THAT'S WHAT HE SAYS IS TRUE.  I DON'T FIND

9    IT CREDIBLE.  LET'S ASSUME THE COURT FINDS THAT IS A LIE, IS

10   THAT STILL ACCEPTANCE IF HE'S IN PART ATTRIBUTING HIS CRIME TO

11   ALCOHOL AND HE'S LYING TO THE PROBATION OFFICER?

12             **MR. GOLDROSEN:**  I'M GOING TO HAVE TO DISAGREE, WELL,

13   THE ANSWER TO THAT AS NO, I DO THINK -- I DO DISAGREE WITH THE

14   COURT'S FINDING ON THAT.

15             I DON'T SEE THE EVIDENCE THAT HE WAS AN ALCOHOLIC.

16   WHEN SOMEONE IS RAISED WITH TWO ALCOHOLIC PARENTS AND A BROTHER

17   WHO'S WRITTEN TO THE COURT ABOUT HIS OWN ALCOHOLISM, THE

18   LIKELIHOOD THAT YOU'RE GOING TO BE AN ALCOHOLIC IN THOSE

19   CIRCUMSTANCES, AT LEAST, HAVE DIFFICULTY WITH ALCOHOL USE IS

20   HIGHLY -- IT'S NOT HIGHLY IMPROBABLE, ITS VERY PROBABLE.

21             SO IF YOU TAKE INTO CONSIDERATION THE KIND OF LIFE

22   MR. KNABB GREW UP WITH, THE KIND OF PARENTS HE HAD, IT'S NOT AT

23   ALL SURPRISING HE WOULD HAVE AN ALCOHOL PROBLEM.

24             IT'S NOT AT ALL SURPRISING BY THE FACT HE HAS A PAIN

25   KILLER PROBLEM THAT HE ALSO HAS AN ALCOHOL PROBLEM.  HE'S GOT

1  AN ADDITIVE PERSONALITY.  YOU GOT GAMBLING, OR SHOPPING, ALL

2  PROBLEMS WITH HIM.

3        I FIND IT HIGHLY CREDIBLE THAT HE WOULD ALSO HAVE

4  ALCOHOL PROBLEM.  BUT EVEN IF THE COURT WERE TO DISBELIEVE THAT

5  I STILL THINK YOU HAVEN'T RISEN TO THE LEVEL OUTWEIGHING THE

6  SIGNIFICANT EVIDENCE OF ACCEPTANCE OF RESPONSIBILITY BASED UPON

7  HIS ADMISSION OF THE CRIME.

8        AND WE'RE NOT IN A SITUATION WHERE HE HAS EVER SAID I

9  DIDN'T REALLY DO IT OR THIS ISN'T THE AMOUNT OF MONEY I

10  SWINDLED.  THESE AREN'T THE INVESTORS I TOOK THE MONEY FROM, I

11  DIDN'T DO THIS, THE CO-DEFENDANT DID IT ALL, HE'S NEVER SAID

12  ANYTHING LIKE THAT.

13        HE'S ALWAYS BEEN UP-FRONT WITH THE COURT, YES, I DID

14  THIS CRIME, AND IN GRAPHIC DETAIL SEVERAL PAGES ON THE PLEA

15  AGREEMENT OUTLINING THE ISSUANCE OF ALL THE FRAUDULENT STOCK

16  CERTIFICATE, AND THE WAY HE SOLD IT TO PEOPLE HE KNEW AND THE

17  WAY HE GOT HIS MONEY BACK.

18        SO THE COURT QUIBBLES ON SOMETHING I THINK ARE

19  RELATIVELY MINOR POINTS THAT DO NOT RISE TO THE LEVEL BY THE

20  WAY OF SIGNIFICANCE OF HIS PLEA AGREEMENT.

21        **THE COURT:**  ALL RIGHT.  ANYTHING FURTHER?

22        **MR. SCHMIDT:**  NO.

23        **THE COURT:**  ALL RIGHT.  I'M CONVINCED THAT THE

24  DEFENDANT IS ENTITLED TO THREE POINTS FOR ACCEPTANCE OF

25  RESPONSIBILITY.

```
1            I THINK, THAT AGAIN RULES ARE SPECIFIC AND I THINK THE
2    PROBATION OFFICER AS WELL AS THE COURT WAS DRIVEN BY THE
3    TOTALITY OF CIRCUMSTANCES AND THE DEFENDANT'S BEHAVIOR DURING
4    THE COURSE OF THE SCHEME AND THE AFTERMATH OF THE SCHEME WHERE
5    I THINK THERE WAS SUBSTANTIAL AMOUNT OF HIDING THE BALL AND
6    FINE-TUNING OF TRANSACTIONS TO PUT THE DEFENDANT IN THE BEST
7    SITUATION FINANCIALLY.
8            AND WHETHER HE'S MOTIVATED BY HIS WIFE'S, PROTECTING
9    HIS WIFE THAT MAYBE LAUDABLE, BUT THE COURT HAS -- THE COURT
10   WHEN APPLYING THE GUIDELINES NEEDS TO FOLLOW THE GUIDELINES AND
11   COME TO THE CORRECT CALCULATION.
12           BY MY CALCULATION WE'RE -- SUBJECT TO YOUR OTHER
13   OBJECTIONS, MR. GOLDROSEN, WE'RE AT A LEVEL 35; IS THAT
14   CORRECT?
15           MR. SCHMIDT:  I HAVE IT AT 34, IS MY MATH WRONG?
16           MR. GOLDROSEN:  THREE PLUS TWO SUBTRACT, I BELIEVE,
17   THE PROBATION OFFICER CALCULATED 39 AND WE'RE SUBTRACTING FIVE.
18           THE COURT:  SO 34.  SO THAT WILL BE THE DETERMINATION.
19   ALL RIGHT.
20           NOW, IS THERE ANYTHING FURTHER AT THIS POINT THE
21   GOVERNMENT WISHES TO SAY WITH RESPECT TO SENTENCE?
22           MR. SCHMIDT:  NO, YOUR HONOR.  I DO WANT TO THANK BOTH
23   THE COURT AND PROBATION FOR THE AMOUNT OF TIME THEY SPENT ON
24   WHAT'S VERY DIFFICULT, VERY FACT INTENSIVE CASE.
25           THE COURT:  LET ME ASK YOU A QUESTION.  HOW MUCH OF
```

```
1    THIS -- THE MONEY THAT WAS STOLEN HAVE YOU ACCOUNTED FOR?

2            MR. SCHMIDT:  WE'VE BEEN ABLE TO ACCOUNT FOR, IN OUR

3    PAPERS, WE'VE BEEN ABLE TO ACCOUNT FOR HOW SOME OF IT WAS

4    SPENT.  I BELIEVE WE -- I THINK, 7 MILLION WENT BACK TO THE

5    COMPANY ITSELF, ANOTHER 11 MILLION WENT TO EXPENSES ARGUABLY

6    RELATED TO THE COMPANY, AND THEN THE REST WENT INTO VEHICLES

7    THAT WERE SOLD IN 2008 AND WE'VE NOT BEEN ABLE TO TRACK.  WE'VE

8    GOTTEN --

9            THE COURT:  YOU SAY THE REST, WE'RE TALKING ABOUT THE

10   GUIDELINE CALCULATION AGREED TO THERE WAS 40 SOME ODD MILLION

11   DOLLARS.

12           MR. SCHMIDT:  RIGHT.

13           THE COURT:  YOU'RE SAYING 11 MILLION OF THAT WENT INTO

14   THE COMPANY?

15           MR. SCHMIDT:  IF I CAN JUST GET A SECOND TO GET THE

16   NUMBERS CORRECT.

17           MR. GOLDROSEN:  THE JUDGMENT AGAINST MR. KNABB WAS FOR

18   40 MILLION, THAT INCLUDED SOME PENALTIES.  I BELIEVE THE AMOUNT

19   OF GAIN WAS 35 MILLION, IF I'M CORRECT, OF WHICH 29 MILLION

20   WENT TO MR. KNABB.

21           I'M LOOKING NOW AT THE GOVERNMENT'S DOCUMENT 58, WHICH

22   IS THE GOVERNMENT'S UNITED STATES SUPPLEMENTAL SENTENCE

23   MEMORANDUM FILED APRIL 19,2012, PAGE SEVEN, WHICH HAS THE

24   BREAKDOWN OF THE ASSETS.  PAGE SEVEN AND EIGHT.  AND WHICH

25   MR. SCHMIDT WRITES THAT AS DETAILED IN THE PLEA AGREEMENT.
```

1          **MR. SCHMIDT:**  I TAKE IT FROM HERE.

2          **MR. GOLDROSEN:**  SORRY.

3          **MR. SCHMIDT:**  MR. GOLDROSEN IS RIGHT, THERE'S A

4    JUDGMENT OF 40 MILLION, THAT INCLUDES INTEREST.  THAT'S THE

5    SEC.

6          THE AMOUNT OF PROCEEDS MR. KNABB TOOK WAS 29 MILLION.

7    OF THAT APPROXIMATELY 7 MILLION RECORDS SHOW WAS RE-INVESTED

8    INTO THE COMPANY PEGASUS.  11 MILLION WENT TO VARIOUS EXPENSES,

9    SOME LEGAL FEES, PLANE REPAIRS AND THINGS THAT WE -- EXPENSES

10   THAT ARE NOW GONE, AND ANOTHER 11 MILLION WENT TO VERY

11   VEHICLES, THE BULK OF THOSE VEHICLES FROM WHAT WE COULD TELL

12   WERE SOLD 2006 TO 2008 BY MR. KNABB OR NOMINEES OF HIS, BUT FOR

13   CASH AND SO WE'VE BEEN UNABLE TO FIND WHERE THAT CASH HAS GONE.

14         **THE COURT:**  SO $11 MILLION, IS THERE ANY ANOTHER

15   AMOUNT UNACCOUNTED FOR FROM THE GOVERNMENT'S PERSPECTIVE?

16         **MR. SCHMIDT:**  LET ME JUST CHECK WITH THE AGENT.  I

17   DON'T THINK SO.  NO.

18         **THE COURT:**  ONLY 11 OF THE 29 MILLION IS UNACCOUNTED

19   FOR?

20         **MR. SCHMIDT:**  YES.  IT'S CASH.  WHERE IT IS I DON'T

21   KNOW.

22         **THE COURT:**  THE NUMBERS THAT I HAVE, ALL RIGHT, VERY

23   WELL.  ALL RIGHT.

24         THE GOVERNMENT HAS NOTHING FURTHER?

25         **MR. SCHMIDT:**  NO, YOUR HONOR.

1          **THE COURT:**  MR. GOLDROSEN, PLEASE.  I KNOW YOU WON'T

2     DO THIS, REPEAT WHAT YOU SAID BEFORE BECAUSE IT'S IN THE RECORD

3     AND THE COURT HEARD.

4          **MR. GOLDROSEN:**  I JUST WANT TO ADD A COUPLE POINTS

5     THAT I THINK WE'VE LOST SIGHT OF.

6          I KNOW WHEN WE STARTED OFF WE RAMBLED OFF 26, WE'RE

7     LOOKING AT 63 TO 78 MONTHS CONSISTENT WITH THE PLEA AGREEMENT

8     THINGS HAVE CHANGE QUITE A BIT SINCE THEN.

9          I DO WANT TO POINT OUT AND REMIND THE COURT OF SOME

10    POINT THAT YOU HAVEN'T FOCUSED ON LATELY.  THAT IS, ONE, THE

11    EARLY ADMISSION OF WRONGDOING BY MR. KNABB IN THIS CASE.

12         IT'S A VERY, VERY IMPORTANT MITIGATING CIRCUMSTANCE.

13    MR. KNABB AGREED TO TOLLING OF THE STATUTE OF LIMITATION BEFORE

14    CHARGES WERE FILED, HE WAIVED HIS RIGHT TO BE PROSECUTED BY AN

15    INFORMATION, HE CONSENTED -- HE WAIVED HIS RIGHT TO PROSECUTED

16    BY INDICTMENT AND CONSENTED TO PROSECUTION BY INFORMATION.

17         HE ON THE VERY FIRST DAY SHOWED UP BEFORE YOUR HONOR

18    HE PLED GUILTY.  SO THERE IS A CASE WHICH MR. KNABB FROM DAY

19    ONE HAS ADMITTED HIS GUILT, AND HASN'T MADE ANY MOTIONS, HASN'T

20    DONE ANYTHING IN COURT OTHER THAN PLEAD GUILTY AND BE

21    SENTENCED.

22         SECONDLY, I WANT THE COURT TO KEEP IN MIND, ALTHOUGH

23    THE COURT TOUCHED ON THIS, I WANT THE COURT TO KEEP IN MIND HE

24    DID HAVE A VERY DIFFICULT CHILDHOOD UPBRINGING, BEING DENIED

25    KNOWLEDGE OF HIS TRUE FATHER, HAVING BEEN ABUSED EXTENSIVELY BY

HIS STEPFATHER WHO HE LOOKED UP AND ADMIRED FOR WHOM HE SO

WANTED DESPERATELY TO PLEASE.

THAT'S BEING COOPERATED BY MANY SOURCES AND PEOPLE

FROM WHAT WE SUBMITTED TO THE COURT.  I ALSO WANT THE COURT TO

KEEP THIS MIND THAT PREVIOUSLY MR. KNABB WAS EXTREMELY

COOPERATIVE WITH LAW ENFORCEMENT IN ANOTHER INVESTIGATION BACK

EAST WHERE HE NOT ONLY CAME FORWARD TO THE GOVERNMENT TO REPORT

THAT PEOPLE WERE INVOLVED WITH STOLEN MICOSOFT DISKS AND HE

WORE A WIRE IN COOPERATION WITH THE GOVERNMENT AND GATHER

EVIDENCE AND TESTIFY AT GREAT LENGTH AT TRIAL, ALL HELP THE

GOVERNMENT MAKE SUCCESSFUL PROSECUTION BACK IN, I BELIEVE, IT

WAS IN ROAD ISLAND OR MASSACHUSETTS.

I ALSO WISH THE COURT TO KEEP IN MIND THAT DESPITE ALL

THAT'S HAPPENED AND THE CRIME HAS BEEN COMMITTED IN THIS CASE

MR. KNABB DID MAKE MANY POSITIVE CONTRIBUTIONS THROUGH HIS WORK

IN TELECOMMUNICATIONS PRIOR TO WHAT OCCURRED HERE.

AND WE ARE STILL ASKING THE COURT FOR 40 MONTHS AS THE

SENTENCE THE COURT SHOULD GIVE EXERCISING ITS DISCRETION TO GO

BELOW THE ADVISORY GUIDELINES.

THIS IS A MAN WHOSE NEVER SPENT A DAY IN JAIL BEFORE,

A 40 MONTH SENTENCE AWAY FROM HIS WIFE, AWAY FROM HIS CHILD IS

SIGNIFICANT SUBSTANTIAL SENTENCE THAT WILL SERVE THE PURPOSES

OF THE SENTENCING ACT.

**THE COURT:**  YOU WANT TO COMMENT ON THE DEFENDANT'S

SUBSTANTIALLY LONG OR NUMEROUS CRIMINAL RECORD, BAD CHECKS,

VEHICLE VIOLATIONS, CONVICTIONS ABOUT WHICH THERE WAS NO

OBJECTION SO THEY STAND AS PROVED.  ANYTHING TO SAY ABOUT THAT

AT ALL?

YOU DIDN'T MENTION THAT.  CERTAINLY GOES TO THE NATURE

AND CHARACTERISTICS OF THE DEFENDANT AND HIS RESPECT FOR THE

LAW.

THERE'S SOMETHING LIKE 30 SOME ODD CONVICTIONS HERE,

FROM MISDEMEANORS TO INFRACTIONS.

**MR. GOLDROSEN:**  I DON'T HAVE THE EXACT NUMBER.  I

WOULD POINT OUT THAT MOST OF THESE OCCURRED QUITE SOME TIME

AGO.  THE LAST RECKLESS DRIVING IS 2005, EXPIRED VEHICLE IN

2002 AND IN 2000 SPEEDING.

THERE'S A LARGE GAP BETWEEN THE END OF THESE AND NOW

AND I THINK THE COURT CAN CERTAINLY TAKE ALL OF THAT INTO

CONSIDERATION, BUT THE QUESTION IS WHAT KIND OF, EVEN TAKING

THAT INTO CONSIDERATION, WHAT AMOUNT SENTENCE IS SUFFICIENT TO

PUNISH MR. KNAPP FOR HIS CRIMINAL CONDUCT AND TO DETER FUTURE

MISCONDUCT?

AND FOR SOMEBODY WHOSE NEVER BEEN INCARCERATED IN

PRISON, FOR SOMEONE WHO HAS A WIFE AND SMALL CHILD, 40 MONTHS

IS A LONG TIME.  10 YEARS IS TREMENDOUS LONG TIME, 15 YEARS IS

EXCESSIVELY LONG TIME, EVEN WITH THIS RECORD, WHICH IS FOR THE

MOST PART TRAFFIC AND MINOR OFFENSES.

**THE COURT:**  ALL RIGHT.  MR. KNABB, THIS IS YOUR

OPPORTUNITY TO ADDRESS THE COURT, WOULD YOU PLEASE STEP UP, IF

1   YOU WILL.

2          **THE DEFENDANT:**  THANK YOU, YOUR HONOR.  ON A PERSONAL

3   NOTE I'D LIKE TO THANK YOU FOR YOUR ALL YOUR PATIENCE IN THIS.

4   EXTREMELY COMPLICATED FACTS.

5          YOUR HONOR, I STAND BEFORE YOU, I KNOW PROBATION AND

6   MANY PEOPLE HAVE QUESTIONED MY REMORSEFULNESS, AND I AM SORRY

7   FOR THIS CONFUSION, BUT I WANT EVERYBODY TO KNOW I'M TRULY

8   SORRY FOR THE CRIMES THAT I COMMITTED.  AND THE HARM THAT I'VE

9   CAUSED FOR ALL THE PEOPLE.

10          I HAVE TAKEN RESPONSIBILITY.  I'VE TAKEN

11   RESPONSIBILITY FOR ALL MY ACTIONS AND I CONTINUE TO DO SO.  I

12   WILL DO EVERYTHING I CAN TO MAKE FULL RESTITUTION TO ALL THE

13   VICTIMS IN THIS.  THANK YOU.

14          **THE COURT:**  THANK YOU, SIR.

15          ALL RIGHT.  SO THE COURT HAS THIS MATTER FOR

16   SENTENCING.  THE COURT IS -- THE LAW REQUIRES THE COURT START

17   WITH THE ADVISORY GUIDELINES RANGE, AND START WITH THE ADVISORY

18   GUIDELINES AND THEN CONSIDER ALL THE APPROPRIATE FACTUAL UNDER

19   18 UNITED STATES CODE SECTION 3553(A) AND THOSE FACTORS ARE

20   WELL-KNOWN AND I WILL ADDRESS THOSE.

21          FIRST OF ALL, I WANT TO ADDRESS THE NATURE AND

22   CIRCUMSTANCES OF THE OFFENSE.  THIS IS, AS THE DEFENDANT HAS

23   ADMITTED, THERE'S BEEN NO DISPUTE, VERY SERIOUS SET OF CRIMES,

24   AND WHAT STRIKES THE COURT HERE IS THAT UNLIKE MANY OF THE

25   WHITE COLLAR CRIMES THIS COURT SEES, DEALS WITH, WHERE THERE

1    ARE MAYBE A COUPLE OF BAD IMPULSES AND BAD ACTIONS, BAD

2    DECISIONS THAT RESULTED IN CRIMINAL CONDUCT, SOMETIMES ONLY

3    ONE, THAT THAT IS A SITUATION WHEREAS HERE WE HAVE MANY BAD

4    ACTS, MANY JUDGMENTS THIS DEFENDANT HAS MADE THROUGHOUT THE

5    COURSE OF THESE -- THIS CONSPIRACY AND THIS -- THESE

6    VIOLATIONS.

7            EVERY TIME HE DECIDED TO CAUSE SOMEBODY TO FORGE A

8    DOCUMENT THAT HE LIED TO PEOPLE THAT HE TOOK MONEY, EVERY

9    SINGLE ONE OF THESE WAS A BAD JUDGMENT AND A BAD ACT AND A BAD

10   IMPULSE.

11           AND AT GIVEN TIME THIS DEFENDANT HAD THE OPPORTUNITY

12   TO CORRECT THE WRONG THAT HE HAD STARTED BUT HE DIDN'T.  HE

13   MADE THESE JUDGMENTS AND HE STANDS BEFORE THE COURT TO TAKE

14   ACCOUNT FOR THOSE.

15           THIS WAS A, AS I HAVE FOUND, SOPHISTICATED SCHEME AND

16   THIS DEFENDANT USED FAMILY MEMBERS AND FRIENDS AND OTHERS TO

17   EFFECTUATE THE SCHEME.  SO HE INVOLVED OTHER PEOPLE WHO MAY OR

18   MAY NOT HAVE BEEN CULPABLE.  THEY CERTAINLY WERE PLACED IN

19   PERIL, IF THEY WERE NOT CULPABLE, BUT HE DID USE OTHER PEOPLE.

20           AND NOT ONLY ARE THERE MANY BAD ACTS AND BAD

21   JUDGMENTS, BUT MANY LIES THAT FAMILY MEMBERS -- TO INVESTORS

22   AND WRITTEN FORGERIES, THE WRITTEN MISSTATEMENTS,

23   REPRESENTATIONS WHO SIGNED A PARTICULAR DOCUMENT, SO THIS CASE

24   IS RIPE WITH LYING AT EVERY TURN.

25           AND THIS IS NOT A CASE WHERE WE HAVE -- WHICH IS KIND

1    OF CASE WHERE WE'VE SEEN A DEFENDANT IS -- TAKES THE MONEY AND

2    ALL GOOD INTENTIONS AND THEN AS IN BEST OF LAID PLANS THINGS

3    TURNED SOUR AND THEY HAVE TO KEEP PLOWING MONEY BACK INTO THE

4    COMPANY AND THEY SUFFERED GREATLY FOR THIS.

5             THIS IS A DEFENDANT WHO LIVED HIGH ON THE HOG WITH

6    OTHER PEOPLE'S MONEY.  SOMEBODY WHO USED GULF STREAM JETS,

7    YACHTS, FERRARIS, ROLEX WATCHES, AND THE -- YES, THE DEFENDANT

8    HAS TAKEN RESPONSIBILITY FINALLY, AND UNDER THE GUIDELINES

9    BARELY, BUT HE'S STILL HAS -- HE STILL -- THE THRUST OF

10   EVERYTHING THAT HE WAS SAYING, THE MOST OF WHAT HE WAS SAYING,

11   THERE ARE OTHER THINGS AND OTHER PEOPLE RESPONSIBLE FOR HIS

12   ACTIONS AND HE'S TOO SMART, TOO SOPHISTICATED TO WILLEY FOR THE

13   COURT TO BELIEVE ANY OF THAT.

14            I THINK, BASED UPON MY REVIEW OF THE ENTIRE RECORD

15   THAT THE TOTAL LOSS IN THIS CASE MAY NEVER BE CALCULATED DUE TO

16   THE SOPHISTICATION OF THE SCHEME.

17            I GIVE VERY LITTLE CREDIT TO WHAT THE GOVERNMENT HAS

18   DONE BECAUSE I DON'T THINK THEY HAVE ADEQUATELY, ACCURATELY,

19   AGGRESSIVELY PURSUED THE MONEY THIS MAN STOLE FROM THESE

20   PEOPLE.

21            AND I WANT TO MAKE AN ASIDE THERE WAS A STATEMENT IN

22   THE PAPERS THAT MR. DURLAND WAS GIVEN RELATIVELY LENIENT

23   SENTENCE, THEREFORE, MR. KNABB SHOULD GET THE SAME LEVEL OR

24   SOME CONSIDERATION, SO AS NOT TO HAVE A UNWARRANTED DISPARITY.

25            I DON'T THINK THAT THERE WILL BE UNWARRANTED DISPARITY

1    BECAUSE ALTHOUGH BOTH OF THESE PEOPLE CAME UP WITH THE SCHEME,

2    IT WAS MR. KNABB WHO DIRECTED DURLAND, WENT TO CREATE THE

3    PROMISSORY NOTES TO REPRESENT FALSE DEBTS AND DIRECTED DURLAND

4    TO SECURE PEGASUS SHARES FROM OLD MAMMOTH WITH FALSE PROMISSORY

5    NOTES, AND ALL THE OTHER ASPECTS OF THE SCHEME.

6            AND MR. DURLAND, I THINK, IT WAS $2.9 MILLION THAT HE

7    ADMITTED TO RECEIVING FOR THE SCHEME AND THE DEFENDANT

8    OBVIOUSLY RECEIVED FAR MORE.

9            SO I FOUND IN CONNECTION WITH MR. DURLAND'S ROLE THAT

10   HIS ROLE WAS -- COMPARED TO THIS DEFENDANT ROLE A MINOR ROLE,

11   THIS DEFENDANT WAS AN ORGANIZER.

12           I WANT TO TALK ABOUT A VERY, VERY SIGNIFICANT FACTOR

13   IN THE CASE WHICH IS VICTIMS.  NOW, ALTHOUGH THE GOVERNMENT,

14   PROBATION DEPARTMENT AND THE DEFENDANT HAVE URGED ON THIS COURT

15   FOR PURPOSE OF GUIDELINES THERE ARE NO VICTIMS, NONE THAT CAN

16   BE ACCOUNT AGAINST THE DEFENDANT.

17           BUT WHAT WE'RE TALKING ABOUT NOW IS THE 3553(A) AND

18   ONE OF THE FACTORS IT TALKS ABOUT IS DETERRENCE, THE EFFECT ON

19   SOCIETY, THE EFFECT ON VICTIMS.

20           I RECEIVED AND SUBMITTED TO COUNSEL AND PROBATION

21   OFFICER MANY LETTERS IN THIS CASE, NOT FROM ALL THE INVESTORS

22   OR VICTIMS, WHATEVER YOU WANT TO CALL THEM, I THINK THEY'RE

23   VICTIMS AND THE MISERY THIS DEFENDANT VISITED UPON THESE PEOPLE

24   IS UNSPEAKABLE.

25           YOU HAVE PEOPLE WHO ARE AT RETIREMENT AGE, NEAR

1    RETIREMENT AGE LOOSE THEIR ENTIRE INVESTMENT, LOST THEIR LIFE

2    SAVINGS, LOST THEIR INVESTMENT, AND THE ANGER AND THE SADNESS

3    AND THE TRAGEDY THAT WAS EVIDENCED BY EVERYONE OF THOSE LETTERS

4    THAT I READ, I READ LETTERS ON BOTH SIDES, ON THE DEFENDANT'S

5    BEHALF AND ON BEHALF OF THESE SO-CALLED INVESTORS, I WOULD CALL

6    THEM VICTIMS.

7            AND THESE VICTIMS LOST MONEY, SOME WOULD SAY INVESTING

8    IN THE STOCK MARKET IS LIKE GAMBLING, PROBABLY IS, BUT AT LEAST

9    YOU KNOW WHAT THE VARIABLES ARE, YOU'RE ON A LEVEL PLAYING

10   FIELD.

11           THIS DEFENDANT SLANTED THE PLAYING FIELD AND THESE

12   INVESTORS, THESE VICTIMS NEVER HAD A CHANCE, NEVER HAD A CHANCE

13   TO PLAY THE GAME THAT THEY PLAYED WITH KNOWING WHETHER THE

14   CARDS WERE MARKED OR WHETHER THEY WERE BEING LIED TO.

15           AND SO I BELIEVE AND I -- THAT THE NUMBER OF VICTIMS

16   AND THE INTENSITY OF THE FEELINGS OF THESE VICTIMS, IS A

17   RELEVANT FACTOR UNDER 3553(A), EVEN THOUGH IT'S NOT CAPTURED BY

18   THE GUIDELINES.  AND SOMETHING THAT COURT CAN PROPERLY

19   CONSIDER.

20           AND ALTHOUGH THE GUIDELINES ARE ONLY GUIDELINES, THE

21   COURT NOTES THAT WITH THE NUMBER OF VICTIMS WE HAVE HERE, THE

22   NUMBER OF KNOWN VICTIMS WE WOULD HAVE BEEN LOOKING AT A SIX

23   LEVEL INCREASE WHICH IS NOT APPLICABLE, BUT THE COURT CERTAINLY

24   CAN AND WILL TAKE THOSE VICTIM'S VIEWS AND THEIR EFFECT ON THEM

25   INTO ACCOUNT AS I RENDER A SENTENCE IN THIS CASE.

1    I WANT TO SAY A WORD FINALLY ABOUT WHAT WE HEARD

2    TESTIMONY ABOUT AND I ALLUDED TO THIS IN MY COLLOQUY WITH

3    MR. GOLDROSEN, I THINK THIS DEFENDANT HAS NOT BEEN CANDID WITH

4    PROBATION OFFICER.  I DON'T THINK HE'S BEEN CANDID WITH THE

5    LAWYERS EITHER.

6    I THINK HE'S GOT EXCELLENT LAWYERS WHO COURT HAS

7    GREATEST RESPECT FOR, BUT I THINK MR. DURLAND HAS CONTINUED,

8    EVEN WHEN WE'RE NOT DEALING WITH A LOT OF MONEY, EVEN WHEN

9    PERHAPS THE INFORMATION THAT HE'S PROVIDING MAY NOT HAVE BEEN

10   CONSEQUENTIAL, BUT THE INSTINCT IS ALWAYS TO HIDE, TO SNEAK, TO

11   CHEAT, TO MANIPULATE OTHERS AND I FIND THAT THE TOTALITY OF

12   CIRCUMSTANCES THAT MR. KNAPP HAS ENGAGED IN, EVEN THOUGH HE'S

13   TAKEN RESPONSIBILITY AS A GUIDELINES MATTER IS NOT WHAT I WOULD

14   EXPECT FROM A DEFENDANT IN A CASE LIKE THIS.

15   I WANT TO SAY A WORD ABOUT THESE CONVICTIONS, AND BY

16   THE WAY, THERE ARE ALSO IN ADDITION TO THE CONVICTIONS, THE

17   NUMEROUS CONVICTIONS, 30 SOME ODD INVOLVING NEGLIGENT OPERATION

18   OF VEHICLES AND VEHICLE VIOLATIONS, BAD CHECK CHARGES, THERE

19   ALSO ADDITIONAL ARRESTS GOING ALL THE WAY IN 2007, THOSE HAVE

20   BEEN DISMISSED, INCLUDING OBTAINING FALSE PROPERTY, PROPERTY BY

21   FALSE PRETENSES IN 1990, IT IS PERHAPS NOT SHOCKING TO ME THIS

22   DEFENDANT IS SOMEBODY WHO IS IN EFFECT A SCOFFLAW.

23   BUT UNUSUAL IN THESE WHITE COLLAR CASES THE DEFENDANT

24   USUALLY COMES HERE WITH ABSOLUTELY BLAMELESS RECORD, NEVER SEEN

25   THE INSIDE OF A POLICE CAR, BUT THIS DEFENDANT HAS EVIDENCED NO

RESPECT FOR THE LAW AND THE COURT, THE SENTENCE THE COURT WILL

IMPOSE IS A SENTENCE WHICH WILL, IN THE COURT'S VIEW,

CONSTITUTE A RESPECT FOR LAW.

WILL EVIDENCE THE DETERRENCE NECESSARY TO THOSE WHO

MIGHT CONSIDER PLAYING WITH THE SYSTEM IN A CRIMINAL WAY AND

MANIPULATING THE LIVES OF HAPLESS INVESTORS AND VICTIMS.

THE WORD HAS TO GO OUT AND QUITE FRANKLY GIVEN THIS

DEFENDANT'S ACTIONS DURING THE COURSE OF THE PRESENTENCE

INVESTIGATION I HAVE NO GREAT CONFIDENCE THAT GIVEN THE

OPPORTUNITY THIS DEFENDANT WILL DO IT AGAIN IF GIVEN THE

OPPORTUNITY.

HE MAY NEVER BE GIVEN THE OPPORTUNITY AGAIN, BUT THE

SENTENCE HAS TO MAKE THAT HAPPEN AND THAT WHAT IS GOING TO

HAPPEN IN THIS CASE.

I WILL SAY IN CLOSING MY REMARKS THAT THIS IS A --

SENTENCING IS THE HARDEST THING A COURT DOES BECAUSE YOU'RE

MAKING A JUDGMENT ABOUT ANOTHER HUMAN BEING WHICH IS GOING TO

HAVE AN IMPACT ON THE LIVE OR IMPACTS ON THE LIVE OF THEIR

FAMILY AND FRIENDS AND THE COURT TAKES NO PLEASURE IN DOING

THIS.

BUT UNFORTUNATELY WE HAVE LAWS AND THE LAWS ARE SET

FORTH AND THEY GIVE THE COURT A LOT OF GUIDANCE ABOUT WHAT THE

APPROPRIATE THING TO DO IN THIS CASE.  AND SO WITH ALL THAT

SAID THE SENTENCE OF THE COURT IS AS FOLLOWS:

PURSUANT TO THE SENTENCING REFORM ACT OF 1984, IT'S

1    THE JUDGMENT OF THE COURT THAT JASPER KNABB HEREBY COMMITTED TO

2    THE CUSTODY OF THE BUREAU OF PRISON TO BE IMPRISONED FOR A TERM

3    OF 253 MONTHS.

4         THE TERM CONSISTS 253 MONTHS ON EACH OF COUNTS 1 AND 2

5    AND 253 MONTHS ON COUNT -- 240 MONTHS ON COUNT 3, ALL SUCH

6    TERMS TO RUN CONCURRENTLY.

7         THE COURT RECOMMENDS THE DEFENDANT PARTICIPATE IN A

8    BUREAU OF PRISON RESIDENTIAL DRUG ABUSE TREATMENT PROGRAM.

9         UPON RELEASE FROM IMPRISONMENT THE DEFENDANT BE PLACED

10   ON SUPERVISED RELEASE FOR A TERM OF FIVE YEARS.  THIS TERM

11   CONSISTS OF FIVE -- THIS TERM CONSISTS OF TERMS OF FIVE YEARS

12   ON EACH COUNTS ONE, TWO, AND THREE YEARS, THREE YEARS ON COUNT

13   3, ALL SUCH TERMS TO RUN CONCURRENTLY.

14        WITHIN 72 HOURS OF RELEASE FROM THE CUSTODY OF THE

15   BUREAU OF PRISONS THE DEFENDANT SHALL REPORT IN PERSON TO THE

16   PROBATION OFFICE IN THE DISTRICT TO WHICH THE DEFENDANT IS

17   RELEASED.

18        WHILE ON SUPERVISED RELEASE THE DEFENDANT SHALL NOT

19   COMMIT ANOTHER FEDERAL, STATE OR LOCAL CRIME.  SHALL COMPLY

20   WITH THE STANDARD CONDITIONS THAT HAVE BEEN ADOPTED BY THIS

21   COURT, SHALL REFRAIN FROM MY UNLAWFUL USE OF A CONTROLLED

22   SUBSTANCE AND SUBMIT TO A DRUG TEST WITHIN 15 DAYS OF RELEASE

23   ON SUPERVISED RELEASE AND TWO PERIODIC DRUG TESTS THEREAFTER,

24   AND SHALL COMPLY WITH THE FOLLOWING ADDITIONAL CONDITIONS.

25        ONE, THE DEFENDANT SHALL PAY ANY SPECIAL ASSESSMENT

THAT IS IMPOSED BY THIS JUDGMENT AND THAT REMAINS UNPAID AT THE

COMMENCEMENT OF THE TERM OF SUPERVISED RELEASE.

TWO, THE DEFENDANT SHALL PROVIDE THE PROBATION OFFICER

WITH ACCESS TO ANY FINANCIAL INFORMATION, INCLUDING TAX RETURNS

AND SHALL AUTHORIZE THE PROBATION OFFICER TO CONDUCT CREDIT

CHECKS AND OBTAIN COPIES OF INCOME TAX RETURNS.

THREE, THE DEFENDANT SHALL NOT OPEN ANY NEW LINES OF

CREDIT OR INCUR NEW DEBT WITHOUT THE PRIOR PERMISSION OF THE

PROBATION OFFICER.

FOUR, THE DEFENDANT SHALL NOT MAINTAIN POSITION OF

FINANCIAL CAPACITY WITHOUT THE PRIOR PERMISSION OF THE

PROBATION OFFICER.

FIVE, THE DEFENDANT SHALL PARTICIPATE IN A PROGRAM OF

TESTING AND TREATMENT FOR DRUG ABUSE AS DIRECTED BY THE

PROBATION OFFICER AND UNTIL SUCH TIME AS THE DEFENDANT RELEASED

FROM TREATMENT BY THE PROBATION OFFICER.

THE DEFENDANT IS TO PAY PART OR ALL THE COST OF THIS

TREATMENT AT AN AMOUNT NOT TO EXCEED THE COST OF TREATMENT AS

DEEMED APPROPRIATE BY THE PROBATION OFFICER.

PAYMENT SHALL NEVER EXCEED THE TOTAL COST URINALYSIS,

COUNSELING, THE ACTUAL CO-PAYMENT SCHEDULE SHALL BE DETERMINED

BY THE PROBATION OFFICER.

SIX, THE DEFENDANT SHALL PARTICIPATE IN A MENTAL

HEALTH TREATMENT PROGRAM AS DIRECTED BY THE PROBATION OFFICER.

THE DEFENDANT IS TO PAY PART OR ALL THE COST OF THIS TREATMENT

1   AT AN AMOUNT NOT TO EXCEED THE COST OF TREATMENT AS DEEMED

2   APPROPRIATE BY THE PROBATION OFFICER.

3           THE PAYMENT SHALL NEVER EXCEED THE TOTAL COST OF

4   MENTAL HEALTH COUNSELING.  THE ACTUAL CO-PAYMENT SCHEDULE SHALL

5   BE DETERMINED BY THE PROBATION OFFICER.

6           SEVEN, THE DEFENDANT SHALL SUBMIT HIS PERSON,

7   RESIDENCE, OFFICE, VEHICLE OR ANY PROPERTY UNDER HIS CONTROL TO

8   A SEARCH, SUCH A SEARCH SHALL BE CONDUCTED BY UNITED STATES

9   PROBATION OFFICER AT A REASONABLE TIME, IN A REASONABLE MANNER,

10  BASED UPON REASONABLE SUSPICION OF CONTRABAND OR EVIDENCE OF A

11  VIOLATION OF A CONDITION OF RELEASE.

12          FAILURE TO SUBMIT TO SUCH A SEARCH MAYBE GROUND FOR

13  REVOCATION.  THE DEFENDANT SHALL WARN ANY RESIDENTS THE

14  PREMISES MAYBE SUBJECT TO SEARCHES.

15          EIGHT, THE DEFENDANT SHALL NOT ENGAGE IN ANY FORM OF

16  GAMBLING, NOT FREQUENT ANY ESTABLISHMENT WHERE GAMBLING IS

17  CONDUCTED AS DIRECTED BY THE PROBATION OFFICER.

18          NINE, THE DEFENDANT SHALL NOT HAVE ANY CONTACT WITH

19  ANY CO-DEFENDANT IN THIS CASE, NAMELY STEVEN DURLAND,

20  D-U-R-L-A-N-D.

21          10, THE DEFENDANT SHALL NOT OWN OR POSSESS ANY

22  FIREARMS, AMMUNITION, DESTRUCTIVE DEVICES OR OTHER DANGEROUS

23  WEAPONS.

24          11, THE DEFENDANT SHALL COOPERATE IN THE COLLECTION OF

25  DNA AS DIRECTED BY THE PROBATION OFFICER.

```
1            12, THE DEFENDANT SHALL PAY AND BE IN ACCORDANCE WITH

2    THE JUDGMENT AND SECURITY EXCHANGE COMMISSION VERSUS PEGASUS

3    WIRELESS CORPORATION DOCKET NUMBER C-09-02302 JSW, UNITED

4    STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA, IN THE

5    AMOUNT OF $40,847,800.79 AND PROVIDE PROOF OF SUCH TO THE

6    PROBATION OFFICER.

7            IT'S FURTHER ORDERED THE DEFENDANT SHALL PAY THE

8    UNITED STATES A SPECIAL ASSESSMENT OF $300 WHICH SHALL BE DUE

9    IMMEDIATELY.

10           IF INCARCERATED PAYMENT OF CRIMINAL MONETARY PENALTIES

11   ARE DUE DURING IMPRISONMENT AT A RATE NOT LESS THAN $25 PER

12   QUARTER AND PAYMENT SHALL BE THROUGH THE BUREAU PRISONS INMATE

13   FINANCIAL RESPONSIBILITY PROGRAM.

14           CRIMINAL MONETARY PAYMENT SHALL BE MADE TO THE CLERK

15   U.S. DISTRICT COURT, 450 GOLDEN GATE AVENUE, BOX 36060, SAN

16   FRANCISCO, CALIFORNIA 94102.

17           THE COURT FINDS THE DEFENDANT DOES NOT HAVE THE

18   ABILITY TOE PAY A FINE AND ORDERS THE IMPOSITION OF ANY FINE

19   WAIVED.

20           THE RECORD WILL REFLECT THIS SENTENCE WILL CONSTITUTE

21   AN UPWARD VARIANCE FROM THE GUIDELINES IN THE COURT'S

22   DISCRETION UNDER 18 UNITED STATES CODE SECTION 3553(A)

23           MR. SCHMIDT, ARE THERE ANY COUNTS BEING DISMISSED

24   PURSUANT TO THE PLEA AGREEMENT?

25           **MR. SCHMIDT:**  NO, YOUR HONOR.
```

1          **THE COURT:**  WHAT'S THE GOVERNMENT'S POSITION WITH

2     RESPECT TO SELF-REPORTING?

3          **MR. SCHMIDT:**  CAN I HAVE A MINUTE, YOUR HONOR.

4          **THE COURT:**  YES.

5          **MR. SCHMIDT:**  YOUR HONOR, GIVEN THE SENTENCE THE COURT

6     HAS IMPOSED AND GIVE THE SOME OF ISSUES DISCUSSED, THE THINK

7     WE'D ADVOCATE IMMEDIATE SURRENDER.

8          **MR. GOLDROSEN:**  WE WOULD ASK THAT THE COURT ALLOW

9     MR. KNABB TO VOLUNTARILY SURRENDER.  HE'S ALREADY GIVEN UP HIS

10    PASSPORT.  HE'S BEEN AT EACH AND EVERY COURT APPEARANCES.  HE'S

11    COMPLIED WITH ALL THE CONDITIONS PRETRIAL RELEASE.  HE LIKE TO

12    GIVEN THE COURT'S LENGTHY SENTENCE HE WOULD LIKE TO SPEND A

13    LITTLE MORE TIME WITH HIS WIFE AND CHILD BEFORE HE GOES INTO DO

14    20 PLUS YEARS WHERE HE WILL NOT HAVE ANY PERSON TO PERSON

15    CONTACT FOR A SUBSTANTIAL MOUNTAIN A TIME.

16         **THE COURT:**  ALL RIGHT.  THE COURT FINDS BASED UPON THE

17    EVIDENCE THAT'S BEFORE THE COURT, INCLUDING THE UNACCOUNTED FOR

18    $11 MILLION AND THIS DEFENDANT, THE FACT THIS DEFENDANT HAS A

19    PILOT'S LICENSE, THIS DEFENDANT KNOWS HOW TO OBTAIN JETS,

20    FERRARIS AND OTHER MODES OF TRANSPORTATION, THE DEFENDANT

21    CONSTITUTES A FLIGHT RISK, THEREFORE, THE DEFENDANT WILL NOT BE

22    RELEASED PENDING TO SELF-REPORT.

23         HE'S RULED AT THIS TIME TO BE IN THE CUSTODY OF THE

24    UNITED STATES MARSHAL.

25         MR. MARSHAL, PLEASE TAKE THE DEFENDANT INTO CUSTODY.

1          **MR. GOLDROSEN:**  WOULD THE COURT RECOMMEND TO BUREAU OF

2    PRISON HE BE PLACED IN THE PRISON IN THE PACIFIC NORTHWEST, SO

3    HE THAT HE CAN BE NEAR HIS WIFE AND CHILD.

4          **THE COURT:**  WILL SO RECOMMEND.

5          **MR. GOLDROSEN:**  THANK YOU.

6          **THE COURT:**  THANK YOU VERY MUCH.

7                    (PROCEEDINGS ADJOURNED.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 19TH DAY OF JULY, 2002

/S/  JAMES YEOMANS

_____

JAMES YEOMANS, CSR, RPR